**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 1:23-cv-00734-GPG-SKC**

SAI NAVEEN LINGAM and WARREN G.
GREGORY, Individually and on Behalf of
All Others Similarly Situated

        Plaintiff(s),

v.                                 JURY TRIAL DEMANDED

DISH NETWORK CORPORATION,
W. ERIK CARLSON, PAUL W. ORBAN,
CHARLES W. ERGEN, JAMES S. ALLEN,
MARC ROUANNE, STEPHEN BYE,
DAVE MAYO, and JOHN SWIERINGA.

        Defendants.

---

**FIRST AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

---

**TABLE OF CONTENTS**

I.   NATURE OF THE ACTION ................................................................................. 1

II.  JURISDICTION AND VENUE .......................................................................... 5

III. PARTIES .............................................................................................................. 6

  A.   Plaintiffs ......................................................................................................... 6

  B.   Defendants ...................................................................................................... 6

  C.   Relevant Non-Parties ................................................................................... 10

IV.  SUBSTANTIVE ALLEGATIONS .................................................................. 10

  A.   DISH Historically Provided Pay-TV Services ............................................ 10

  B.   In the Face of Steadily Declining Pay-TV Sales, DISH Pivots to Become a 5G
       Wireless Service Provider ............................................................................ 11

    1.   DISH Executives Set Out to Build a 5G Wireless Network Based on Brand
         New and Unproven Technologies ............................................................... 11

    2.   Because the Retail Wireless Market Is Already Saturated and Dominated by Large,
         National Providers, Defendants Design DISH's Wireless Network Primarily for
         Wholesale and Enterprise Use ................................................................... 14

    3.   The Individual Defendants Closely Managed Every Aspect of the 5G Network
         Design, Development, and Deployment ...................................................... 16

  C.   DISH Acquires Boost Mobile to Jumpstart Wireless Sales, Which Subjects the
       Company to Huge FCC Penalties if DISH Does Not Meet Milestone Construction
       Deadlines ...................................................................................................... 18

  D.   DISH Lacks Sufficient Capital to Complete the 5G Network, Yet Falsely Tells
       Investors the Company Has "Everything that We Need to Build the 5G Network"
       in Terms of Capital and Cashflow ............................................................... 20

    1.   DISH Covertly Seeks Additional Capital to Complete the 5G Network ...... 21

    2.   DISH Engages in Undisclosed Cost-Cutting Measures That Negatively Impacted
         the Commercial Viability of DISH's Wireless Network ............................. 21

  E.   To Meet the FCC June 2022 Milestone While Conserving Cash, DISH Builds
       the 5G Network's Physical Infrastructure Before Developing the Necessary
       Software, Onboarding Critical Vendors or Achieving Integration of the
       Network's Myriad Components, and Without Regard for Network
       Functionality or Commercial Viability ....................................................... 25

F.    Starting in Early 2021, DISH Experiences Critical Issues Integrating Its Network, But Conceals These Problems from Investors ............................................................. 28

G.    Due to DISH's Inability to Build a Functioning 5G Network and Its Decision to Pause Enterprise Product Development and Voice Functionality, Defendants Are Unable to Attract Enterprise Customers ........................................................ 31

1.    DISH's Failure to Fund Enterprise Product Development During the Class Period Resulted in No Demand from Enterprise Customers ...................................................... 32

2.    DISH Pauses the Development and Launch of Voice Functionality to Focus on Meeting the FCC Population Coverage Requirements, Prohibiting DISH From Achieving Enterprise or Retail Revenues from Its 5G Wireless Network .................. 34

V.    DEFENDANTS MADE OR FAILED TO CORRECT MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD ..................................... 37

A.    2020 Annual Report on Form 10-K ............................................................................. 37

B.    February 22, 2021 Earnings Call ................................................................................. 39

C.    April 29, 2021 First Quarter 2021 Form 10-Q ............................................................ 47

D.    April 29, 2021 Earnings Call ....................................................................................... 49

E.    August 9, 2021 Second Quarter Form 10-Q ............................................................... 56

F.    August 9, 2021 Earnings Call ...................................................................................... 58

G.    November 4, 2021 Third Quarter Form 10-Q ............................................................. 64

H.    November 4, 2021 Earnings Call ................................................................................. 65

I.    February 24, 2022 Annual Report on Form 10-K ....................................................... 72

J.    February 24, 2022 Earnings Call ................................................................................. 73

K.    May 6, 2022 First Quarter Earnings Call .................................................................... 78

L.    May 10, 2022 DISH Analyst Day 2022 Presentation ................................................. 81

M.    November 2, 2022 Earnings Call ................................................................................. 83

VI.    DEFENDANTS REVEALED THE TRUTH IN A SERIES OF PARTIALLY CORRECTIVE DISCLOSURES ........................................................................................ 85

A.    On November 4, 2021, DISH Reveals that Its Novel Wireless Network Has Been Experiencing Undisclosed Integration Problems and Is Not Ready for Commercialization ....................................................................................................... 85

B.    On May 6, 2022, DISH Discloses Enterprise Sales Are Non-Existent and that it Needs to Raise Capital to Complete its 5G Network ........................................................... 87

C.    On May 10, 2022, DISH Further Reveals That Its Enterprise Business Opportunity Is Still Highly Uncertain and That It Lacked Significant Capital Which Could Impact Network Development ........................................................................................ 90

D.    On February 23, 2023, DISH Reveals that it Had Been Unable to Scale or Commercialize its 5G Network and, Thus Still Had No Enterprise or Wholesale Customers .............................................................................................................. 92

VII. POST-CLASS PERIOD EVENTS ........................................................................... 97

VIII. ADDITIONAL SCIENTER ALLEGATIONS ......................................................... 99

A.    Defendants' Admissions That They Abandoned Any Efforts to Build a Functioning 5G Network to, Instead, Focus on Meeting the FCC Milestones Create a Strong Inference of Scienter ......................................................................... 99

B.    Defendants Admitted That the Platforms and Software Necessary to Integrate the Network Were Not Ready During the Class Period and That They Knew from the Outset That Certain Vendors Lacked the Requisite R&D Capacity ........................... 101

C.    Defendants Attended Regular Meetings Discussing the Progress of the 5G Network Design, Deployment, and Integration and Conducted Monthly Visits to the Las Vegas Site to Observe Progress on the 5G Network ..................................................... 102

D.    Defendants Actively Tracked Relevant Metrics in Their Internal Communications System .................................................................................................................... 103

E.    Defendant Ergen Closely Controlled All Aspects of the 5G Network Deployment and Regularly Visited the Physical Buildout Sites ................................. 104

F.    Defendants' Actions from the Start of the 5G Build Demonstrate They Knew Dish Did not Have Sufficient Capital to Build the 5G Network ................................. 105

    1.    Defendants Continually Reiterated a Baseless, $10 Billion Cost Estimate for the 5G Network Throughout the Class Period to Assure the Public that DISH Had the Means Necessary to Construct a Network ................................................................................ 105

    2.    DISH's Plans for Constructing a 5G Network Always Included Raising Additional Capital to Complete the Network ................................................................................ 105

    3.    Defendants Engaged in Cost-Cutting Efforts at DISH Wireless to the Detriment of the Network and Enterprise Product Development, to Conserve Needed Cash to Meet the FCC 20% Milestone ......................................................... 106

G.    The 5G Network Deployment Was DISH's Core Operation Throughout the Class Period, and Gaining Enterprise Customers Was the Core Component of Monetizing the 5G Network ......................................................................................... 107

H.      Defendants Provided Detailed Responses to Analyst Questions on Earnings Calls, Evidencing and Publicly Representing Themselves as Having Significant Knowledge of the Facts Underlying the Fraud ................................................ 110

I.      Defendants Had Motive to Misrepresent DISH's Wireless Network Progress to Meet the FCC Milestone Deadlines ............................................................. 113

IX.    LOSS CAUSATION ...................................................................................... 114

A.      On November 4, 2021 DISH Discloses Network Integration Problems ..................... 115

B.      On May 6, 2022, DISH Discloses Enterprise Sales are Non-Existent and that it Needs to Raise Capital to Complete its 5G Network ................................................ 116

C.      On May 10, 2022, DISH Further Reveals the Enterprise Opportunity Was Far More Uncertain Than Previously Disclosed and the Extent of the Capital Raise Necessary to Build the 5G Network .......................................................... 120

D.      On February 23, 2023, DISH Discloses that it Had Been Unable to Scale or Commercialize its 5G Network and, Thus Still Had No Enterprise or Wholesale Customers ............................................................................... 122

X.      CLASS ALLEGATIONS ............................................................................... 124

XI.    PRESUMPTION OF RELIANCE ................................................................... 125

XII.   NO STATUTORY SAFE HARBOR ................................................................ 127

XIII.  CLAIMS FOR RELIEF ................................................................................ 128

COUNT I ............................................................................................................. 128

COUNT II ............................................................................................................ 131

PRAYER FOR RELIEF ........................................................................................ 133

DEMAND FOR JURY TRIAL .............................................................................. 133

1.      Lead Plaintiff Sai Naveen Lingam ("Lead Plaintiff") and Additional Plaintiff Warren W. Gregory (collectively, "Plaintiffs"), bring this class action pursuant Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of themselves and all persons and entities similarly situated, other than Defendants (defined below), who purchased or otherwise acquired DISH Network Corporation ("DISH" or "Company") Class A common stock between February 22, 2021 and February 27, 2023, inclusive (the "Class Period").

2.      Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding DISH; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews with individuals who are former employees of DISH; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning DISH and the industry in which the Company operates; and (v) pertinent court filings.

## I.      NATURE OF THE ACTION

3.      This is a class action arising out of Defendants' fraudulent scheme to conceal crippling issues concerning the integration and capabilities of DISH's novel 5G network buildout that prevented DISH from scaling and commercializing its network to obtain viable enterprise customers.

4.      For decades, DISH operated a highly profitable business, providing television programming via satellite broadcast. But the years of smooth-sailing came to an end as the TV industry began to evolve from linear broadcast formats to on-demand programming delivered via the internet. Recognizing that DISH-branded Pay-TV service was doomed, DISH executives embarked on an initiative to construct a novel, nationwide 5G wireless network that was intended to become DISH's new core line of business to service mainly enterprise customers because the retail wireless market was already saturated and dominated by three national juggernauts— Verizon, T-Mobile, and AT&T.

5.      DISH's efforts to construct a 5G network began in earnest in 2019, after DISH committed to the FCC that it would build a nationwide 5G network covering 20% of the U.S. population by June 2022 and 70% by June 2023. If DISH failed to meet the FCC deadlines, it would be subject to $2.2 billion dollars in cash penalties and forfeiture of billions more in spectrum licenses. However, the agreement with the FCC did not require that DISH demonstrate that the 5G network was functional until June 2023.

6.      Former DISH employees confirmed that Dish was, thus, singularly focused on reaching the 20% deadline without regard to network functionality or the ability to commercialize the network, instructing employees to build the physical infrastructure of the network and hoping they could figure out how to integrate the network and develop functionality required by enterprise customers, later.

7.      Indeed, instead of engaging an experienced wireless network manufacturer that could build a functioning 5G wireless network based on proven designs and industry standards, DISH chose to design a novel, "Open-RAN" network which, while purporting to offer increased

scalability and interoperability, was based on brand new and unproven technologies. Constructing an Open-RAN network was theoretically cheaper, both in initial construction and in maintenance costs, because it would enable the network operator to select the most competitively priced vendors rather than relying upon just one manufacturer. But it was extremely risky because Open-RAN technology was new and unproven at this scale. Further, even with the cost savings DISH expected from designing its own cloud-native, Open-RAN 5G network, DISH did not have the capital it needed to complete its nationwide network.

8.      Up against a looming FCC deadline, throughout the Class Period, Defendants abandoned any meaningful attempt to construct a reliable and functioning 5G network to focus solely on meeting the June 2022 FCC deadline and avoid massive financial penalties. For example, DISH contracted with software vendors who were the lowest bidders, even though those vendors had not demonstrated they could develop critical software components and integrate an Open-RAN network. Defendants began construction of the physical cell towers and infrastructure before DISH had even developed critical software or had done the proper validation testing to ensure the 5G network would work. It did not.

9.      According to former DISH employees, DISH began experiencing undisclosed integration issues in the first quarter of 2021, which Defendants admitted in November 2021 had been occurring throughout 2021 and prevented DISH from launching its first planned 5G network launch in Las Vegas until May 2022. Even then, the network did not have the necessary capabilities to be useable by most customers and could not be scaled to a nationwide network for enterprise customer use.

10.    Defendants also consciously decided to put enterprise customer product development on hold, slashing the budget to below $10,000, and delayed development of Voice over New Radio, or "VoNR," the technology that allows voice communication over 5G. As Defendant Ergen admitted in February 2023, VoNR is a required component of the network to scale and commercialize a functioning nationwide network and DISH did not start working to include VoNR on the network until 2023.

11.    Despite Dish's network integration issues and decision to stop working on building a functional network or enterprise products, Defendants falsely assured investors throughout the Class Period that Dish had "completed a successful field validation," "tested a lot of vendors" and had "brought radios, computer software together" (e.g., integration) so that DISH was "just deploying [the network] now" and DISH would have "service for this market to begin by the end of the third quarter of 2021." Defendants also claimed, DISH had "terrific demand" for enterprise customers and was purportedly "working with customers" on "a private networks that are not limited by geography of our national footprint." None of this was true.

12.    As Defendants would ultimately reveal through a series of partially corrective disclosures, DISH did not have a fully integrated and functional network, as previously represented. Rather, due to DISH's early decisions to essentially abandon efforts to build a reliable and functioning network that could be scaled and commercialized so that enterprise (or any) customers could use it, DISH experienced years' worth of delays due to, *inter alia*, extensive network integration issues, the need to replace vendors incapable of integrating DISH's network and to belatedly develop products and functionality such as VoNR, needed to scale and commercialize the network.

13.    Upon these disclosures, the price of DISH's common stock plunged from $32.18 at the start of the Class Period to $11.41 per share on February 28, 2023, for an aggregate drop of $20.77 or **64.5%**.

14.    Defendants are culpable for the fraud knowingly perpetrated on the market and Plaintiffs bring this action to hold them responsible for the resulting harm to investors resulting from their purchases of DISH's stock at artificially inflated prices.

## II.    JURISDICTION AND VENUE

15.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. 21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.

16.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. DISH is headquartered in this District, with DISH's principal place of business located at 9601 South Meridian Boulevard, Englewood, Colorado, 80112.

III.    **PARTIES**

    **A. Plaintiffs**

18.    Lead Plaintiff Sai Naveen Lingam purchased DISH Class A common stock during the Class Period, as set forth in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF 5-2) which Lead Plaintiff incorporates by reference herein, at prices artificially inflated by Defendants' materially false and misleading public statements and omissions and was damaged thereby.

19.    Additional Plaintiff Warren W. Gregory purchased DISH Class A common stock during the Class Period, as set forth in the Certification of Warren W. Gregory Pursuant to Federal Securities Laws, attached hereto, at prices artificially inflated by Defendants' materially false and misleading public statements and omissions and was damaged thereby.

    **B. Defendants**

20.    Defendant DISH is a public corporation, organized and existing under the laws of the State of Nevada with its principal place of business and principal executive offices located in Englewood, Colorado. The Company's Class A common stock is traded on the Nasdaq Global Select Market ("NASDAQ"), a national exchange, under the ticker symbol "DISH."

21.    Defendant Charlie Ergen co-founded DISH, formerly EchoStar Communications Corporation, in 1980 and, at all relevant times hereto, has served as the Chairman of the Board of Directors for both DISH and EchoStar. Ergen oversees DISH's long-term business development and strategy and the Company's wireless division ("DISH Wireless").

22.     Defendant W. Erik Carlson, a near thirty-year veteran of DISH, has served as DISH's President and Chief Executive Officer at all relevant times hereto and has been employed by DISH since 1995 in a variety of roles.

23.     Defendant Paul W. Orban was, at all relevant times hereto, DISH's Executive Vice President, Chief Financial Officer. Defendant Orban signed DISH's SEC filings containing materially false and misleading statements, as discussed below, during the Class Period.

24.     Defendant James S. Allen was, at all relevant times hereto, DISH's Senior Vice President and Chief Accounting Officer. Defendant Allen signed DISH's SEC filings containing materially false and misleading statements, as discussed below, during the Class Period.

25.     Defendant John Swieringa was employed at DISH at all relevant times, was Group President of Retail Wireless at DISH from June 2020 through January 2022 and was appointed as President and Chief Operating Officer of DISH Wireless on January 5, 2022, responsible for all operational aspects of DISH's wireless business including the deployment and management of DISH's virtualized, O-RAN 5G broadband network, its retail wireless business, and its day-to-day activities. Swieringa has served in a variety of roles at DISH since joining the Company in 2007. Defendant Swieringa participated in the Company's earnings calls and analyst conferences throughout the Class Period and is responsible for false statements alleged herein.

26.     Defendant Dave Mayo has served as Executive Vice President of Network Development at DISH since June 2020 and is responsible for DISH's wireless buildout strategy and the deployment of its 5G network. Defendant Mayo participated in the Company's earnings calls and analyst conferences throughout the Class Period and is responsible for false statements alleged herein.

27.     Defendant Marc Rouanne has served as Executive Vice President and Chief Network Officer of DISH's wireless business since December 2019 and is responsible for DISH's 5G network architecture and strategy, radio frequency network and strategy, and 5G device and interoperability testing. Defendant Rouanne participated in the Company's earnings calls and analyst conferences throughout the Class Period and is responsible for false statements alleged herein.

28.     Defendant Stephen Bye served as Chief Commercial Officer and Executive Vice President at DISH from December 2019 through January 2023 and was responsible for efforts to monetize DISH's 5G network, including through enterprise opportunities. Defendant Bye has served as a member of DISH's Board of Directors since January 18, 2023.  Defendant Bye participated in the Company's earnings calls and analyst conferences throughout the Class Period and is responsible for false statements alleged herein.

29.     Defendants Ergen, Orban, Allen, Carlson, Swieringa, Mayo, Rouanne, and Bye are collectively referred to herein as the "Individual Defendants."

30.     The Company and the Individual Defendants are collectively referred to herein as "Defendants."

31.     The Individual Defendants, by virtue of their high-level positions at DISH, directly participated in the management of DISH and were directly involved in the day-to-day operations of DISH at the highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

32.     As senior executives at a publicly held company with securities registered with the SEC and traded on the NASDAQ, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of DISH's publicly traded securities would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

33.     As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the public statements issued by the Company during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the materially false and misleading public statements detailed in this complaint.

34.     As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about the Company's business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that the positive representations made by Defendants about the Company were materially false and misleading and material facts omitted from positive representations made by Defendants about the Company rendered those representations materially false and misleading, as detailed herein.

**C. Relevant Non-Parties**

35.    CW1 was employed at DISH Wireless from 2020 through the end of the Class Period in DISH's Retail Wireless Operations segment. CW1 was responsible for activities such as relationships with DISH Wireless' indirect dealers, marketing and promotion. CW1 reported through an Executive VP of Retail Wireless who reported directly to John Swieringa, President and COO of DISH Wireless.

36.    CW2 was employed at DISH in the Wireless division prior to January 2021 and continuing at least through October 2022. CW2 was responsible for planning and developing products to be offered to enterprise customers and reported to multiple individuals at different times that reported to Defendant Bye.

**IV.    SUBSTANTIVE ALLEGATIONS**

**A. DISH Historically Provided Pay-TV Services**

37.    DISH was founded by Defendant Ergen in 1980 as EchoStar, a distributor of C-band TV systems. Since 1996, DISH has used direct broadcast satellite and fixed satellite service spectrum to provide DISH-branded Pay-TV programming packages to its customers.

38.    In 2008, DISH spun off from EchoStar to allow DISH to focus on growing its Pay-TV service business while EchoStar focused on the satellite and technology business.

39.    For decades, DISH operated as a low-cost provider in the Pay-TV industry with a focus on service, value, and technology. DISH offered programming packages that included programming from national and local broadcast networks, premium movie channels, regional and specialty sports channels, and international programming.

40.      Innovations in the Pay-TV industry, like streaming services and other over-the-top internet transmission services (also known as streaming platforms), put pressure on DISH's revenues, margins, and subscribership, forcing DISH to begin offering internet-based TV services. Nonetheless, DISH's Pay-TV subscribership continued to decline steadily, falling from 13.9 million subscribers in 2015 to just 12.0 million by the end of 2019. During that same period, DISH's annual revenues fell from $15.5 billion to $12.8 billion.

41.      As a result of increased competition in the Pay-TV industry from new streaming services and the concomitant decline in DISH's revenues, DISH made the strategic decision to pivot into a new line of business and become a wireless service provider. In a February 19, 2020 earnings call (the "February 2020 Call"), Defendant Ergen explained that DISH's pivot to enter the wireless service industry was "…to put ourselves in a position that has linear TV declines. We [have] another engine to grow the business[.]"

**B.  In the Face of Steadily Declining Pay-TV Sales, DISH Pivots to Become a 5G Wireless Service Provider**

**1.  DISH Executives Set Out to Build a 5G Wireless Network Based on Brand New and Unproven Technologies**

42.      In 2019, after years of declining revenues, DISH set out to build an entirely novel wireless network based on unproven technologies. In a July 26, 2019 letter to the FCC, DISH described the planned network as "a ***first-of-its-kind*** 5G network ***built from the ground up***." Defendant Ergen described it in a February 22, 2021 earnings call (the "February 2021 Call"), stating that "at the end of the day, we're going to have this really, really special 5G cloud native, Open-RAN virtualized network ***that really doesn't exist in the world today***."

43.    Wireless service providers typically rely upon a single Original Equipment Manufacturer ("OEM"), like Ericsson or Nokia, to provide all the hardware and software necessary to build and integrate a Radio Access Network ("RAN"). These components include hardware and software pre-designed to work together seamlessly and to complete integration of the network.

44.    DISH did not follow this industry standard business model—opting for a potentially less costly, yet far riskier strategy. Rather than rely upon well-established and proven OEMs for the network design, hardware and software components, and integration of the network, DISH decided to use recently developed and unproven "Open-RAN" standards. Open-RAN or Open Radio Access Network refers to a network that does not require each of the components to be manufactured by a single OEM. In the more traditional construction of wireless networks, one OEM's proprietary components cannot be substituted for another OEM's components. In contrast, any component that complies with Open-RAN standards should be compatible with and capable of being integrated into an Open-RAN compliant wireless network.

45.    Figure 1, below, is a slide that DISH created illustrating how an Open-RAN network might integrate components from many different vendors into a single wireless network. In this illustration, the Open-RAN network would utilize antennas designed and manufactured by JMA or CommScope, radios units from Fujitsu or Samsung, distributed units ("DUs") from Dell or Cisco running software from VMware, fiber optics from Verizon or Comcast, local data centers running software from Mavenir, cloud services from Amazon Web Services, regional data center services from Nokia, and national data center services from Oracle, all integrated into a functional Open-RAN wireless network.

**Figure 1**



46.     In theory, embracing Open-RAN technologies would allow DISH to use hardware from any manufacturer that complied with certain standards. A primary benefit of building an Open-RAN network was that it was expected to greatly reduce initial construction and maintenance costs and would not lock DISH into relying upon any single OEM to supply the components needed to construct and integrate its wireless network. But in practice, DISH would be required to integrate the physical infrastructure of the network, consisting of antennas, radios, DUs, fiber optics, datacenters, and other necessary hardware with an amalgamation of software systems, stitched together by DISH and its vendors, a task that had never been achieved before. As Defendants explained, DISH was trying to build a completely new style of network because in the O-RAN world, everything was brand new and nobody else had done this before.

47.     Complicating the construction of the network even more, DISH executives and engineers planned DISH's wireless network to be "cloud native" and "virtualized" – meaning that rather than relying upon hardware components specifically engineered for the task, most network operations would be executed by software running in the cloud. In the February 2020 Call, Defendant Ergen explained: "[O]ur network is primarily going to be software and in the cloud versus people's hardware networks today."

48.     In theory, DISH's reliance on Open-RAN standards and cloud technology to integrate tens of thousands of radios and other assets from disparate manufacturers would greatly reduce initial equipment and construction costs, as well as maintenance costs, and would permit upgrades more quickly and more efficiently than switching out proprietary hardware components from OEMs. But in practice, constructing an Open-RAN Cloud Native network posed a huge risk because it had never been done before.

**2.     Because the Retail Wireless Market Is Already Saturated and Dominated by Large, National Providers, Defendants Design DISH's Wireless Network Primarily for Wholesale and Enterprise Use**

49.     When DISH first began purchasing wireless spectrum licenses in preparation to enter the wireless service industry, the retail wireless market was already saturated and dominated by several large national providers, including T-Mobile, Verizon, AT&T, and Sprint. The fierce competition between the large national providers, and the large amount of capital expenditure needed to construct a network, made entrance into the retail wireless market difficult and unattractive.

50.     Thus, DISH and its executives planned the Company's 5G network primarily to serve the nascent enterprise and wholesale markets that purportedly demanded private 5G

networks. Secondarily, DISH's network was also expected to provide wireless service to retail customers.

51.     In a May 7, 2020 earnings call (the "May 2020 Call"), Defendant Ergen stated that DISH did not originally plan the 5G network with the expectation of servicing the retail market, comprised of individuals who would purchase mobile phone plans. Ergen described retail customers as "a cherry on top that we didn't think we were going to get[.]"

52.     At this time, the enterprise market was largely untapped and forecasted to reach $30 billion in 2025, according to Verizon, and $80 billion in 2026, according to global technology research firm Omdia. According to Defendant Ergen, for DISH to sell to enterprise customers, it first needed to commercialize and scale the 5G network. In a February 23, 2023 earnings call ("February 2023 Call"), Ergen stated that he defined scale "as 70% [of the nation's population] with voice coverage." Reliable voice coverage was critical to creating a functional 5G network because voice is a real-time critical service, meaning that any delay in voice transmission significantly impacts user experience of speech and video quality.

53.     According to the Defendants, to service enterprise and wholesale customers, DISH's network was designed to permit network slicing—layering of multiple networks on a single infrastructure—and the creation of private 5G networks to be able to meet each enterprise customer's individual needs, which other wireless service providers could not do. In a November 6, 2020 earnings call (the "November 2020 Call"), Defendant Ergen explained: "So we're building the next-generation of where things go… And so the consumer is going to benefit from our network. It's going to do things in the network that current networks don't do. But the network is

also designed architecturally that if somebody wanted a private network, they could have their own private network. And it would look like, it would look like their own network."

54.     The Defendants represented to the market that there was strong demand for private wireless networks from enterprise and wholesale customers. For example, Defendant Stephen Bye, DISH's Chief Commercial Officer, explained in an April 29, 2021 earnings call (the "April 2021 Call"):

> **So we're seeing a terrific demand. And the network architecture that we're putting in place actually enables and unlocks that opportunity for those enterprise customers. And it's again not restricted to any specific vertical. We're touching a lot of different companies and a lot of different vertical segments across the country.**

55.     As investors would learn at the end of the Class Period, DISH had no demand from enterprise customers. Rather, all it had was potential interest in the technology if DISH could develop it.

### 3. The Individual Defendants Closely Managed Every Aspect of the 5G Network Design, Development, and Deployment

56.     Defendants Ergen, Rouanne, Mayo, Bye, and Swieringa closely managed every aspect of DISH's 5G network building. According to CW1 and CW2, Defendants held a 5-hour long meeting every two weeks called the "5G Summit meeting" in which they and all VP-level-and-above DISH Wireless employees would gather to discuss the state of the 5G network buildout. CW1 and CW2 stated that the bi-weekly 5G Summit meetings occurred throughout 2020, 2021, and 2022.

57.     These meetings were accompanied by slide presentations that contained hundreds of slides concerning the 5G network buildout. CW1, who sometimes attended the 5G Summit meetings, stated that during the 5G Summit meetings, critical issues concerning the 5G network

were presented and discussed with the Individual Defendants. CW1 noted that Defendant Mayo was particularly involved with any issues relating to network integration. Thus, Defendants were aware throughout the Class Period of the serious 5G network integration issues, discussed below.

58.     CW2 also stated that CW2 attended weekly meetings with Defendant Bye where the state of DISH's enterprise products was discussed.

59.     In addition, the Individual Defendants also regularly participated in calls with analysts during the Class Period in which they demonstrated their close monitoring and control of the wireless segment and their knowledge of the details of the 5G wireless network deployment plans, progress, and expected costs. For example, as detailed below, during the April 2021 Call, Defendant Ergen discussed details of DISH's internal financial modeling of the 5G project, the total expected costs of the project, when capital expenditures would ramp up, and how long that spending was expected to last, stating "One is the $10 billion we're building, that doesn't all happen in the next 2 years. We don't spend that entire $10 billion to meet our FCC obligation. So it's -- and you'll see it as we ramp up, you'll see the ramp rate we get to, and you'll be able to model that out."

60.     Similarly, in DISH's May 10, 2022 Analyst Day, Defendants displayed detailed knowledge of the elements of the 5G network. For example, employing an elaborate football metaphor, Defendant Rouanne described the functions of the various elements, partners, and vendors of DISH's 5G network. Defendant Bye then discussed the monetization opportunities for the network, stating, in part, "There's an incredible growth in the number of connected devices, and Charlie touched on this in his presentation. But that forecast will grow between 15% and 30% per year, depending on the source that you look at. But that's clearly much faster than smartphone

growth in the U.S. And the volume of that data is growing, both at the edge as well as within the

core and within the capabilities of every device that generate data."

61.     Defendant Ergen also told investors during a February 2022 earnings call (the

"February 2022 Call") that he traveled to Las Vegas every month to review DISH's progress

building its 5G network in its first market: "***I go to Las Vegas every month, so I can see kind of***

***the progress***, but I was there yesterday."

62.     Defendant Mayo demonstrated his intimate knowledge of and participation in the

5G network buildout when he was able to recall the exact number of days remaining before the

FCC deadline during an interview. During that interview, posted to YouTube on October 13, 2020,

Defendant Mayo explained: "I've done this before [at T-Mobile] and it took us about 12 years to

build 235 million covered pops. That's what we have to do [here at DISH] in three years. Well,

no, I'm sorry, ***it's two years, nine months and fifteen days***."

### C.  DISH Acquires Boost Mobile to Jumpstart Wireless Sales, Which Subjects the Company to Huge FCC Penalties if DISH Does Not Meet Milestone Construction Deadlines

63.     Hoping to hit the ground running with a stable of retail customers once the 5G

network was built, DISH acquired Boost Mobile ("Boost") from Sprint. Boost is a retail wireless

provider with approximately 9 million existing customers.

64.     In 2019, when DISH announced its agreement to purchase Boost, T-Mobile and

Sprint were attempting a merger that was being challenged in court[1] by states and the U.S.

Department of Justice ("DOJ") who viewed the merger as anti-competitive and a violation of anti-

---

[1] *United States et al.* v. *Deutsche Telekom AG; T-Mobile US, Inc.; SoftBank Group Corp.; and Sprint Corp.,* Civil Action No. 1:19–cv–02232–TJK (DDC 2019); *State of New York et al v. Deutsche Telekom AG et al*, No. 1:19-cv-05434 (SDNY 2020).

trust laws because the combined T-Mobile and Sprint entity would result in a less competitive industry, with only three dominant wireless carriers instead of four. These lawsuits resolved and the merger was permitted after DISH agreed to purchase Boost Mobile from Sprint. In connection with the purchase of Boost, Defendant Ergen testified in court that DISH was planning a nationwide 5G network, and DISH committed to the FCC and the DOJ that it would meet certain construction deadlines.

65.     Specifically, DISH agreed with the FCC that if DISH did not meet certain "concrete milestones related to its 5G deployment" that DISH would be subject to spectrum license forfeitures and up to $2.2 billion in cash penalties. Those concrete milestones included building a network that could provide 5G service to at least 20% of the U.S. population by June 14, 2022 and a nationwide network covering 70% of the population by June 14, 2023.

66.     Importantly, DISH's commitments to the FCC did not technically require the Company to demonstrate the network was useable or functioning in 2022. Rather, it was not until June 14, 2023 that DISH had to demonstrate that the network provided at least 35 Mbps download speeds, at which time DISH was supposed to commence "drive tests" to verify the network actually worked for 70% of the population.

67.     According to Dish's agreement with the FCC, the commitment did not require a functional network by June 2022, it merely required a network with a coverage area encompassing 20% of the U.S. population.

68.     When the Boost acquisition was finally completed on July 1, 2020, DISH acquired Boost, its assets, over 9 million existing Boost customers, and all of Sprint's 800-megahertz spectrum.

69.    The Boost acquisition agreement also gave DISH the right to use T-Mobile's existing network to provide wireless service to Boost customers for at least seven years, giving DISH time to construct its own wireless network. Thus, beginning in July 2020, DISH Wireless operated as a Mobile Virtual Network Provider ("MVNO"), meaning that DISH provided wireless service to retail customers through another carrier's network.

**D. DISH Lacks Sufficient Capital to Complete the 5G Network, Yet Falsely Tells Investors the Company Has "Everything that We Need to Build the 5G Network" in Terms of Capital and Cashflow**

70.    When Defendants introduced DISH's 5G network buildout plan in 2019, they simultaneously claimed it would cost $10 billion to build the entire, fully functioning network. Defendants repeatedly affirmed this $10 billion budget to investors throughout the Class Period. Defendants, however, had no basis to claim that a fully functioning 5G network capable of servicing the enterprise and wholesale customer audience that DISH was targeting could be built for $10 billion. Indeed, the $10 billion price tag was actually a holdover from a completely different project—DISH's previously planned Narrowband Internet of Things ("NB-IoT") network. When Defendants abandoned the NB-IoT project and embarked on a completely different project—the novel, Open-RAN 5G network—they maintained the 5G network would cost exactly the same—$10 billion—despite the fact that the nationwide 5G wireless network was vastly more complex and broader in scope.

71.    DISH and its executives knew that building a novel, 5G wireless network from the ground up would require more capital than DISH had. As a result, Defendants covertly sought to raise additional capital and preserve existing cash through undisclosed cost-cutting measures.

### 1. DISH Covertly Seeks Additional Capital to Complete the 5G Network

72.    Knowing Dish had insufficient capital to build and commercialize a fully functional 5G network, DISH secretly sought to raise additional capital through an independent, special purpose acquisition company ("SPAC") that was registered by Defendant Ergen. Defendant Ergen's SPAC, named CONX, was registered in October 2020. CONX raised $750 million that would be held in trust to be used in a future de-SPAC transaction. When asked during the November 6, 2020 earnings call ("November 2020 Call") what role Defendant Ergen's SPAC would play in DISH's 5G network deployment, Defendant Ergen assured investors that the SPAC was not related to or intended to benefit DISH.

73.    But nearly two years later, after DISH disclosed in May 2022 that it needed to raise more capital to complete the nationwide 5G network, Defendant Ergen revealed in a letter to CONX stockholders filed with the SEC on October 12, 2022 that CONX was engaged in "discussions with DISH Network Corp. [] regarding a potential business combination[.]" That letter also asked CONX stockholders to extend the deadline for completing any such business combination from November 3, 2022 to June 3, 2023 to give CONX and DISH more time to complete a deal that would bring much needed capital onto DISH's balance sheet.[2]

### 2. DISH Engages in Undisclosed Cost-Cutting Measures That Negatively Impacted the Commercial Viability of DISH's Wireless Network

74.    DISH's lack of capital led the Company to engage in undisclosed cost-cutting initiatives to help fund the 5G buildout. As disclosed in Dish's own public filings, Defendants selected vendors for the 5G build that were smaller with no experience or capability to build such

---

[2] CONX has continued to extend the date by which a merger must be consummated, and, as of October 2023, remains in discussions with DISH regarding a potential business combination.

an extensive, one of a kind 5G network to conserve cash. For example, Defendants selected an inexperienced and unproven vendor, Mavenir, to build DISH's radio access network software.

75.    Moreover, Defendant Ergen admitted after the Class Period that DISH had installed less equipment than would be needed to provide the capacity and reliable coverage necessary to be useful to consumers in densely populated areas. As Defendant Ergen would explain in the February 2023 Earnings Call, "to do 5G voice [] you have to have a very dense network[.]" Instead of building sufficiently dense clusters of radios to provide a functional network, however, DISH strategically placed sites sporadically throughout the United States to meet the FCC's population requirement.

76.    The blue hexagons on the left of Figure 2[3] below depict the areas throughout the United States that theoretically had DISH coverage in December 2022, i.e. areas where DISH had built at least some sites. By contrast, the red hexagons on the right in Figure 2 depict the places in the same area at the same time with a coverage threshold above 70% as required by the FCC and as Defendant Ergen conceded during the February 2023 Earnings Call was required for DISH to be able to commercialize its 5G network:

---

3 Data Source: https://broadbandmap.fcc.gov/ (visited October 19, 2023).

**Figure 2**



77.     As is evident in the image above, instead of building enough sites in specific locations to provide reliable coverage, DISH built a network of sparse sites throughout the United States to meet the technical FCC requirements while conserving funds. Further, DISH strategically built sites in areas with heavy population density in pursuit of the FCC population coverage milestone. For example, the New York metropolitan area is heavily blue in the image on the left, indicating that DISH built sites in the vicinity; but, as evident in the image on the right, the area had no or nearly no reliable coverage in December 2022. Indeed, during the May 8, 2023 Earnings Call, Ergen stated that additional capital expenditures were still needed "***to densify the current markets that we have***."

78.     In addition, CW2 recalled that DISH never allocated a dedicated budget for enterprise product development, so funding requests even for minimal expenditures required strict, multiple stages of approval. CW2 stated that the reasoning shared was that the primary focus of available funding was to be used for the construction of the 5G network. CW2 explained that in late 2020 or early 2021, the enterprise product development budget was reduced to less than $10K so that every penny could be used towards building the 5G radio towers or sites as part of the push to complete the FCC population coverage deadlines. CW2 stated that although CW2's team worked on roadmaps and plans for developing enterprise products, the team had virtually no budget or company resources to dedicate to engineering the products they were conceptualizing.

79.     CW1 recalled that immediately upon DISH's acquisition of Boost Mobile in July 2020, Defendant Ergen cut the national marketing budget for the retail wireless division by at least 20%, even though doing so was certain to cause DISH Wireless to lose retail subscribers. CW1 knew this because CW1 attended several meetings with Defendant Ergen soon after the acquisition in which Defendant Ergen made it clear that he did not want to spend money on national marketing. CW1 explained that there is a direct correlation between marketing spend and subscribers and that Defendant Ergen was aware of the resulting losses in subscribers and independent dealers who sold Boost subscriptions for DISH because Senior Manager John Pauto would send out a daily email called the Flash Report to executives, including Defendant Ergen, which detailed the previous days' activities, such as new and lost subscribers.

80.     Thus, unbeknownst to investors, DISH did not have the capital or cashflows needed to construct a nationwide 5G network in 2021 and was, thus, seeking outside investors from the beginning and cutting costs throughout the Class Period to make up for DISH's lack of resources.

In addition, DISH's insistence to investors that the nationwide 5G wireless network had a $10 billion price tag had no basis and was merely repeated to assure investors that the 5G buildout could be completed with existing cash and cash flows without raising additional capital.

**E. To Meet the FCC June 2022 Milestone While Conserving Cash, DISH Builds the 5G Network's Physical Infrastructure Before Developing the Necessary Software, Onboarding Critical Vendors or Achieving Integration of the Network's Myriad Components, and Without Regard for Network Functionality or Commercial Viability**

81.    In the July 2019 agreement DISH made in connection with DISH's acquisition of Boost, DISH committed to the FCC that DISH's 5G network coverage area would cover at least 20% of the U.S. population by June 14, 2022 and 70% by June 14, 2023. Defendant Mayo, who was responsible for DISH's network buildout, stated in a YouTube video published October 13, 2020 that he had "done this before" while employed at T-Mobile and that it took T-Mobile 12 years to cover "235 million pops," approximately 70% of the U.S. population. Defendant Mayo also stated that to meet the FCC obligation deadlines that DISH would need to "shatter every buildout record that's ever been known in this country."

82.    Failure to meet the 2022 commitment could cost DISH nearly $200 million in cash penalties, and failure to meet the 2023 commitment could cost DISH $2.2 billion in cash penalties and billions more in forfeited spectrum licenses. However, the agreement with the FCC did not require DISH to demonstrate *any* functionality of the network in June 2022. Thus, DISH could technically meet the 2022 deadlines if the network covered 20% of the population, even if the network was not reliable or even operable. Under the agreement, DISH did not have to verify the functionality of the network until June 2023 when DISH was supposed to conduct "drive tests" using a methodology to be agreed upon by the FCC and DISH.

83.    Thus, to avoid the $200 million in penalties that would accrue in June 2022, DISH began the construction of the 5G network's physical infrastructure long before DISH selected and onboarded critical software vendors, tested its network design or developed the critical software elements of the network. As Defendants' singular concern was covering 20% of the population before the June 2022 FCC deadline, they instructed employees to build without regard to functionality, ignoring employees who raised concerns that DISH was building a network that would not be functional. Indeed, CW2 stated that Dish was focused on meeting the FCC population coverage deadlines, to the detriment of the commercial viability of the 5G network.

84.    CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This single validation was insufficient according to industry practice to validate the network actually worked and would be reliable. And, in fact, it did not operate consistently or reliably.

85.    CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

86.    Thus, Defendants' singular focus on the population coverage deadlines motivated them to begin construction of the network's physical infrastructure long before onboarding all the critical vendors and before validating that the vendors would be able to integrate all the hardware and software components of the network into a functional wireless network.

87.    As Defendant Rouanne would later confirm in an interview posted to YouTube on June 21, 2022, when DISH first began constructing its 5G network, Amazon's AWS cloud services were not yet ready to support DISH's 5G network and critical software developers had not yet developed the software needed to integrate the network. Defendant Rouanne explained that even in 2022, AWS was still upgrading to make its services ready for DISH to use: "When we started we looked at all the clouds, and when we started with AWS, they were not telco ready. Especially when it comes to networking… and *they are upgrading that platform for us to be telco ready and telco grade*." Defendant Rouanne further stated that it "would've been easier for us" if Amazon had been ready when DISH first began constructing its network. Defendant Rouanne also explained that most of the software vendors "*had to rewrite their software from scratch*, not try to carry over the old stuff."

88.    Despite still not having retained critical software vendors, as well as DISH's lack of progress on developing the critical software required to integrate the 5G network, in the February 2021 Earnings Call and the concurrently filed Form 10-K, Defendants announced to investors that DISH had "completed [DISH's] first 5G validation" in December 2020, and had "tested a lot of vendors," "solidified key vendor relationships," "brought radios, [and] compute software together," and was now "transferring this knowledge to [DISH's] teams in the field to build [the network] across the U.S." Defendants also assured investors during this call that DISH would launch its 5G network in a major city "by the end of the third quarter" and in additional cities by the end of the year.  In short, DISH's Chief Network Officer explained, DISH was "now moving into the second phase of [DISH's] O-RAN journey" and "*we're just deploying it now*."

89.     Investors reasonably understood Defendants' comments to mean that DISH's ability to launch its 5G service in the third quarter 2021 was not in question and that DISH would have its 5G network launched in several markets by the end of 2021.

90.     Credit Suisse, whose analyst asked questions during the February 2021 Earnings Call, reported that DISH would launch in Las Vegas in the third quarter 2021 and that "each month starting in 4Q should see several additional markets launched[.]"

91.     Morningstar similarly reported on February 22, 2021 that "DISH expects to have its own wireless network live in one market during the third quarter, with subsequent markets likely following quickly thereafter." UBS and JP Morgan also reported that DISH's 5G network would launch in 3Q 2021 with additional markets launching by the end of 2021.

92.     However, unbeknownst to investors, DISH had not "validated" its 5G network in December 2020 and DISH's 5G network was far from "just" needing to be deployed.

**F.  Starting in Early 2021, DISH Experiences Critical Issues Integrating Its Network, But Conceals These Problems from Investors**

93.     Due to Defendants failure to truly validate the functionality of the 5G network, DISH immediately began experiencing crippling integration issues.

94.     As Defendants explained during DISH's later earnings calls, to function properly and be usable by consumers, DISH's 5G wireless network needed to be both integrated (so that all of the hardware and software components would work together) and optimized (to ensure reliability of service) before the network would be useable and marketable. DISH's failure to vet and retain critical vendors capable of integrating the multitude of hardware and software components from all the disparate manufacturers and vendors proved fatal to the Company's

ability to launch a functioning 5G network at scale that enterprise—or even retail—customers would buy.

95.    CW2 learned of integration issues with the 5G network that began in the first quarter of 2021. Defendants confirmed during the November 2021 and May 2002 Earnings Calls that these persisted throughout 2021 and at least halfway through 2022.  CW2 further stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

96.    One of the biggest integration issues that occurred early in 2021 was that the Defendants expected Mavenir was going to act as a systems integrator, rather than just designing the radio access network software. But, as Defendants later admitted, Mavenir did not have the ability to coordinate with all the various vendors to integrate all the different hardware and software components into a functional network. Thus, Dish disclosed on May 3, 2022 that it had to hire Samsung for the job.

97.    The Defendants were fully aware of the integration issues plaguing DISH's network buildout from the beginning from, for example, their admitted hands-on monitoring of every phase of the buildout, as well as from the bi-weekly 5G Summit meetings. CW2 recalls that these meetings were accompanied by hundreds of pages of slides created by each of the teams responsible for constructing and integrating the network and during those meetings, critical issues, including network integration problems, were discussed.

98.    Moreover, as Defendants admitted during the November 21, 2021 earnings call, by November 2021, DISH's 5G wireless network was neither integrated nor optimized and Mavenir, who was to provide critical software for DISH's radio access network, was still working to develop essential elements of that software and working to integrate it into the network.

99.    Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately:

> I'd say the biggest thing that we learned was *when we first started this* we thought the vendors all kind of worked together. *Quickly did we learn that was not going to happen*, and we actually became the system integrator.

100.    In other words, DISH had made a critical error in selecting small, inexperienced vendors like Mavenir to save money and just assuming, with no validation, that Mavenir would be capable of integrating the network. Mavenir's inability to integrate the network ended up costing DISH as much as six months of delay. It wasn't until May 2022 that DISH struck a deal with Samsung for its support in deploying and integrating the Open-RAN network.

101.    Despite their knowledge that DISH's 5G wireless network would never be ready to launch in 3Q 2021, and despite serious integration and stability issues developing by February 2021 and continuing throughout the Class Period, Defendants continued to tell the market that DISH would launch its 5G wireless network by the end of 2021. For example, in the April 29, 2021 Earnings Call, Defendant Bye assured investors that "[t]he infrastructure that we're deploying is optimized for 5G" and "we've proven that O-RAN, from a technology perspective can work." Defendant Bye also reiterated that "we're on a path to launching in the third quarter,

but it's one of a number of markets we have coming on. We just haven't announced those markets

through the end of the year[.]" Defendant Mayo likewise represented to investors in the August 9,

2021 Earnings Call that "we'll be substantially complete with the [Las Vegas] construction

activities in the next 60 days by the end of the third quarter and we'll – and as we've talked about,

we'll be beta testing customers in the fourth quarter."

102.    Investors believed that the commercial launch of DISH's 5G network was imminent

and that DISH had sufficient cash flows to complete the build. In an August 2021 analyst report,

Morningstar's Michael Hodel, CFA wrote:

> DISH's wireless **network buildout gathered momentum during the second quarter** as it prepares to launch service in Las Vegas, planned within the next 60 days, and construction ramps up in 30 other markets across the country. **The television business continues to pump out cash, funding wireless spending with enough left over to build cash on the balance sheet.** DISH likely isn't totally out of the woods concerning its financing needs, but **we believe it has the financial leeway to experiment with various wireless business models**.

103.    In a November 4, 2021 earnings call ("November 2021 Earnings Call"), however,

DISH was forced to reveal that it had been unable to launch the 5G Network in Las Vegas by the

end of the third quarter 2021, as previously represented, due to the undisclosed integration issues,

and that DISH's commercial launch in Las Vegas would be delayed because the Company was

having difficulty integrating the network's hardware with the software.

### G. Due to DISH's Inability to Build a Functioning 5G Network and Its Decision to Pause Enterprise Product Development and Voice Functionality, Defendants Are Unable to Attract Enterprise Customers

104.    Throughout the Class Period, DISH was unable to construct a commercially viable

network for the reasons described in Sections IV.B-D, *supra*. Moreover, DISH's need for

additional capital motivated the Defendants to take resources away from the DISH Wireless teams

that were tasked with developing enterprise products and the network's voice functionality, Voice over New Radio (VoNR).

### 1. DISH's Failure to Fund Enterprise Product Development During the Class Period Resulted in No Demand from Enterprise Customers

105.    CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

106.    As a result of the Defendants' failure to dedicate resources to the engineering of enterprise products, CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market. CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research. CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

107.    DISH's failure to fund enterprise product development prevented the Company from achieving any success in the enterprise market during the Class Period and delayed any success long into the future. As Defendants would ultimately disclose in February 2023, DISH would not have any revenue from enterprise customers until at least 2024, or for at least another year.

108.    Defendant Rouanne also confirmed CW2's statements when, after the Class Period, he stated in an interview at the Mobile World Congress ("MWC") conference on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed:

**David Nicholson**, *Interview Host*

[Y]ou have on your business card, Chief Network Officer. What potentially either keeps you up at night in terror or gets you very excited about the future of your network? What's out there on the frontier and **what are those key obstacles that have to be overcome**, that you work with?

**Marc Rouanne**, *Chief Network Officer, DISH Wireless*

Yeah, I think we have the network, **we have the baseline, but we don't yet have the consumption that is easy**, by the enterprise. You know, in enterprise, they like to say "I have a 4K camera, I connect it to my software. Click. Click." Right? **And that's where we need to be**. So we're talking about APIs that are so simple that they become a click. And we engineers, have a tendency to want to explain, but we should not. **It should become a click**. And the phone revolution—with the apps— became those clicks. **We have to do the same for the enterprise, for video, for surveillance, for analytics—it has to be clicks**.

> **2. DISH Pauses the Development and Launch of Voice Functionality to Focus on Meeting the FCC Population Coverage Requirements, Prohibiting DISH From Achieving Enterprise or Retail Revenues from Its 5G Wireless Network**

109.    The Defendants also paused efforts to integrate Voice over New Radio capabilities into DISH's network during the Class Period so that DISH could focus on meeting the FCC population coverage requirements of 20% coverage by June 2022 and 70% by 2023.

110.    In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges. CW1 likewise recalled that DISH had launched its 5G network in Las Vegas around May 2022, but explained that DISH's network could only support a few users at that time, that the network was not scalable, and that Voice over New Radio (VoNR) was not working at that time.

111.    But DISH did not disclose to the public that the Company had paused efforts to integrate VoNR capabilities into DISH's network. Defendant Swieringa would ultimately admit at the end of the Class Period during the February 2023 Earnings Call, however, that Dish had paused development of VoNR, stating that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs*. When that happens, we load that market up with handsets that work on our network." And in a *Fierce Wireless* news article dated May 10, 2023, Sue Marek reported that Dave Mayo

revealed DISH would only restart its efforts to launch VoNR "***once the Company meets the FCC's
buildout requirement*** of providing coverage to 70% of the U.S. population by June 14, 2023."[4]

112.     DISH's undisclosed decisions to pause work on VoNR during the Class Period had
serious repercussions. Critically, DISH was unable to scale and commercialize its 5G network and
land any enterprise customers. As Defendant Ergen explained during the February 2023 earnings
call, DISH needed voice coverage over 70% of the population before enterprises would be
interested in DISH's network.

113.     Moreover, DISH's undisclosed decision to pause work on VoNR prevented DISH
from using the network to service its existing Boost Mobile retail customers. Thus, throughout the
Class Period, DISH was still relying on, and paying, other network providers like T-Mobile and
AT&T to provide network coverage for its retail customers.

114.     Accordingly, despite telling investors that DISH would have material revenue from
enterprise customers in 2022 and 2023, Defendants knew that would never happen during the Class
Period due to DISH's undisclosed pause of enterprise product development and VoNR integration.

115.     CW1 stated that because DISH's 5G network was unproven in January 2023, to
mitigate the risk of losing large numbers of existing subscribers, DISH did not transfer existing
retail customers onto the 5G network, but instead was only loading a few newly acquired customers
onto the network. CW1 stated that DISH had never transferred any existing retail customers onto
its network before CW1 left the Company in Q2 2023 because the network still lacked capacity
and reliability. CW1 stated that when CW1 left the Company in Q2 2023, approximately 95% of

---

[4] Sue Marek, *Dish will expand VoNR throughout network later this year*, May 10, 2023.
https://www.fiercewireless.com/5g/dish-will-expand-vonr-throughout-network-later-year,
accessed on October 16, 2023.

retail wireless customers were still being serviced under the MVNO model, meaning the customers wireless service was being provided by T-Mobile and AT&T.

116.    Even now, as of the filing of this complaint in October 2023, DISH's 5G network is still not sufficiently developed to be commercially viable, even for retail use. In a registration statement, dated October 3, 2023, filed with the SEC on Form S-4 by EchoStar, EchoStar disclosed details of the current state DISH's wireless business:

> DISH Network is currently operating its Retail Wireless business unit primarily as a mobile virtual network operator ("MVNO") as it continues its 5G Network Deployment and commercialization of its 5G Network, as defined below. ***As an MVNO, today DISH Network depends on T-Mobile and AT&T to provide it with network services*** under the amended Master Network Services Agreement ("MNSA") and Network Services Agreement (the "NSA"), respectively. ***Under the NSA, DISH Network expects AT&T will become its primary network services provider.***

117.    The October 3, 2023 registration statement also explained: "DISH Network ***plans to commercialize*** its Wireless spectrum licenses ***through the completion*** of the nation's first cloud-native, Open Radio Access Network based 5G network[.]"

118.    In other words, as of October 3, 2023, DISH was still operating its retail wireless brands, like Boost, primarily as an MVNO. This meant that DISH was still using T-Mobile and AT&T's networks to provide service to DISH's own customers because the Company's 5G network was still not developed enough to transfer those existing retail customers onto DISH's network, and DISH is still merely *planning to commercialize* its wireless spectrum licenses by *completing* its still unfinished network.

V.    **DEFENDANTS MADE OR FAILED TO CORRECT MATERIALLY FALSE
AND MISLEADING STATEMENTS DURING THE CLASS PERIOD[5]**

119.    Throughout the Class Period, Defendants repeatedly made materially false and misleading statements and omissions relating to the capabilities and progress of DISH's 5G network development and deployment, DISH's need for additional capital to complete its 5G network, DISH's purported relationships with enterprise customers, that rate at which DISH expected to achieve enterprise revenues, and the purported demand in the enterprise segment. Specifically, during the Class Period, Defendants made the statements enumerated below, which materially misled investors and artificially inflated the price of DISH securities.

A.  **2020 Annual Report on Form 10-K**

120.    On February 22, 2021, DISH filed its Annual Report on Form 10-K for the period-ended December 31, 2020 (the "2020 Form 10-K") with the SEC, signed by Defendants Orban, Carlson and Ergen. The 2020 Form 10-K contained material misstatements concerning the sufficiency of DISH's capital and requirements for future funds. For example, in the "Acquisition and Capital Structure Risks," Defendants characterized DISH's future capital needs as a mere possibility, when Defendants knew DISH had insufficient capital to operate even one more year given the numerous 5G integration issues and loss of subscriber revenue:

> In addition, **we may need to raise significant additional capital in the future to fund the efforts described above**, which may not be available on acceptable terms or at all. There can be no assurance that we will be able to develop and implement a business model that will realize a return on these wireless spectrum licenses or that we will be able to profitably deploy the assets represented by these wireless spectrum licenses, which may affect the carrying amount of these assets and our future financial condition or results of operations.

---

[5] All statements alleged to be false and misleading are bolded and underlined. All other statements are included for context.

121.    The above statement in the 2020 Form 10-K was materially false and misleading

when made because, at the time of the statement, DISH lacked the capital it needed to complete a

*functioning* 5G network buildout and Defendants knew that DISH would need to raise additional

capital, evidenced by the following:

1) Defendant Ergen registered the SPAC CONX in October 2020 and raised $750 million to be used in a de-SPAC transaction between CONX and DISH's retail wireless business, Boost Mobile.
2) Defendants admitted in May 2023, after the Class Period, that they selected vendors like Mavenir who did not have the requisite experience or capability, presumably to conserve cash and "do[] it infinitely less expensive[ly] than anybody has ever done before."
3) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
4) As Defendant Ergen would later admit on May 8, 2023, DISH planned to minimize costs by positioning a small number of radios in concentrated population hubs to meet the FCC's technical population requirements, knowing the radio density would be wholly insufficient to actually provide useable coverage to those areas, and DISH would need to go back later and "densify the current markets that we have."
5) According to CW2, even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized.
6) Defendants chose to pursue an Open-RAN network because DISH did not have the capital to construct a RAN from a single, experienced OEM.

122.    Defendants also falsely claimed in the 2020 Form 10-K to have conducted a

"successful field validation" which, in reality, was a single text message sent:

**During December 2020, we completed a successful field validation, utilizing our fully virtualized standalone 5G core network and the industry's first O-RAN compliant radio**.

123.    The above statement in the 2020 Form 10-K was materially false and misleading

when made because DISH had not validated critical technologies, software, and vendors in

December 2020, evidenced by the following:

1) Defendants admitted in May 2023, after the Class Period, that they selected vendors, like Mavenir, who did not have the requisite experience or capability, presumably to conserve cash and "do[] it infinitely less expensive[ly] than anybody has ever done before."

2) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

3) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

4) Defendant Mayo would later admit, in the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable."

5) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

6) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

7) As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.

### B. February 22, 2021 Earnings Call

124. On February 22, 2021, Defendants released DISH's earning results for the fourth quarter and full year 2020 and held an accompanying earnings call ("February 2021 Call"). In the February 2021 Call, Defendants assured investors that DISH had the necessary cash on DISH's balance sheet, and "had everything [] need[ed]" to build the planned network:

> And we have over $4 billion of cash in our balance sheet. **So that all leads to the fact that as we enter 2021, we have everything that we need to build this one-of-a-kind 5G network. And now it's – now, for us, its execution.**
>
> *        *        *
>
> And so I think we're probably in a similar situation today in the sense that **we do have enough capital to build on our balance sheet today, to build our network to the point where people can see whether OpenRan cloud-native networks work.**

-39-

125.     Moreover, when asked by Credit Suisse analyst Douglas David Mitchelson during the February 2021 Call to confirm his understanding that DISH could "fully fund the [5G] network build-out," Defendants did not dispute or correct Mitchelson's characterization:

**Douglas David Mitchelson,** *Credit Suisse AG*:

**<u>I understand, Charlie, your comments that you can fully fund the network build-out at this point, based on cash flow and cash on hand</u>**.

\*     \*     \*

**Thomas A. Cullen,** *Executive Vice President of Corporate Development*:

As far as the go-to-market, obviously, the conversations with -- they range, depending on which cloud service provider we're talking to. But they clearly all have enterprise sales channels, and they all see a movement towards distributed cloud, mobile edge computing, which brings 5G into the conversation naturally with their customer base.

126.     The above statements in the February 2021 Call were materially false and misleading when made because DISH lacked the capital it needed to complete the 5G network buildout and Defendants knew that DISH would need to raise additional capital, evidenced by the following:

1) Defendant Ergen registered the SPAC CONX in October 2020 and raised $750 million to be used in a de-SPAC transaction between CONX and DISH's retail wireless business, Boost Mobile.
2) Defendants admitted in May 2023, after the Class Period, that they selected vendors, like Mavenir, who did not have the requisite experience or capability, presumably to conserve cash and "do[] it infinitely less expensive[ly] than anybody has ever done before."
3) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
4) As Defendant Ergen would later admit on May 8, 2023, DISH planned to minimize costs by positioning a small number of radios in concentrated population hubs to meet the FCC's technical population requirements, knowing the radio density would be wholly insufficient to actually provide useable coverage to those areas, and DISH would need to go back later and "densify the current markets that we have."

7) According to CW2, even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized.

5) Defendants chose to pursue an Open-RAN network because DISH did not have the capital to construct a RAN from a single, experienced OEM.

127.    During the February 2021 Call, Defendants reiterated the false statements they had made in the 2020 Form 10-K concerning the progress of construction on the 5G network, claiming "**[w]e've also completed our first 5G validation in December**," when, in fact, they had only sent a single text message, which was insufficient to validate anything.

128.    The above statement in the February 2021 Call was materially false and misleading when made because DISH had not validated critical technologies, software, and vendors in December 2020, evidenced by the following:

1) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

2) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

3) Defendant Mayo would later admit, in the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable."

4) DISH's critical software vendor, Mavenir was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung in May 2022.

5) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

6) As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.

129.    During the February 2021 Call, Defendant Ergen assured investors that DISH had

"**solidified key vendor relationships**" and Defendant Rouanne claimed that the only thing left for

DISH to do was deploy the assets:

> I would say that **we are now moving into the second phase of our O-RAN journey, that is – we're starting to build. We have tested a lot of vendors. We have brought radios, compute software together**. And now what we're doing is that **we are transferring this knowledge to our teams in the field in order to build it across the U.S.** So that's really where we are. **In terms of testing integration**, we – for me, this has been a normal journey, like I've seen in the past for other technologies. This is – **we're coming at a time when there is maturity in the O-RAN industry for us. So we're just deploying it now**.

130.    Defendant Ergen also represented during the February 2021 Call that the software

elements of DISH's network were well developed, stating:

> And for us, it has to be automated. And so we spend a lot of time with our cloud partners to be able to do that seamlessly. And I – **like I said, for the O-RAN, we are now in the deployment mode where we have the capability with VMware and with some cloud partners to move the software east, west, north, south**.

131.    The above statements in the February 2021 Call were false and misleading when

made because Open-RAN was not a mature technology or industry at the time and DISH had not

validated critical technologies, software, and vendors in February 2021. Thus, contrary to

Defendants' statements, Dish had not tested a lot of vendors or brought the software and hardware

together and thus was not in the "deployment mode," as evidenced by the following:

1) CW2 learned of integration issues with the 5G network that began in the first quarter of 2021. As Defendants admitted in November 2021, these issues continued throughout 2021.
2) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
3) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

4) Defendants admitted in May 2023, after the Class Period, that they selected vendors, like Mavenir, who did not have the requisite experience or capability, presumably to conserve cash and "do[] it infinitely less expensive[ly] than anybody has ever done before."

5) Mavenir—one of DISH's critical software vendors—was never able to handle the integration of DISH's physical infrastructure. Defendants eventually had to hire Samsung to assist with the network integration because Mavenir simply did not have the necessary capabilities and expertise. It wasn't until May 2022 that DISH struck a deal with Samsung for their support in deploying and integrating the Open-RAN network.

6) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional.  This was not considered a true validation under industry standards.

7) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

8) Defendant Mayo would later admit, in the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable."

9) As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.

132.    Despite ongoing integration issues, Defendant Ergen assured investors during the February 2021 Call that DISH would now be able to "execute" and complete the 5G buildout in several major cities by the third quarter 2021:

> So I have a high degree of confidence that we're going to execute in 2021. **That means that we're going to build our first major cities by the end of the third quarter and more to come**.
>
> \*      \*      \*
>
> **So by the end of the third quarter**, you'll see that, **you'll see the first major city**. **We'll have other cities**. I don't have a number for you year in, but what we'll be doing **every month after the third quarter, we'll be doing multiple cities**.

133.    The above statement in the February 2021 Call was materially false and misleading when made because in February 2021, DISH was experiencing serious integration issues and had not even selected its vendors or built its software. Thus, Defendants could not reasonably expect commercial launch in any cities by 3Q or 4Q 2021, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.

2) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.

3) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

4) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

5) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

6) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at **_really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs._**"

7) As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.

134.    Defendant Ergen also assured investors during the February 2021 Call that DISH's network was primed to capture enterprise demand, in response to an analyst question:

**Michael Ian Rollins,** *Citigroup Inc. Exchange Research*:

First, on the 5G side, I was curious if you could just provide some additional context of how you're seeing the emerging addressable market in dollars for the business side of what you're focused on versus the consumer wholesale side for the wireless business plan?

**Charles William Ergen,** *Co-founder & Chairman of the Board*:

[…] But your question is well taken in the sense that a part of our business will be -- the enterprise business that is a fairly nascent business today. **<u>And we'll be on the leading edge of that as it grows</u>**.

135.    The above statement in the February 2021 Earnings Call was materially false and

misleading when made because DISH was not even attempting to develop enterprise products, let

alone sell to enterprise customers at the time and was nowhere near ready to do so, as evidenced

by the following:

1) According to CW2, even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized.
2) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and that it would be at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.
3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
4) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research.
5) CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.
6) Defendant Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone, and Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

136.    Defendant Ergen also stated during the February 2021 Call that there were risks

associated with the execution of the 5G network buildout and that there would be problems with

execution in the future, but omitted to state that DISH was already experiencing some of those

"risks" and problems:

**And there are certainly significant risks for us as we go execute**. We have to
deploy our network. And then we've got to put it all together to work -- to make it

work. **And there certainly will be substantial risk. There's certainly going to be lots of problems**, but we have the team and the focus to overcome that.

137.    The above statement was materially false and misleading when made because, at that time, there was not merely a risk of future problems; rather, DISH was already experiencing serious integration and functionality problems and setbacks in February 2021. The statement was also materially false and misleading when made because the statement omitted that DISH had not yet validated critical technologies, software, and vendors in February 2021, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.
2) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
3) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
4) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.
5) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.
6) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

138.    Analysts were specifically attuned to these disclosures regarding DISH's 5G network validation and plans for 5G network launch. In a February 22, 2021 report released after the Defendants announced earnings but prior to the February 2021 Call, Credit Suisse analysts noted, first and foremost: '**What We Learned About Wireless: Chairman Mr. Ergen notes "as**

we enter 2021, we have everything that we need to build this one-of-a-kind 5G network. And now, for us, it's execution."'  The report further observed that DISH's first large 5G market would launch in 3Q 2021, "while each month starting in 4Q should see several additional markets launched[.]"

139.    Defendants' false statements in the February 2021 Earnings Call served to artificially inflate and/or maintain the artificial inflation in DISH's stock price.

### C. April 29, 2021 First Quarter 2021 Form 10-Q

140.    On April 29, 2021, Defendants filed with the SEC, DISH's First Quarter Form 10-Q for the three-month period ended March 31, 2021 (the "Q1 2021 Form 10-Q"), which was signed by Defendants Carlson and Orban. The Q1 2021 Form 10-Q contained material misstatements concerning the sufficiency of DISH's capital and requirements for future funds. For example, Defendants characterized DISH's future capital needs as a mere possibility, when Defendants knew DISH could not make it even another year given the numerous 5G integration issues and loss of subscriber revenue:

> **We may need to raise significant additional capital in the future to fund the efforts described above**, which may not be available on acceptable terms or at all. There can be no assurance that we [] will be able to develop and implement business models that will realize a return on these wireless spectrum licenses or that we [] will be able to profitably deploy the assets represented by these wireless spectrum licenses, which may affect the carrying amount of these assets and our future financial condition or results of operations.

141.    The above statement was materially false and misleading when made because, at the time of the statement, DISH lacked the capital it needed to complete the 5G network buildout and Defendants knew that DISH would need to raise additional capital, evidenced by the following:

1) Defendant Ergen registered the SPAC CONX in October 2020 and raised $750 million to be used in a de-SPAC transaction between CONX and DISH's retail wireless business, Boost Mobile.

2) Defendants admitted in May 2023, after the Class Period, that they selected vendors, like Mavenir, who did not have the requisite experience or capability, presumably to conserve cash and "do[] it infinitely less expensive[ly] than anybody has ever done before.".

3) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.

4) As Defendant Ergen would later admit on May 8, 2023, DISH positioned small numbers of radios in concentrated population hubs to meet the FCC's technical population requirements, knowing the radio density was wholly insufficient to actually provide useable coverage to those areas and DISH needed to go back and "densify the current markets that we have."

5) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

6) Defendants chose to pursue an Open-RAN network because DISH did not have the capital to construct a RAN from a single, experienced OEM.

7) Defendants themselves later admitted to building the network as cheaply as possible. Defendant Ergen, for example, stated on the November 4, 2021 Earnings Call in reference to the 5G buildout that "we're doing it infinitely less expensive[ly] than anybody has ever done before."

142.    Defendants also falsely claimed in the Q1 2021 Form 10-Q to have conducted a

"successful field validation" which, in reality, was a single text message sent:

> **During December 2020, we completed a successful field validation, utilizing our fully-virtualized standalone 5G core network and the industry's first O-RAN compliant radio**. We began construction of our first major market, Las Vegas, Nevada, during the second quarter of 2021. **We anticipate service for this market to begin by the end of the third quarter of 2021**.

143.    The above statement in the Q1 2021 Form 10-Q was materially false and misleading when made because DISH had not validated critical technologies, software, and vendors in December 2020. Moreover, Defendants conspicuously omitted this disclosure from DISH's future

SEC filings. That the above statement was false and misleading when made is evidenced by the following reasons:

1) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
2) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
3) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.
4) The launch of the Las Vegas network was delayed because DISH was having difficulty "getting the radio software to work together."
5) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.
6) As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.
7) CW2 learned of integration issues with the 5G network that began in the first quarter of 2021.
8) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties from the very beginning because vendors were not capable of integrating the network.

### D. April 29, 2021 Earnings Call

144.    Defendants also held an investor call on April 29, 2021 to discuss DISH's first quarter 2021 results (the "April 2021 Call"). During the April 2021 Call, Defendants falsely claimed that DISH had strong demand from enterprise customers and that the Company was building out its 5G network to capture that demand:

**Richard Hamilton Prentiss,** *Raymond James & Associates, Research Division*

A second question on the 5G side is we think the enterprise wholesale side of the business could be actually fairly exciting and significant opportunity. Help us understand what you're hearing from customers as far as what do they need to see

from you guys before they could make commitments or contracts? Is it Vegas up and working? Is it a nationwide network? What do the customers want to see from you before they start making commitments? And am I right that wholesale enterprise could be significant?

\*        \*        \*

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*

Absolutely. Yes. No, I think **we've talked to a number of customers across multiple verticals in different industry segments, and there's an increasing appetite and demand for the kind of network that we're building**, which is really to enable them to have more security, more control and also more visibility into the data that's coming off the devices so that they control their business more effectively. **So we're seeing a terrific demand. And the network architecture that we're putting in place actually enables and unlocks that opportunity for those enterprise customers. And it's again not restricted to any specific vertical. We're touching a lot of different companies and a lot of different vertical segments across the country.** And the other aspect of the opportunity that we see for ourselves is that while we build out a nationwide network, **we are in the process of working with customers and prospective customers on private networks that are not limited by the geography of our national footprint**. So we can deploy those within their environments to support their business operations as well. **So the demand we're seeing is terrific, and we're already engaged with a number of customers today**.

145.    The above statements in the April 2021 Call were materially false and misleading when made because DISH was not, in fact, putting in place a network that would be usable by enterprise customers (or any customers). Rather, as CWs confirmed and Defendants would later admit during the February 2023 Call, DISH was building the bare minimum needed to comply with the FCC directive. Additionally, DISH was not actively working with any enterprise customers and demand from enterprise customers was non-existent at this time, as evidenced by the following:

1)   CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

2) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.

3) Defendant Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone, and Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

4) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.

5) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research.

6) CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

7) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

146.    When asked by David William Barden of BofA Securities, about the status of the

5G buildout in Las Vegas, Defendant Bye stated the following, in response to an analyst question:

**David William Barden,** *BofA Securities, Research Division*:

…And then I know we don't have Dave on, but Stephen, maybe on the Las Vegas build. Could you talk to us about what does that build look like? What are you going to do? When is it going to happen? What are you trying to get out of that in terms of showing people what this network is capable of?

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*:

Yes. So just in terms of what the Las Vegas build looks like, I think there are several attributes that are really important to what we're doing, to build on Charlie's comment. One is we are building a cloud-native infrastructure. We are using an open radio access architecture, but it's also a 5G-native network. We're not trying to put 5G on top of in 2G, 3G and 4G. The infrastructure that we're deploying is optimized for 5G. And the way we've designed in or work from an RF perspective

and a deployment perspective is to take advantage of the 5G architecture as well as the 5G platform.

And so what does that look like? It's basically a new network. It's a new infrastructure. It's designed using all of the spectrum bands that we have, and the RF is up in line to take advantage of that. **So -- and we're on a path to launching that in the third quarter, but it's one of a number of markets we have coming on**. We just haven't announced those markets through the end of the year, but it's the first of, obviously, a number that we have in flight today, and we've got activity going on across the country to actually build out this network.

So we'll be the first one that people can touch and feel and get the experience, but it is really a 5G-native network. **And we've proven that O-RAN, from a technology perspective can work.** Compared to that at the end of last year, now we're in the execution phase. Now we're in the deployment phase. **And so Vegas will happen to be the first one that it will be a fully deployed market that people will be able to touch and feel and experience.**

147.    The above statement in the April 2021 Call was materially false and misleading when made because in February 2021, DISH could not reasonably expect commercial launch in any cities by 3Q or 4Q 2021 and because DISH had not yet proven its Open-RAN network could be integrated and was suffering serious integration problems at the time. Thus, Defendants had "proven" nothing and were not "on a path" to launch the 5G network in the third quarter, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.
2) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
3) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
4) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
5) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

6) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

7) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

8) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

148.    During the April 2021 Call, Defendant Ergen stated he didn't think DISH could have done anything better in designing the network, while Defendant Rouanne assured investors that DISH had onboarded "all the telco software" into the cloud and boasted that, unlike a traditional telco network where "everything is frozen," DISH's network was fast, impressive, and easily scaled:

**Charles William Ergen,** *Co-Founder & Executive Chairman*:

I think from an architectural point of view, and Marc really is the architect here. I don't know, but you spent a lot of time on it, and you talked to a lot of people. **I don't know if you'd change anything today**.

**Marc Rouanne,** *Executive VP & Chief Network Officer*:

No, absolutely. I mean, **the more we play with it, the more we're impressed**. When we are -- of course, **we've onboarded a software, all the telco software on the cloud, and it's fascinating how fast it is, how we can make changes, how we can scale it**. I mean just scaling it. In the telco network, everything is frozen and you plan your investment 18 years ahead. We scale. We scale up and down during the day, during the night. We need a new platform to test a new private use case; we just scale it. **It's quite fascinating for engineers to see what we can do now**.

149.    Defendant Rouanne gave investors further assurances that DISH had an operational network, differentiated from competitors, with latency "way better than what you see in the current networks":

> I mean, **currently, we have today**, we've designed the network, **we have the latency required, which is** -- I'm not going to give a number, but it's **way better than what you see in the current networks**. **So we have enough local zone situation, availability zones to create a differentiated latency network**.

150.    When analyst Michael Ian Rollins of Citigroup Inc. Exchange Research asked whether some of DISH's purchase of a small retail wireless brand satisfied certain regulatory requirements, Defendant Ergen assured investors that DISH's focus was not on FCC obligations or regulatory requirements, but rather on building a "world-class network":

> The answer is yes, it would qualify. Yes. It satisfies the final judgment as is. But we believe as we add Republic and other growth into the market, we will further reinforce that. **But I think you're being a little too anal on -- we got FCC obligations, but we -- what we're really doing is building a world-class network that takes telecom to the next level**. It really is an IT network that looks like a telecom network.

151.    Much like he did in the February 2021 Call, in the April 2021 Call Defendant Ergen assured investors that DISH had the technical capabilities necessary to launch DISH's 5G network in Las Vegas and multiple additional cities over the next few months, and again misrepresented the DISH's ongoing integration problems as risks that could materialize in the future:

> And so I'll just repeat what -- my opening comments last time, which is **we're technically now confident that we can do, technically, what we've talked about for the last several years. But we do have execution risk. And I'm sure that things won't go smooth,** whether it be COVID, supply chain **or the actual execution of taking things from the laboratory and then deploying them in Las Vegas and multiple cities over the next few months. We're going to have some -- some stuff is not going to work.** And having been through this kind of scale before, and we just have to fix it, and then we find out how -- we find out whether that strategy of picking the vendors who are committed to what we're doing. Is that -- we picked the right team from a vendor community? And do we have the right

team internally to overcome the obstacles that we inevitably will face. **And we're all confident today.** And then as soon as we light up Las Vegas, we're probably going to be less confident the next day. That's the way my experience is. And then we'll dig in and fix the problems and we'll be patting ourselves in the back, hopefully. **But it's execution risk.** And so you guys as investors, that's a serious risk. And -- but **we've eliminated what I always thought was, by far, the more serious risk, probably 10x more risk**. Was could you architect a network?

152.    The above statements in the April 2021 Call were materially false and misleading when made because the purported risks had materialized as DISH had not yet validated its critical technologies, vendors, and software, had been experiencing serious integration issues, did not yet have a functional network, and had abandoned efforts to create a functioning network while it frantically attempted to meet the FCC 2022 deadline. Thus, DISH was experiencing serious execution issues because the company could not integrate the network's software and hardware components, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.
2) According to CW2, by Q1 2021, DISH was experiencing serious network integration issues throughout CW2's tenure.
3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
4) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
5) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
6) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.
7) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."
8) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified,

functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

9)  As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.

153.    In response to Defendants' positive, but false statements, DISH's stock price increased from $41.59 per share on April 28, 2021 to $45.05 per share on April 29, 2021 on heavy trading volume of over 10 million shares. Analysts took note of Defendants' comments about the progress of DISH's 5G network and its purported relationships with enterprise customers and incorporated the information into their valuations of DISH's stock price. For example, in an April 29, 2021 report, Credit Suisse analysts noted Defendants' statements that "(a) *Las Vegas launch in 3Q*, with several more markets later this year; (b) enterprise vs. consumer service launches will be "done in phases"; (c) *they are "technically now confident"* – Ergen believes the network architecture/paradigm shift was 10x more risky than the network build / wireless execution will be; [and] (d) *enterprise demand is "terrific" and they're already engaged with a number of customers today*[.]" As a result, the Credit Suisse analysts assessed that "[n]ear-term catalysts favor DISH, with the formal launch of its first markets likely to prove out the O-RAN / native 5G cloud-based architecture and push the Street to start formally modeling wireless operational scenarios for the company."

### E.  August 9, 2021 Second Quarter Form 10-Q

154.    On August 9, 2021, Defendants filed with the SEC, DISH's Second Quarter Form 10-Q for the three and six-month period ended June 30, 2021 (the "Q2 2021 Form 10-Q"), which was signed by Defendants Carlson and Orban. The Q2 2021 Form 10-Q contained material misstatements concerning the sufficiency of DISH's capital and requirements for future funds. For

example, Defendants characterized DISH's future capital needs as a mere possibility, when Defendants knew DISH could not make it even another year given the numerous 5G integration issues and loss of subscriber revenue:

> **We may need to raise significant additional capital in the future to fund the efforts described above**, which may not be available on acceptable terms or at all. There can be no assurance that we [] will be able to develop and implement a business model that will realize a return on these wireless spectrum licenses or that we [] will be able to profitably deploy the assets represented by these wireless spectrum licenses, which may affect the carrying amount of these assets and our future financial condition or results of operations.

155.    The above statement in the Q2 2021 Form 10-Q was false and misleading when made because, at the time of the statement, DISH already lacked the capital it needed to complete the 5G network buildout and Defendants knew that DISH would certainly need to raise additional capital, evidenced by the following:

1) Defendant Ergen registered the SPAC CONX in October 2020 and raised $750 million to be used in a de-SPAC transaction between CONX and DISH's retail wireless business, Boost Mobile.
2) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
3) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
4) As Defendant Ergen would later admit on May 8, 2023, DISH positioned small numbers of radios in concentrated population hubs to meet the FCC's technical population requirements, knowing the radio density was wholly insufficient to actually provide useable coverage to those areas and DISH needed to go back and "densify the current markets that we have."
5) CW2 also recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.
6) Defendants chose to pursue an Open-RAN network because DISH did not have the capital to construct a RAN from a single, experienced OEM.

7) Defendants themselves later admitted to building the network as cheaply as possible. Defendant Ergen, for example, stated on the November 4, 2021 Earnings Call in reference to the 5G buildout that "we're doing it infinitely less expensive[ly] than anybody has ever done before."

### F. August 9, 2021 Earnings Call

156.    Defendants also held an investor call on August 9, 2021 to discuss DISH's second quarter 2021 results (the "August 2021 Call"). Despite undisclosed ongoing integration issues, during the August 2021 Call, Defendant Ergen assured investors that "things work in a lab today" and the Las Vegas site would "be deployed by the end of September" with "retail" and other cities following soon after:

> **John Christopher Hodulik,** *UBS Investment Bank, Research Division*
>
> Yes. Just what the service looks like when you guys turn that network on. Is it going to be in beta for the rest of the year? Or do you actually start adding customers to it?
>
> **Charles William Ergen,** *Co-Founder & Executive Chairman*
>
> So we've got a lot of – so we think that's going to be at least a 90- day kind of beta integration. **Things work in a lab today,** but when you take them out of the lab and we get them on [Dave Mayo's] network, **that will be deployed by the end of September, we can light up Vegas in total**[,] [t]hat goes from the lab to the reality. In my experiences, things don't work exactly right the first month or 2, and you've got to integrate that. But – and then we'll go from there. **We will have retail. Obviously, Vegas, as in other cities, it will light up very quickly after Las Vegas. We'll have a retail presence and we'll have offers for consumers that we think will be competitive**.

157.    The above statements in the August 2021 Call were materially false and misleading when made because in August 2021, DISH's network was not working even in a "lab" or controlled environment and DISH could not reasonably expect commercial launch in Las Vegas by the end of September 2021 or in any other cities very quickly afterward, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.

2) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.

3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

4) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

5) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

6) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

7) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

8) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

9) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

10) As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.

158.    Not only did Defendants falsely assure investors that the Las Vegas network would be fully deployed in another month, when asked about DISH's long-term capital needs "post Las Vegas," Defendant Ergen claimed DISH had sufficient capital "to meet [] deployment guidelines":

Well, I mean, I think historically, we've accessed the capital markets, so over our 40-year history. So I don't -- and obviously, we have obligations we need to pay back. So we continue to -- as always, we're opportunistic in the capital markets, if there's reasonable ways to raise capital and we plan our business accordingly to -- and we've been pretty innovative. And obviously, we've never had the kind of

capital that some of our competitors do. And so we've had to be more innovative. And I think that we're comfortable in that space. **But we have the capital to -- I think Dave sleeps at night, knowing that he had the capital available to meet his deployment guidelines for now. And obviously, Erik has run the business in a positive cash flow manner, so.** But if there's opportunity out there with partners or with the markets themselves, we obviously look to take advantage of those things.

159.    The above statement in the August 2021 Call was false and misleading when made because, at the time of the statement, DISH already lacked the capital it needed to complete the 5G network buildout and Defendants knew that DISH would certainly need to raise additional capital, evidenced by the following:

1) Defendant Ergen registered the SPAC CONX in October 2020 and raised $750 million to be used in a de-SPAC transaction between CONX and DISH's retail wireless business, Boost Mobile.
2) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
3) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
4) As Defendant Ergen would later admit on May 8, 2023, DISH positioned small numbers of radios in concentrated population hubs to meet the FCC's technical population requirements, knowing the radio density was wholly insufficient to actually provide useable coverage to those areas and DISH needed to go back and "densify the current markets that we have."
5) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.
6) Defendants chose to pursue an Open-RAN network because DISH did not have the capital to construct a RAN from a single, experienced OEM.
7) Defendants themselves later admitted to building the network as cheaply as possible. Defendant Ergen, for example, stated on the November 4, 2021 Earnings Call in reference to the 5G buildout that "we're doing it infinitely less expensive[ly] than anybody has ever done before."

160.    Analysts continued to be heavily focused on DISH's enterprise customers.

161.    During the August 2021 Call, Defendant Bye claimed DISH was "in active discussions on enterprise and wholesale" and Defendant Ergen told investors that DISH would have enterprise customers in 2022, just four months after the planned Las Vegas launch:

**Raymond James & Associates, Inc.,** *Research Division*:

Makes sense. Second question, you mentioned on Vegas there's busy work there. The consumer beta trial, how should we think about why not a wholesale enterprise beta trial? Or is that something that would also be occurring in the fall in this time frame?

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*:

**Yes. We're in active discussions on enterprise and wholesale**. Not all wholesale is national and a lot of business services are local. **And so we are actively pursuing a number of opportunities**, not necessarily just in Las Vegas either, for that matter.

162.    The above statements in the August 2021 Call were materially false and misleading when made because DISH was not, in fact, putting in place a network that would be usable by enterprise customers. Rather, as Defendants would later admit during the February 2023 Call, DISH was building the bare minimum needed to comply with the FCC directive and had cut the enterprise product development budget. Thus, DISH was not actively working with any enterprise customers and demand from enterprise customers was non-existent at this time, as evidenced by the following:

1) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.
2) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.
3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

4) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research.

5) CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

6) Defendant Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone, and Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

163.    In response to a question from Scott Moritz of Bloomberg about when DISH's 5G network would launch as "a full-fledged product," Defendant Ergen assured investors that he expected that to occur "at the first of the year" (e.g., early 2022) but failed to disclose the already-known integration issues plaguing DISH and its vendors and that DISH had shelved VoNR so the 5G network could not be commercialized:

**Scott Moritz,** *Bloomberg*:

So it's a 90-day beta launching in September, I believe you said. And after that 90 days, it becomes a full-fledged product, which is probably, what, early next year?

**Charles William Ergen,** *Co-Founder & Executive Chairman*:

I mean, I think the way I'd say it is, if **our normal expectation would be that, yes, we turned in a full-fledged product early next year, right? And it's commercialized**. But we'll have to see how our beta goes, right? So I'm in a beta test now for a service of a different sort that I'm thinking, I've got 9 months into beta. So it depends on -- we don't think -- but that's where we are. But we have to get more data on the beta to know when we rolled out. We want to -- we get a first impression, and we want it to be a good first impression. Obviously, we have -- we do -- and as soon as we -- everything we learn in Vegas rolls directly into the other networks that we can line up at the same time. So the bottom line is, that it's going to be a minimum of 90 days. **And if we do our jobs correctly and our vendors**

**do our jobs correctly, then we're going to be ready for prime time at the first
of the year**.

164.    The above statement in the August 2021 Call was false and misleading when made

because DISH's 5G network was not validated and was not close to functional enough to be

launched as a commercial product by early 2022, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.
2) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
4) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
5) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
6) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.
7) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.
8) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."
9) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

165.    In response to Defendants' positive and false statements, DISH's stock price

increased from $41.97 per share on the prior trading day, August 6, 2021, to $42.25 per share on

August 9, 2021. Analysts considered the above information in their assessment and valuation of DISH securities. In an August 9, 2021 report, for example, Raymond James analysts gave the stock a "Strong Buy" rating, noting that DISH's 5G buildout was "underway in earnest" and stating "Bottom line: we believe DISH presents a very attractive option on the 5G future, funded significantly by the cash cow Pay-TV business, with 4G wireless retail, and in the future, the potential for a large 5G Wholesale/Enterprise business."

### G.  November 4, 2021 Third Quarter Form 10-Q

166.    On November 4, 2021, Defendants filed with the SEC, DISH's third Quarter Form 10-Q for the three and nine-month period ended September 30, 2021 (the "Q3 2021 Form 10-Q"), which was signed by Defendants Carlson, Orban and Allen. The Q3 2021 Form 10-Q contained material misstatements concerning the sufficiency of DISH's capital and requirements for future funds. For example, Defendants characterized DISH's future capital needs as a mere possibility, when Defendants knew DISH could not make it even another year given the numerous 5G integration issues and loss of subscriber revenue:

> **<u>We may need to raise significant additional capital in the future to fund the efforts described above</u>**, which may not be available on acceptable terms or at all. There can be no assurance that we will be able to develop and implement a business model that will realize a return on these wireless spectrum licenses or that we will be able to profitably deploy the assets represented by these wireless spectrum licenses, which may affect the carrying amount of these assets and our future financial condition or results of operations.

167.    The above statement in the Q3 2021 Form 10-Q was false and misleading when made because, at the time of the statement, DISH already lacked the capital it needed to complete the 5G network buildout and Defendants knew that DISH would certainly need to raise additional capital, as evidenced by the following:

1) Defendant Ergen registered the SPAC CONX in October 2020 and raised $750 million to be used in a de-SPAC transaction between CONX and DISH's retail wireless business, Boost Mobile.

2) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

3) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.

4) As Defendant Ergen would later admit on May 8, 2023, DISH positioned small numbers of radios in concentrated population hubs to meet the FCC's technical population requirements, knowing the radio density was wholly insufficient to actually provide useable coverage to those areas and DISH needed to go back and "densify the current markets that we have."

5) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

6) Defendants chose to pursue an Open-RAN network because DISH did not have the capital to construct a RAN from a single, experienced OEM.

7) Defendants themselves later admitted to building the network as cheaply as possible. Defendant Ergen, for example, stated on the November 4, 2021 Earnings Call in reference to the 5G buildout that "we're doing it infinitely less expensive[ly] than anybody has ever done before."

**H. November 4, 2021 Earnings Call**

168.    Defendants also held an investor call on November 4, 2021 to discuss DISH's third quarter 2021 results (the "November 2021 Call"). During the November 2021 Call, Defendant Bye falsely claimed that DISH had "both wholesale and enterprise" customers lined up:

**Richard Hamilton Prentiss,** *Raymond James & Associates, Research Division*:

Yes. A couple of questions. One, on the Las Vegas consumer trial. Do you anticipate having a wholesale enterprise trial strictly to Vegas? Or do you need more footprint before you could actually do a wholesale enterprise trial?

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*:

Yes, Rick, it's a very good question. **And in fact, we do have both wholesale and enterprise lined up**. We're very focused on the consumer trial right now. And at the appropriate time, we'll talk more about what we're doing there on the wholesale side. And what's actually exciting about the wholesale opportunity is a lot of pundits would suspect that you need to have a nationwide footprint to support that segment. There are a lot of opportunities there to serve customers with very niche products and capabilities that are local or even a regional level, **and we're working with companies to do that.** And we'll announce at a later date some further details on what we're doing there.

169.    The above statement in the November 2021 Call was false and misleading because DISH was not actively working with any enterprise customers and demand from enterprise customers was non-existent at this time. Thus, Dish did not have enterprise customers "lined up", as Defendants falsely claimed, as evidenced by the following:

1) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

2) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and that it would be at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

3) CW1 recalled that in May 2022, DISH's network still could only support a few users at that time and network was not scalable.

4) CW1 explained that Voice over New Radio (VoNR) was still not working in May 2022.

5) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

6) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research.

7) CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

8) Defendant Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to

meet the FCC milestone, and Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

170.    In response to a follow-up question from Credit Suisse analyst Douglas Mitchelson about the timeline for when DISH would begin servicing enterprise customers, Defendant Bye falsely claimed that DISH had "traction now in the enterprise segment," was deploying to enterprise customers and that DISH was ready to scale:

**Douglas David Mitchelson,** *Crédit Suisse AG, Research Division*:

And last one, your comments on consumer versus wholesale are always interesting -- and versus enterprise. *I was hoping you could help us understand time frame a little bit for the enterprise opportunity.* So you've talked about it being a big opportunity but it's one that might take a while to emerge. Like what's a good time frame for investors to think about when enterprise becomes a really big business for DISH? And I'm just curious the capital intensity of that business versus consumer, are there big upfront cost to help enterprises activate that service? Or is the thought that enterprises will bear those costs?

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*:

**Yes. On the enterprise, we're actually -- we're -- we have traction now in the enterprise segment. But the revenue is still fairly small. Obviously, that business scales as we grow the business. So we already have some really positive traction right now. That will grow as we go into '22, but** I don't anticipate that to become material until we get into 2023. And so we'll continue to grow that business scale out. We can grow that while they're building the network because it's not constrained by geography. **And so we can actually -- and we are pursuing opportunities that aren't limited by the geographies and footprint we're deploying**. But as we build that footprint out, then it expands the market opportunity for us. So we'll see that sort of begin to pick up as we go through '22, but really not having a material impact until we get into '23. So that's kind of where we see the enterprise.

171.    The above statements in the November 2021 Call were materially false and misleading when made because: DISH was not actively working with any enterprise customers and demand from enterprise customers was non-existent at this time, as evidenced by the following:

1) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

2) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and that it would be at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

4) CW1 recalled that in May 2022, DISH's network still could only support a few users at that time and network was not scalable.

5) CW1 explained that Voice over New Radio (VoNR) was still not working in May 2022.

6) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research.

7) CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

8) Defendant Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone, and Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

9) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.

10) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

11) Defendants admitted during the February 2023 Earnings Call that DISH was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.

12) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

13) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

14) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

15) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

16) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

17) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

172.    During the November 2021 Call, Defendant Ergen assured analysts that DISH was well-positioned to capture a portion of the enterprise market because of DISH's technical capabilities and expected DISH to be "first-to-market" in the enterprise market, while Defendant Bye assured investors that DISH's network already had capabilities that differentiated it from the other wireless carriers' enterprise offerings:

**David William Barden,** *BofA Securities, Research Division*:

Does DISH want to be the last to market consumer smartphone broadband player? Or does it want to be a first-to-market wholesale provider or enterprise service provider? Any color you could share about how you're thinking there would be great.

**Charles William Ergen,** *Co-Founder & Executive Chairman*:

Yes. No, **I think we're going to do both**… **And particularly on the enterprise side, where that's kind of a jump ball. In other words, I think all the carriers are going to do well in enterprise.** It's a new market segment. It's a market segment that can rival the kind of demand you see for consumers, because on the enterprise side, when they can have their own private networks, so to speak, a slice of the network, they can -- they're going to be able to build their products safer, cheaper,

better and gain on the competition. **So it's going to be a big market. We're well positioned for that because our opinion is that you need to be cloud-based and you need to be automated to do it, to slice your network.** So we're going to have an advantage there. But the incumbents have an advantage of incumbency and brand recognition and that kind of stuff. So I think everybody is going to do pretty well. But I feel like that's a place where we can get more market share than we will in the handset business. Stephen, do you want to add any -- Stephen runs that side of the forest.

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*:

I think, Charlie, you characterized it very well. And I think what's interesting in sort of the enterprise space is sort of the move to sort of industrial [ forward area ]. And sort of the opportunity that, that presents for enterprise customers to build a more efficient operating model. **And so with our platform, we do have some capabilities in that environment with the cloud-native architecture that we're deploying that gives us the opportunity to differentiate more and actually provides more degrees of freedom for an enterprise customer as well than what you would have with a traditional network. So we do think we have some inherent advantages there**, but it's certainly going to be a good business for everybody.

173.    Defendant Ergen further assured analysts and investors that DISH's purported product offering to enterprise customers included the "fastest 5G" and that DISH's level of automation in the cloud and use of artificial intelligence was on the "leading edge" and differentiated DISH from the other carriers in the industry, even though, unbeknownst to investors, Dish had cut the enterprise product development budget at the end of 2020 or early 2021 and had not been working to develop any such products:

**Charles William Ergen,** *Co-Founder & Executive Chairman*:

…we think that the enterprise business has more profitability, probably, that's our guess. That has a lot more profitability than kind of a very competitive retail wireless business, where everybody is selling the same thing. **We're the best 5G, we're the fastest 5G. We can differentiate a lot more on the enterprise business, where we can say we're in the cloud** -- I don't think the business survives the next decade. If you don't -- if you're not -- if you don't have automation, then you don't have -- you're not using the artificial intelligence and you're not cloud-based. I just don't think you should. But rare exception, some old school industries maybe do,

but you're just not going to survive. **And we're on the leading edge of that. And so we think that we move people there in a way that – or help move them there in a way with our partners, in a way that they couldn't otherwise get there with the other carriers.**

174.    The above statements in the November 2021 Call were materially false and misleading when made because DISH's supposedly superior network had not been validated and was not near functional at the time the statement was made, such that the factors Defendants claimed differentiated the network and created a competitive advantage were wholly theoretical and offered no actual advantage, as evidenced by the following:

1) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.
2) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.
3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
4) CW1 recalled that in May 2022, DISH's network still could only support a few users at that time and network was not scalable.
5) CW1 explained that Voice over New Radio (VoNR) was still not working in May 2022.
6) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
7) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
8) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.
9) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.
10) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets

-71-

from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

11) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

### I. February 24, 2022 Annual Report on Form 10-K

175.    On February 24, 2022, Defendants filed with the SEC, DISH's Annual Report on Form 10-K for the year-ended December 31, 2021 (the "2021 Form 10-K"), which was signed by Defendants Carlson, Orban and Allen. The 2021 Form 10-K contained material misstatements concerning the sufficiency of DISH's capital and requirements for future funds. For example, Defendants characterized DISH's future capital needs as a mere possibility, when Defendants knew DISH could not make it even another year given the numerous 5G integration issues and loss of subscriber revenue:

> **We may need to raise significant additional capital in the future to fund the efforts described above**, which may not be available on acceptable terms or at all. There can be no assurance that we will be able to develop and implement a business model that will realize a return on these wireless spectrum licenses or that we will be able to profitably deploy the assets represented by these wireless spectrum licenses, which may affect the carrying amount of these assets and our future financial condition or results of operations.

176.    The above statement in the 2021 Form 10-K was false and misleading when made because, at the time of the statement, DISH already lacked the capital it needed to complete the 5G network buildout and Defendants knew that DISH would certainly need to raise additional capital, as evidenced by the following:

1) Defendant Ergen registered the SPAC CONX in October 2020 and raised $750 million to be used in a de-SPAC transaction between CONX and DISH's retail wireless business, Boost Mobile.
2) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

3) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.

4) As Defendant Ergen would later admit on May 8, 2023, DISH positioned small numbers of radios in concentrated population hubs to meet the FCC's technical population requirements, knowing the radio density was wholly insufficient to actually provide useable coverage to those areas and DISH needed to go back and "densify the current markets that we have."

5) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

6) Defendants chose to pursue an Open-RAN network because DISH did not have the capital to construct a RAN from a single, experienced OEM.

### J. February 24, 2022 Earnings Call

177.    Defendants also held an investor call on February 24, 2022 to discuss DISH's fourth quarter and annual 2021 results (the "February 2022 Call"). During the February 2022 Earnings Call, CW2 Defendant Carlson assured investors that DISH would be offering 5G wireless service to customers in "numerous markets" within the next few months, even though DISH had solely been focusing on building the radio sites and towers, without regard to functionality, to meet the FCC deadline:

> Our wireless network team has made significant progress over the past quarter and recent weeks. **We'll begin opening up access to customers in numerous markets over the coming months. And at a high level, we'll hit our June milestone with 20% of the population covered.**

178.    The above statement in the February 2022 Call was false and misleading when made because DISH's 5G network was not yet validated or close to functional at the time the statement was made. As Defendant Ergen would explain in the February 2023 Call, network optimization takes six months from the completion of network buildout. In February 2022, the

buildout was still months from completion, so the network could not be ready for consumer use

"over the coming months," as evidenced by the following:

1) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.
2) CW1 recalled that in May 2022, DISH's network still could only support a few users at that time and network was not scalable.
3) CW1 explained that Voice over New Radio (VoNR) was still not working in May 2022.
4) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
5) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.
6) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the enterprise team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.
7) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
8) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.
9) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.
10) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."
11) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

179.    Defendant Ergen assured investors in the February 2022 Call that DISH's 5G

network in Las Vegas now supported voice and was the most advanced network in the world, but

failed to mention that the Company was building out the rest of the network without regard to functionality and had "shelved" any effort to implement voice to focus solely on meeting the FCC deadline:

> The second positive is that our network in Vegas, **we actually have operational now a 5G stand-alone network that operates in O-RAN with O-RAN principles. It's cloud native in the AWS cloud, with VoNR voice. So that is the most advanced network in the world.** We probably ended up doing a lot more development than we thought in some of the technologies with our vendors. But that is up and operational and when it works, it works pretty well. As always we still have work to do. We're not ready to spike the football, **we have work to do to develop through all the cities and to optimize the network. But the technical challenge has been resolved for some of the core things that we needed to do**.

180.    With respect to the network's functionality, Defendant Ergen further assured investors, in direct response to an analyst inquiry, that Defendants had "optimized the network," "the speeds are good," and the network "works well," as below:

**John Christopher Hodulik**
*UBS Investment Bank, Research Division*

Maybe for Charlie, just are there any early indications of how the network in Las Vegas is performing in terms of signal quality or speeds or capacity? And you mentioned that you said it's performing well when it's working, I mean, I guess, without getting too technical, can you explain sort of why it doesn't work, when it doesn't, and your efforts to overcome those roadblocks?...

**Charles William Ergen**
*Co-Founder & Executive Chairman*

…I was in -- I've been -- I go to Las Vegas every month, so I can see kind of the progress, but I was there yesterday. And so the -- **where we've optimized the network, the speeds are good and it works well**. We haven't optimized the whole city. And so this fun fact just for you guys, but obviously, your team takes you to the places where they've optimized the network. But obviously, before we got -- we left, we went to -- we decided to go to address the places where they hadn't optimized them. And we had some issues there. So the good news is we know -- we know when we get to optimize and we make it work….

-75-

181.    Similarly, on the same February 2022 Call, Defendant Rouanne touted that DISH's

5G network in Las Vegas and other markets was already "working" and had significant speed and

capability, but failed to mention that the Company was building out the rest of the network without

regard to functionality and only to meet the FCC deadline:

**Brett Joseph Feldman**
*Goldman Sachs Group, Inc., Research Division*

So you guys for a long time, have said that as you build out a wireless network
built on cloud technology, that you'll inevitably have a cost advantage. I think,
conceptually, that's always made sense. As you've noted, you are now actually
operating a network on this technology that sometimes works the way you want it
to.

So you haven't scaled it yet, but can you start to maybe give us some insight as to
what you think that sustainable operating cost advantage is going to be, now that
you have some evidence as to what you've been able to do in the field?

And then just as a follow-up to that, I think we all anticipate that when you launch
and go to market, you're going to be offering consumers a really great value for
the quality of service that you're delivering as you sort of flow through some of
those cost savings to the consumer. But I'm wondering if the architecture that
you've chosen is also going to allow you to deliver features and functionalities
that might be a competitive advantage we're not putting enough thought into?

**Marc Rouanne**
*Executive VP & Chief Network Officer*

Yes, we're starting to see benefits. We're certainly seeing benefits in the cloud now
of something that is pretty costly for existing operators, which is to test new
software and to embark on new innovation. **And we have the speed and capability
to do that, that is truly comparable to the cloud and with much more
automation**. So we require much smaller of people and when we scale, we think
that will give us both benefits of speed innovation but also of cost.

**We are also seeing with the OpenRAN -- the OpenRAN today is working in
Vegas and in other markets**. But we are starting to see a lot of new ideas and
benefits from the OpenRAN observability, which means you can see things, you
can see how the quality of service is evolving. You can see how -- the benefits of

your footprint. You can see if you need new small cells or not in a way that was hidden inside Nokia and Ericsson in the past….

182.    The above statements in the February 2022 Call were materially false and misleading when made because the network was not, in fact, operational, functional, or advanced at the time the statements were made and Dish had stopped efforts to include voice (VoNR). To the contrary, the network was experiencing significant integration issues and did not have functional voice capabilities or optimized functionality, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.
2) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
3) CW1 recalled that in May 2022, DISH's network could only support a few users at that time and network was not scalable.
4) CW1 explained that Voice over New Radio (VoNR) was not working in May 2022.
5) Defendants admitted during the February 2023 Earnings Call that Dish was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
6) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.
7) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.
8) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.
9) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.
10) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

11) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

183.    Upon the news, DISH's stock price increased from $27.57 per share on February 23, 2022 to $32.80 per share on February 25, 2022 on heavy trading volume.

184.    Analysts noted the above statements by Defendants and integrated the information into their analyses and valuation of DISH's securities. For example, a February 24, 2022 report, Credit Suisse analysts gave a "favorable update" on the stock, specifically noting Defendants' remarks that DISH's 5G network was "now functional" in Las Vegas, that well over 100 markets were set to launch by June 2022, and that financing would not be needed until the next year.

### K.  May 6, 2022 First Quarter Earnings Call

185.    Defendants also held an investor call on May 6, 2022 to discuss DISH's first quarter 2022 results (the "May 2022 Earnings Call"). During the May 2022 Earnings Call, Defendant Bye continued to misrepresent the capabilities of DISH's 5G network and the Company's ability to service enterprise customers, stating, "[a]nd as we've talked about in the past, we think that there's significant potential with the enterprise business. **And the capabilities of our network actually enable that as we go forward.**"

186.    The above statement in the May 2022 Earnings Call was false and misleading because DISH had shelved development of enterprise products, was not actively working with any enterprise customers and demand from enterprise customers was, thus, non-existent at this time because the network lacked capabilities that were critical to enterprise customers, as evidenced by the following:

1) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.

2) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

3) CW1 recalled that in May 2022, DISH's network could only support a few users at that time and network was not scalable.

4) CW1 explained that Voice over New Radio (VoNR) was not working in May 2022.

5) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

6) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

7) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

8) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

9) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

10) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

11) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

187.    During the May 2022 Earnings Call, in response to a question from a BofA Securities analyst about DISH's objectives for the 5G network, Defendant Carlson emphatically denied that the network was being built just to minimum specifications to meet the FCC requirement, falsely assuring that the Company had "things in place to make sure" Dish was both meeting FCC requirements and building a 5G network that would be profitable:

**David William Barden**, *BofA Securities*, *Research Division*

… When we look at Las Vegas from the outside, DISH looks like a last-to-market, single-device, consumer wireless broadband player, which doesn't really seem to be as novel an approach to return as the approach you're trying to take towards investment. And maybe this is something that's going to come out on Tuesday, but I think we ask this every quarter, which is what does the pot of gold at the end of the rainbow look like?

**W. Erik Carlson**, *President, CEO & Director*:

Yes. I think I'll take the retail wireless part and then maybe on the network side would be Stephen and if there's something left over for John. On the retail side, I mean, we'll talk more about this in Vegas. But obviously, as a fourth player, we certainly have historical data where we think that goes, and it certainly should be a very profitable business for us. Obviously, as the fourth player, you're going to have to be innovative to get people. You certainly are going to look at price. You're certainly going to look at innovation in terms -- our network allows us to be more innovative, so that is interesting stuff. As John mentioned, right, the time to do that is when you've got a fully loaded -- a bag of tricks, which we do need Band 70. We do need lower-cost phones, right? You wouldn't hit the gas on that today with one phone that's $899, right? So on the other hand -- so we -- but we have FCC obligations that are focused on retail wireless, and they're not focused as much on maybe some of the other things that we think our network does. So we're -- we didn't make the rules. And so we would probably approach it a little bit different way if it was all P&L. **But we have things in place to make sure that we can kind of walk and chew gum at the same time, which is meet the FCC obligations and also make that a profitable business.** So I think we'll go a little bit more detail on this in Vegas, and then...

188.    The above statement in the May 2022 Earnings Call was materially false and misleading when made because Defendants were focusing on developing the bare infrastructure to meet the FCC requirements at the expense of the other elements necessary to make the network functional, as evidenced by the following:

1) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
2) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The

market research conclusions did not seem to be founded on concrete willingness to pay research.

3) CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

4) By Q1 2021, DISH was experiencing serious network integration issues, which continued throughout the Class Period, as CW 12 recalled.

5) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung

6) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

7) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

8) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

9) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs." Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

10) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

### L. May 10, 2022 DISH Analyst Day 2022 Presentation

189.    On May 10, 2022, DISH held an Analyst Day (the "May 2022 Analyst Day") in Las Vegas in which DISH executives discussed DISH's 5G network buildout. At the May 2022 Analyst Day, DISH's Executive VP and Chief Commercial Officer, Defendant Bye, misrepresented the state of DISH's enterprise sales, stating:

So the best way to think about it is **we're starting to grow that revenue this year**. **We already got customers, we're growing that revenue this year**. Think of it as sort of the private 5G network space. **We see that scaling in 2023 and clearly picking up momentum as we go into '24 and beyond**. But as I said, there's a long sales cycle when you're dealing with enterprise. So it's a ramp that's going to take some time to kind of ramp up. The way to look at the sort of revenue as it builds up is really going to be about private 5G networks. And then over time, it becomes far more transactional as enterprise customers take advantage of the API gateway and the transactions that are available through that gateway.

I'm not going to give you a year-by-year forecast of what that looks like. But **think of it as early revenue this year, scaling into '23, and then picking up momentum into '24 and then '25**. If I look at the size of the opportunity, I said it's about $30 billion in 2025 for the private 5G as a service. And what I really was pointing out with the 20% is that's where we see our long-term sustainable market share over time. So think of that as beyond 2025 is where we think our sustainable competitive market share position will be. I actually I think it will be a little higher than 20%, given the advantages that we have today, but I think it's going to scale up over time.

So I won't give you specific numbers through those years, but **you'll see it picking up through '23, '24 and clearly into '25, as we get more momentum into '25**.

190.    The above statement at the May 2022 Analyst Day was materially false and misleading when made because Defendants were focusing on developing the bare infrastructure to meet the FCC requirements at the expense of the other elements necessary to make the network functional and relevant to enterprise customers and therefore were not seeing growth, momentum, or revenue from enterprise customers, as evidenced by the following:

1) CW2 recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.
2) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and that it would be at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.
3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.
4) CW2 learned of integration issues with the 5G network began in the first quarter of 2021.

5)  CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research.

6)  CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

7)  Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

8)  CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

9)  CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

10) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

11) Defendant Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs." Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

12) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

### M. November 2, 2022 Earnings Call

191.  Defendants also held an investor call on November 2, 2022 to discuss second quarter results (the "November 2022 Call"). During the November 2022 Call, Defendant Bye continued to mislead investors about DISH's prospects in the enterprise segment, stating:

As we talked about in the Analyst Day, we started out with sort of private 5G and we're sort of evolving that product into a private 5G as a service solution. We talked about the early success we had with DoD. **We continue to win more projects and take on more opportunity with the Department of Defense**. It's very exciting projects. Unfortunately, I can't go into a lot of details specifically about those projects. But **we're also very active in several other verticals and industry sectors, not the least of which includes hospitality**, given the DISH business from the video side of the business, **we are actively engaged with different hotel groups for private networks**. **Also industrial manufacturing, we're responding to more and more RFPs in that space** as companies are looking at how do they invest in more sophisticated solutions to take cost out of the manufacturing facility in the plant. So **we're actively engaged in responding to a number of RFPs there, we're seeing more and more RFP flow coming to us**, which is very encouraging. And then we're also active with utilities. And you've seen different stuff being published recently about utilities and their activity in sort of the private space, and we see movement there in a very positive direction, and we're actively engaged in those conversations. I think the point that I would leave you with is **we've got some really strong proof points in '22. We're seeing growing momentum as we step into '23. We expect that deal flow to continue to grow**, and we're excited about that opportunity. I think on the projects we have won, we're very focused on the execution and gains of those projects. It's very important for us to deliver against those commitments, execution is key. **As we've done on the macro network, we're shifting that focus on to the enterprise side**.

192.    The above statement in the November 2022 Earnings Call was false and misleading because DISH was not "done" with development of the network and was not experiencing momentum or deal flow with enterprise customers, as evidenced by the following:

1) CW2 also recalled that even after scoping out opportunities and road-mapping the development of several potential enterprise products, the team was left with a budget of less than $10,000 and had no engineers or budget to engineer or test any enterprise products that had been conceptualized. The primary focus where budget was utilized was to test consumer mobile devices and achieve a reliable connection with a DISH cell site.

2) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and that it would be at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

3) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

4) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The

market research conclusions did not seem to be founded on concrete willingness to pay research.

5) CW2 explained that while many enterprises expressed *interest* in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

6) Defendant Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone, and Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

7) By Q1 2021, DISH was experiencing serious network integration issues, which continued throughout the Class Period, as CW 12 recalled.

8) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring Dish to ultimately hire Samsung.

9) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards.

10) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a data session reliably in the area.

11) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

## VI.    DEFENDANTS REVEALED THE TRUTH IN A SERIES OF PARTIALLY CORRECTIVE DISCLOSURES

### A.    On November 4, 2021, DISH Reveals that Its Novel Wireless Network Has Been Experiencing Undisclosed Integration Problems and Is Not Ready for Commercialization

193.    On November 4, 2021, Defendants filed with the SEC DISH's Third Quarter Form 10-Q for the three and nine-month period ended September 30, 2021 (the "Q3 2021 Form 10-Q"), which was signed by Defendants Carlson, Orban and Allen. The Q3 2021 Form 10-Q reported on, among other things, DISH's third quarter financial results. Defendants also issued a press release

on November 4, 2021 reporting DISH's third quarter financial results (the "Q3 2021 Press Release") and held an investor call the same day to discuss DISH's results (the "November 2021 Call").

194.    In the Q3 2021 Press Release, Defendants reported earnings and revenue below analyst expectations. In explaining the Company's poor financial performance during the November 2021 Call, Defendant Carlson revealed that, contrary to Defendants' prior statements that DISH had purportedly "**completed a successful field validation, utilizing our fully virtualized standalone 5G core network and the industry's first O-RAN compliant radio**" and was "**deploying it now**" and that the Las Vegas site would have a "**full-fledged product**" ready for commercialization at the start of 2022, DISH had actually been experiencing significant delays at the Las Vegas site because of undisclosed integration issues.

195.    During the November 2021 Call, Defendant Carlson admitted, "[w]e were a little delayed as a consequence of frankly, the Vegas network was…[j]ust getting the radio software and the core network software to work together and be reliable." Defendant Carlson further admitted that DISH was also "still working through T-Mobile roaming and specifically handover issues. So Vegas is, I'd say, coming along." Thus, the Las Vegas site was not on track and would not be ready for "prime time," as previously represented.

196.    Upon the news, DISH's stock price declined from $43.09 per share on November 3, 2021 to $37.08 per share on November 4, 2021 on heavy trading volume of over 11 million shares, as compared to the previous day of 2.9 million shares.

197.    Analysts expressed concerns, noting DISH's stock price decline was likely less to do with earnings and everything to do with the lack of progress on, and capabilities of, the Las

Vegas site. As one Barclays analyst stated in a November 5, 2021 report entitled "Why did DISH stock sell off?" reporting on DISH's Q3 2021 results:

> [W]e don't think earnings had much to do with the selloff. The simplest explanation, in our view, was likely positioning ahead of the call as some may have expected details around the company's test launch in Las Vegas… the bigger issue with DISH is that it is a story stock with very little by way of milestones beyond small data points around network build. In that context, management's commentary during the call may have introduced some degree of pessimism around the pace of network build.

### B. On May 6, 2022, DISH Discloses Enterprise Sales Are Non-Existent and that it Needs to Raise Capital to Complete its 5G Network

198.    On May 6, 2022, Defendants filed with the SEC DISH's First Quarter Form 10-Q for the three-month period ended March 31, 2022 (the "Q1 2022 Form 10-Q"), which was signed by Defendants Carlson, Orban and Allen. Defendants also issued a press release on May 6, 2022 reporting DISH's first quarter financial results (the "Q1 2022 Press Release") and held an investor call that same day to discuss DISH's first quarter results (the "May 2022 Call").

199.    The Q1 2022 Form 10-Q and Q1 2022 Press Release reported that DISH missed consensus earnings and revenue estimates by 9.33% and 1.25%, respectively. Defendants also shocked the market when they revealed in the Q1 2022 Form 10-Q that DISH would need to raise additional capital to fund the construction and buildout of its 5G network, despite telling the market just three months earlier that DISH had "everything we need" in terms of cashflow, disclosing:

> In addition, as we complete our 5G Network Deployment we have and will continue to incur significant additional expenses related to, among other things, research and development, wireless testing and ongoing upgrades to the wireless network infrastructure. As a result of these investments, among other factors, *we plan to raise additional capital*, depending on market conditions, which may not be available on favorable terms.

200.     DISH also conspicuously changed its "Acquisition and Capital Structure Risks" disclosure in the 2021 Form 10-K from "[w]e **may** need to raise significant additional capital in the future to fund the efforts described above," which DISH described as all relating to completion of the 5G network to "[w]e will need additional capital" to complete the 5G network in the Q1 2022 Form 10-Q.

201.     During the May 2022 Call, Defendants elaborated on the Company's cash flow issues, stating that "[f]or the first time in many years, we're **in the negative**, but that's because of the investment we're making in our network," explaining that DISH only had "the necessary capital to fund **portions** of the [capex] bill happening this year." (Emphasis added).

202.     Moreover, in response to a question from analyst Richard Prentiss of Raymond James & Associates about the size and timing of DISH's expected capital needs, Defendant Ergen admitted that DISH would run out of cash flow in less than one year:

**Richard Hamilton Prentiss,** *Raymond James & Associates, Inc., Research Division:*

...And then, obviously, the 10-Q points out now you are -- will need to raise capital plan to raise capital. Can you help us understand just framework about sizing it, timing it, what type of capital you might be interested in? Does the spectrum purchase of the low band in 3Q '23 option, the debt maturity 1Q '23 and how any wholesale or private network contracts might fit into your timing also? But just a question kind of on the sizing, timing and type as you're thinking about it.

**Charles William Ergen,** *Co-Founder & Executive Chairman:*

…As far as -- the exact problem in terms of raising money, I think you can look at it that the -- we have capital on hand and cash flow to continue our build-out. But we get to March of next year with the next -- I think it's $1.5 billion bond repayment. We'll need to refinance or willing to raise capital or refinance part of that in that time frame, but that gives you an order of the magnitude of what might look at.

203.    Defendants' disclosures corrected their prior misstatements just two months earlier that DISH had "everything we need" to complete the 5G network and Defendants' purported risk disclosure that Dish "may need to raise significant additional capital."

204.    Defendants further revealed that, while investors expected the commercial launch in Las Vegas in early 2022, integration issues were much worse than represented and, thus, the delays would be much longer. Accordingly, investors learned for the first time that DISH had not actually launched its 5G services until May 4, just two days before the earnings call, stating "[o]n Wednesday of this week, we commercially launched [] in Las Vegas." But what Defendants did not disclose was that DISH had slowed efforts to launch voice functionality by mid-2021 and was merely building out the network to comply with the minimum FCC population coverage deadlines.

205.    Moreover, although Defendants claimed DISH had a strong interest from enterprise customers and would begin servicing enterprise customers in 2022, Defendants revealed during the Q1 2022 Earnings Call that DISH had "FCC obligations that are focused on retail wireless" and DISH was not yet servicing any enterprise customers. Thus, Defendant Ergen admitted, while DISH would hit the 20% requirement in June 2022, "*it's not going to be a robust offering. The commitment that we have to make is we have to do data*. We have to do data 20% of the population in the United States, so it's not going to be a robust offering as robust as we'd like," meaning DISH was still not ready to service enterprise customers. Thus, Defendants characterized DISH's enterprise business as a "future" opportunity that, as of May 2022, DISH had not begun. Defendant Bye, for example, stated, "we think that there's significant potential with the enterprise business. And the capabilities of our network actually enable that as we go forward."

206.    Analysts were fed up and complained about Defendants' lack of transparency, characterizing Defendants' disclosures concerning the network status as a "black box" to which Defendant Ergen admitted, "we need to do a better job of communicating."

207.    Upon the news, DISH's stock price declined from $27.48 per share on May 5, 2022 to $22.22 per share on May 6, 2022 on heavy trading volume of over 13 million shares, as compared to the previous day of 4.4 million shares.

208.    Analysts expressed concern about DISH's need to raise more capital in a challenging economic environment. For example, according to a May 6, 2022 Barclays report:

> **Overall Take**: DISH reported result[s] that were worse than expected across the board (Figure 1). The company also turned FCF negative for the first time, on account of the wireless build and given the early stage of the build, is likely to remain negative FCF for many years to come.

### C. On May 10, 2022, DISH Further Reveals That Its Enterprise Business Opportunity Is Still Highly Uncertain and That It Lacked Significant Capital Which Could Impact Network Development

209.    On May 10, 2022, DISH held an analyst day at the Caesars Forum in Las Vegas to discuss the status of its 5G buildout. Call participants included Defendants Ergen, Mayo, Swieringa, Bye, and Carlson.

210.    While the Company had already teased some topics of discussion in its earnings call four days prior, analysts had remained optimistic in the interim that the analyst day would provide clarity and reveal progress in DISH's 5G network buildout. It did not. At the Analyst Day, Defendant Ergen disclosed that the network was still not perfect and still needed to be scaled, and provided conflicting statements about whether the foundation was even complete:

> "**Now we're not perfect yet, and we certainly have to scale**, but our company has certainly built the most modern network in telecommunications today…. So with our smart 5G network up and operating today, **while we have to scale it**,

**the last piece of our foundation is now in place**. We're on track to finish the first 20% of our network in the coming weeks… And hopefully, you'll be able to test drive the network if you want to here. And we have some Genesis people -- Project Genesis people out here. You can actually sample our network if you want to, right? **But as we sit here today, the most difficult parts of our foundation are now complete**."

211.    Further, in a transparent acknowledgement of DISH's dearth of enterprise customers, Defendant Bye pleaded with investors that "**all of this being said, the pitch to close sales process within the enterprise customer is longer. It takes time**."

212.    Even in the face of these acknowledgements that it would take more time to achieve success in the enterprise market because the "pitch to close sales process" takes longer, Defendant Stephen Bye reassured investors that enterprise revenues would begin to ramp up in 2023—a year later than previously represented. See *supra*, Section V.L.

213.    In the same call, Defendants more fully revealed the extent to which they would need to raise additional capital to complete the 5G Buildout, in response to analyst inquiry. In an exchange with an unknown analyst, Defendant Ergen disclosed that the Company would need to "raise money or refinance" to meet the $1.5 million debt obligation due in March of 2023.:

**Unknown Analyst**

Yes. Three questions. Two questions, if I could. Charlie, first for you. Last week on your earnings call, you were reticent to talk too much about your financing expectations ahead of today. Now that we've sort of -- you've shared this, I wonder if you could just talk a little bit about, in essence, what's the ask or what's your expectation for financing needs and -- which I presume is one of the reasons you wanted to sort of gather us here to sort of set expectations a bit….

**Charles William Ergen**, *Co-Founder & Executive Chairman*

Yes, to your question, I wasn't -- I don't think it was reticent to answer the financing question on the conference call, and my answer today will probably be pretty much the same. **But we know that in March of next year, we have a debt payment of $1.5 billion, and we think we'll have to raise money or**

**refinance part of that or raise money at that point in time**. And then it's another, I think, 14 or 18 months before we have another debt payment and the world is kind of a different place for us at that point in time. So the way -- I only tell you the way I think about it, which is, I look at the debt payment next year and something that we have to focus on. And we'll let -- and look at all the different opportunities, and we have -- we could raise the money today. There's a lot of opportunities out there today. **I believe that the cost of capital for us today would be higher than it will be after the market settles down at wherever it settles down, I think the volatility is not a good thing right now. So -- but we're -- but it's certainly something that we'll look at and make sure that we raise capital prior to that time.**

214.    On this news, the price of DISH common stock fell $4.29 per share, or 19.7%, from a close of $21.75 on May 10, 2022 to a close of $17.46 on May 11, 2022 on heavy trading volume of 18.69 million shares, compared with the previous day's volume of 7.35 million shares.

> **D.    On February 23, 2023, DISH Reveals that it Had Been Unable to Scale or Commercialize its 5G Network and, Thus Still Had No Enterprise or Wholesale Customers**

215.    On February 23, 2023, Defendants filed with the SEC, DISH's 2022 Form 10-K for the year-ended December 31, 2022 (the "2022 Form 10-K"), which was signed by Defendants Carlson, Orban and Allen. Defendants also held an investor call that same day to discuss DISH's fourth quarter 2022 and annual results.

216.    During the February 2023 Call, Defendants revealed for the first time that DISH would not have any enterprise or wholesale customers until at least 2024, or at least one more year; that the reason DISH had no enterprise customers was because it was unable to scale its 5G network, as previously represented; that DISH had only began integrating VoNR at the sites it had set up last June 2022 which accounted for 20% coverage; and that DISH could not market to enterprise customers until it had achieved VoNR at 70% of sites.

217.    Analysts expressed concerns during the February 2023 Call about Defendant Bye stepping down as DISH's Head of Enterprise, prior to DISH obtaining any real enterprise

customers. In response to a follow-on question about when investors could finally expect to see the enterprise and wholesale business going, Defendant Ergen revealed that, contrary to Defendants' prior statements, it would now be another whole year before DISH expected to see revenue from enterprise:

> **Richard Hamilton Prentiss,** *Raymond James & Associates, Research Division*:
>
> …The second question is more strategic. With Stephen leaving the operations and joining the Board, TMobile/AWS had an announcement this week talking about private networks and working together with 5G, how should we think about the enterprise wholesale side? What's needed to get that business going? And when could it become meaningful?
>
> **Charles William Ergen,** *Co-Founder & Executive Chairman*:
>
> …And so I think we've said *we would expect that you'll start seeing real revenue from that next year from us, and you'll start seeing -- you'll see some movement this year*.

218.    Analysts spent a large portion of the February 2023 Call probing why enterprise customer revenue was delayed and when investors could hope to see enterprise and wholesale revenue. For example, Richard Hamilton Prentiss of Raymond James asked whether VoNR was something enterprise customers needed before they would sign up, to which Defendant Ergen disclosed for the first time that, not only did enterprise customers require VoNR, it had to be at scale and DISH had only recently "got it up and working" due to "technical challenges" and now DISH was finally "starting" to "roll that out as fast as we can," which was needed for commercial launch:

> **Richard Hamilton Prentiss**
> *Raymond James & Associates, Inc., Research Division*
>
> And do you think VoNR or Voice over New Radio, is that something the enterprise wholesale people want to see working? Or is it more nationwide coverage? But what's kind of one of the hurdles to that long sales cycle that they're really wanting

to see that box checked? Anything in particular?

…

**Charles William Ergen**
*Co-Founder & Executive Chairman*

I'll answer briefly, maybe turn that over to John. But we're going -- we have 2 paths. One is the FCC requirements for data, right? So to build that in a network, that's where we're covering going to cover 70% of the POPs and data. ***The problem that we've run into is that we are -- for commercial launch of it, we need voice, and we're doing 5G voice or VoNR.*** We made the strategic call not to do 2G, 3G, 4G voice and have all that legacy and carry that around for the rest of our life, right?

So we're thinking long term about that and saying, "Look, let's have the best voice in the industry. Let's go with 5G voice." That was -- there are many companies are working on that. Obviously, T-Mobile has launched a couple of markets. The Chinese are working on that. But we're now the largest -- as far as we know, the largest company that has real time VoNR in the United -- the voice of 5G in the United States. ***And John will give you a little bit more detail on that. That -- we've got -- so now we've got it up and working. That was probably one of our biggest technical challenges,*** and we're very thankful to the Mavenirs of the world and our vendors that kind of helped us get there. We wouldn't have got there without them. ***And so -- now we -- we're starting to roll that out as fast as we can, but we've kind of got over those hurdles. But that's what we need for commercial launch.*** So what happens is you're going to see a 6-month lag. I'm going to say 6 months. It could be a little less than that. ***But a 6-month lag from the time we get data to the time that we optimize that network fully to be able to do voice -- to do 5G voice*** because it's very tricky, and you have to have a very dense network to do it. John?

219.    Defendant Ergen revealed that that DISH defined scale as "70% with voice coverage" before the Company could hope to sell its 5G network to enterprise customers:

**Charles William Ergen**
*Co-Founder & Executive Chairman*

***You'll start seeing some numbers, but you won't see -- you're going to see a material ramp when you have scale, which I define as 70% with voice coverage.*** So again, given our build-out, take 6 months from build-out to optimize, so that gets you to ***70% by the end of this year optimized.*** And then you can do things like national market and things because you have scale to do it….

220.    In response to a question from Bryan Kraft of Deutsche Bank asking whether DISH's "slower-than-expected pace of 5G adoption among enterprises" had anything to do with Defendant Bye's departure, Defendant Swieringa admitted that enterprise sales would be delayed another full year because DISH had not been able to yet scale its 5G network, as previously claimed and, thus, "Job 1 is getting our 5G network up and operating at scale":

**Bryan D. Kraft**
*Deutsche Bank AG, Research Division*

It's Bryan Kraft from Deutsche Bank. As Dave Barden alluded to in his question earlier, ***there's been a lot of discussion lately about the slower-than-expected pace of 5G adoption among enterprises. Many investors are asking the question as to whether there's some connection between that and Stephen Bye leaving his management role at DISH as Head of Enterprise. Can you just talk about what's going on there from a demand perspective***? If you can share anything on maybe why Stephen decided to leave. And lastly, how you're managing the enterprise sales effort now? Who's leading that?

**John W. Swieringa**
*President & COO of DISH Wireless*

Yes. It's John Swieringa. Look, we've been building our team for the last 4 years. There's a lot of talent inside DISH Wireless now. So I don't think it's about any one person. ***And I'm personally calling on a number of enterprise customers as our several members of our senior management team. And I think the momentum is picking up*** to echo Charlie's comments. We're really busy having really good discussions with a lot of big companies, and that's what we expect to be doing. And I think we said earlier, ***we'd be seeing some of that business start to pick up next year***. But we're not confused. ***Job 1 is getting our 5G network up and operating at scale***. And there's a lot of focus there, and I can take the eye off the ball looking at other things that -- it's really about sequencing. ***We need to get the network up and running first, and then there's lots of opportunities in the pipeline we can take advantage of***.

221.    Defendant Ergen further confirmed that the same would be required before DISH could sign up wholesale customers:

**Charles William Ergen**
*Co-Founder & Executive Chairman*

… but the – *from an enterprise side or private network side of the business, we're already positioned because we've got the architecture that we believe is required to do that properly, right? And that's before you get into things like AI and ChatGPT only a positive for what we're doing, which we properly foresaw as part of what we needed to be able to do. Scale will matter, and reaching 70% of the country will start opening up a lot more opportunities because now some conversations are only on a regional basis today. So that is probably the one thing that's missing*, but we're not having to change the architecture of what we're doing. So we're already positioned and so forth. And I think the thing is, ultimately, regardless of who signs private network deals, it's going to be a positive because if your competition does it -- if Uber signs a deal, then Lyft has to sign a deal or just going to be out of business as an example. So that's that part. And then on the -- what was the second part?

*     *     *

Yes. Same answer *because we'd have to have scale in the network,* and we have -- 2 things have to happen. We have to be off TSA from T-Mobile unless we -- again, our focus on for the first half of the year by end of June. *And the second one, we have to have scale, which, again, we're focused on by the end of* this *year. Then I think we have a really neat platform for people who might be interested from a wholesale perspective, but that's very similar to what the enterprise opportunity is as well….*

222.    When asked whether DISH even had the VoNR up and running, Defendant

Swieringa revealed for the first time that DISH was so far behind on scaling its 5G network that

the Company only started, in 2023, to roll out VoNR to the 20% of markets it began servicing one

year ago pursuant to the FCC requirement:

**Mike Dano**

…I had 2 separate questions. One is, can you just kind of explain how the network launch is going to work throughout the rest of this year? I mean do you have the voice VoNR service up and running now? And how is that going to be expanded? And how does that -- how does the rest of that like commercial launch of the DISH Network work throughout the rest of this year?...

**John W. Swieringa**
*President & COO of DISH Wireless*

…So I made a few comments on this earlier in the call. First of all, all of our on-air sites are providing 5G broadband. And now as a subset of those, we're going market

by market to tune the market for commercial VoNR. As I said earlier, we now have handsets that are available through Boost Mobile that run on our DISH 5G network with commercial VoNR, and we view that as going pretty well. So as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs*. When that happens, we load that market up with handsets that work on our network. And we start marketing services with those devices, and we are basically going to be launching new markets every -- sometimes every week.

*     *     *

And we're doing quite a bit of work to prepare our indirect distribution to market and provide those devices to our customers. And you'll see us really picking up speed there as we do that throughout the year. *And really by this time next year, we'd expect to have commercial VoNR available throughout the 70% footprint, as we've said earlier*.

223.    Upon the news, DISH's stock price declined from $13.76 per share on February 23, 2023 to $11.41 per share on February 28, 2023 on heavy trading volume.

## VII.    POST-CLASS PERIOD EVENTS

224.    Events after the Class Period further confirm that DISH did not have the capital it needed to complete its 5G wireless network and that DISH's 5G network was nowhere near ready for enterprise customers during the Class Period.

225.    After failing to obtain funds from the CONX SPAC, DISH was still desperate to obtain additional capital to complete its nationwide 5G network. Accordingly, Defendant Ergen arranged for DISH to merge with EchoStar, yet another company majority-owned and controlled by Defendant Ergen, and on August 8, 2023, DISH announced that it had entered into an agreement to merge with EchoStar.

226.    In an August 8, 2023 interview on CNBC, the host of Squawk on the Street asked Defendant Ergen if the anticipated merger between DISH and EchoStar was primarily intended to increase DISH's capital to allow the Company to complete its nationwide 5G network, explaining

that some analysts even described the merger as "a disguised equity raise." Defendant Ergen acknowledged that this was a primary benefit of the merger:

> **David Faber,** *CNBC Host*
>
> Charlie, what I hear from many of your investors, of course, is the ***continued question of how much capital you're going to need to be able to successfully build out your wireless business***. And ***many would view this deal*** potentially under that perspective ***as simply giving you access to EchoStar's balance sheet***. One saying to me, it's almost a disguised equity raise. How do you respond to those, uh, questions and or concerns?
>
> **Charles William Ergen**
>
> Well, ***there's no question*** that this deal, one of the benefits of this deal is that ***it certainly strengthens our balance sheet. It certainly strengthens our runway*** for the next couple of years.

227.    Even now, in October 2023, DISH's 5G network is still not sufficiently developed to be commercially viable, even for retail use. In a registration statement, dated October 3, 2023, filed with the SEC on Form S-4 by EchoStar, EchoStar disclosed details of the current state of DISH's wireless business:

> DISH Network is currently operating its Retail Wireless business unit primarily as a mobile virtual network operator ("MVNO") as it continues its 5G Network Deployment and commercialization of its 5G Network, as defined below. ***As an MVNO, today DISH Network depends on T-Mobile and AT&T to provide it with network services*** under the amended Master Network Services Agreement ("MNSA") and Network Services Agreement (the "NSA"), respectively. ***Under the NSA, DISH Network expects AT&T will become its primary network services provider***.

228.    The October 3, 2023 registration statement also explained: "DISH Network ***plans to commercialize*** its Wireless spectrum licenses ***through the completion*** of the nation's first cloud-native, Open Radio Access Network based 5G network[.]"

229.    In other words, as of October 3, 2023, DISH was still operating its retail wireless

brands, like Boost, primarily as an MVNO—meaning DISH was still using T-Mobile and AT&T's

networks to provide service to DISH's own customers because the 5G network was still not

developed enough transfer those existing retail customers onto DISH's network, and DISH is still

merely *planning to commercialize* its wireless spectrum licenses by *completing* its still unfinished

network.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

230.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly

disregarded, that the public documents and statements they issued and disseminated to the

investing public in the name of the Company, or in their own name, during the Class Period were

materially false and misleading when made. The Defendants knowingly and substantially

participated or acquiesced in the issuance or dissemination of such statements and documents as

primary violations of the federal securities laws. The Defendants, by virtue of their receipt of

information reflecting the true facts regarding Dish, and their control over and/or receipt and/or

modification of Dish's allegedly materially misleading misstatements, were active and culpable

participants in the fraudulent scheme alleged herein.

### A. Defendants' Admissions That They Abandoned Any Efforts to Build a Functioning 5G Network to, Instead, Focus on Meeting the FCC Milestones Create a Strong Inference of Scienter

231.    Defendants made startling admissions at the end of the Class Period which, alone,

create a strong inference of scienter.

232.     Defendants secretly abandoned any effort to build a functioning network so that

they could focus on meeting the FCC milestone of 20% coverage by June 2022. Defendants also

covertly took funding away from the enterprise product development teams and paused voice

functionality efforts. Yet, throughout the Class Period, Defendants concealed these facts from investors and, instead, misrepresented that DISH was "building a world-class network that takes telecom to the next level" and that DISH had significant demand from enterprise customers and would have enterprise sales by 2022.

233.     Defendants were later forced to admit during the February 2023 Call, that, consistent with the CW accounts, DISH had abandoned any attempt to build a functioning network that could be commercialized and scaled as required by enterprise customers. Rather, DISH was only *then*, in early 2023, beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs*. When that happens, we load that market up with handsets that work on our network." Indeed, Defendants admitted that DISH "*now* we -- *we're starting* to roll that out as fast as we can, but we've kind of got over those hurdles. *But that's what we need for commercial launch*."

234.     Thus, Defendants stated, DISH would not have any enterprise customers or revenues until at least 2024. As Defendant Swieringa stated in the February 2023 Call in response to an analyst question regarding the reason(s) for "slower-than-expected pace of 5G adoption among enterprises," Dish had not even built its 5G network to scale—a key requirement for enterprise customers—by 2023:

> We're really busy having really good discussions with a lot of big companies, and that's what we expect to be doing. And I think we said earlier, *we'd be seeing some of that business start to pick up next year*. But we're not confused. *Job 1 is getting our 5G network up and operating at scale*. And there's a lot of focus there, and I can take the eye off the ball looking at other things that -- it's really about sequencing. *We need to get the network up and running first, and then there's*

*lots of opportunities in the pipeline we can take advantage of*.

235.    Defendant Mayo made a similar admission, reported by Sue Marek *of Fierce Wireless* on May 10, 2023. According to that article, Defendant Mayo revealed DISH would only restart its efforts to launch VoNR "*once the Company meets the FCC's buildout requirement* of providing coverage to 70% of the U.S. population by June 14, 2023."

236.    Thus, Defendants' admissions that they had chosen to build out a network to meet FCC population coverage deadlines while not taking any actions to make the network functional, including building and implementing VoNR and ensuring network integration was possible, support a strong inference of scienter.

### B. Defendants Admitted That the Platforms and Software Necessary to Integrate the Network Were Not Ready During the Class Period and That They Knew from the Outset That Certain Vendors Lacked the Requisite R&D Capacity

237.    In an interview posted to YouTube on June 21, 2022, Defendant Rouanne expressly admitted that (a) Amazon's AWS cloud services were not yet ready to support DISH's 5G network; (b) critical software developers had not yet developed the software needed to integrate the network; and (c) Defendants had recklessly assumed vendors like Mavenir would be able to integrate the network, but quickly learned of integration problems and knew that those vendors were not capable of integrating the network.

238.    Defendant Rouanne explained that, as late as June 2022, AWS was still upgrading to make its services ready for DISH to use, stating: "When we started we looked at all the clouds, and when we started with AWS, they were not telco ready. Especially when it comes to networking… and *they are upgrading that platform for us to be telco ready and telco grade*."

Defendant Rouanne further stated that it "would have been easier for us" if Amazon had been ready when DISH first began constructing its network.

239.     Furthermore, Defendant Mayo made the startling admission that DISH executives had known from the beginning that Mavenir and the other vendors were unable to integrate the network. In a speech at the 2023 CTIA 5G Summit on May 17, 2023, Defendant Mayo admitted that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately:

> I'd say the biggest thing that we learned was ***when we first started this*** we thought the vendors all kind of worked together. ***Quickly did we learn that was not going to happen***, and we actually became the system integrator.

240.     Defendants' post-disclosure admissions that they learned very quickly that vendors they recklessly assumed could integrate the network were incapable of doing so supports a strong inference of scienter.

### C. Defendants Attended Regular Meetings Discussing the Progress of the 5G Network Design, Deployment, and Integration and Conducted Monthly Visits to the Las Vegas Site to Observe Progress on the 5G Network

241.     Defendants had knowledge of the true status of DISH's 5G network design and integration progress because, as former DISH employees recall, the Individual Defendants regularly attended meetings at which network integration issues were discussed and Defendant Ergen admittedly visited the Las Vegas site every month to monitor the progress.

242.     CW1 and CW2 stated that, during at least 2021 and 2022, Defendants and all VP-level-and-above DISH Wireless employees gathered at five-hour 5G Summit meetings where critical issues, including network integration problems, were discussed.

243.    CW1 also attended several meetings with Defendant Ergen soon after the Boost acquisition at which the budget for the 5G buildout was discussed. In these meetings, Defendant Ergen made it clear that he did not want to spend money on national marketing.

244.    CW2 also attended weekly meetings with Defendant Bye where the state of DISH's enterprise products were discussed. Thus, Defendant Bye would have been aware that Dish had no viable enterprise products throughout the Class Period.

245.    In the February 2022 Call, for example, Defendant Ergen touted: "I was in – I've been – I got to Las Vegas every month, so I can see kind of the progress, but I was there yesterday."

246.    Defendants' attendance at, and active participation in, regularly held meetings discussing the status of the 5G network and difficulties integrating the network and monthly visits to the Las Vegas 5G site to personally observe Dish's progress building out the 5G network evinces a strong inference of their scienter.

**D. Defendants Actively Tracked Relevant Metrics in Their Internal Communications System**

247.    In an effort to aggressively triage many network integration issues in the Las Vegas trial market and other DISH trial areas like Yuma, Arizona, DISH utilized an internal logging tool that was a part of DISH's "Slack" – an organizational communication platform. DISH employees used Slack to "ticket" issues as they cropped up and then assigned the tickets to the different cross-functional vendors and teams who would be accountable for fixing the bugs. DISH executives, including the Individual Defendants, had access to the Slack tickets. Indeed, Defendant Ergen, himself, acknowledged reviewing the tickets to address network integration issues, stating the following in the November 2021 Call: "And then ***every day, we go through the tickets of the stuff that doesn't work***, and there's stuff that doesn't work, and then we go fix that."

248.    That Defendants had access to and reviewed data evidencing significant network integration issues in their trial markets "every day" bolsters the above scienter inference.

**E. Defendant Ergen Closely Controlled All Aspects of the 5G Network Deployment and Regularly Visited the Physical Buildout Sites**

249.    By his own admission, Defendant Ergen was closely involved in all aspects of the 5G network design and deployment. In the February 2022 Call, for example, Defendant Ergen touted: "I was in – I've been – I got to Las Vegas every month, so I can see kind of the progress, but I was there yesterday." Similarly, in disclosing that DISH would not be ready to launch the Las Vegas network by the targeted date, Defendant Ergen took personal responsibility for the miss, stating: "First of all, we're six months behind where we thought we'd be. It's my fault."

250.    Indeed, Ergen's primary focus throughout the Class Period was on Dish Wireless. In a December 2017 Press Release, Dish announced the promotion of Defendant Carlson and that Defendant Ergen would be "devote more attention to the company's emerging wireless business." Similarly, Defendant Ergen's own LinkedIn profile emphasizes his focus on DISH's wireless and 5G projects, stating:

> In 1980 I co-founded DISH, formerly EchoStar Communications Corporation, and currently act as Chairman of the Board of Directors for both DISH and EchoStar. Today, I oversee DISH's long-term business development and #strategy as well as the company's emerging #wireless division. **Most recently, I am focused on our opportunity in wireless and #5G**.[6]

251.    Defendant Ergen's hands-on involvement in DISH's 5G design and buildout, as supported by his own admissions, strongly evidences his scienter.

---

[6] https://www.linkedin.com/in/charlieergen/ (visited 10/20/2023).

**F. Defendants' Actions from the Start of the 5G Build Demonstrate They Knew Dish Did not Have Sufficient Capital to Build the 5G Network**

**1. Defendants Continually Reiterated a Baseless, $10 Billion Cost Estimate for the 5G Network Throughout the Class Period to Assure the Public that DISH Had the Means Necessary to Construct a Network**

252.    Throughout the Class Period, Defendants continually maintained publicly that the cost of DISH's 5G network buildout would be $10 billion. But Defendants knew the $10 billion figure was completely baseless. In fact, Defendants had merely rolled the estimate over from a previous project, DISH's abandoned NB-IoT network—despite the fact that the nationwide 5G wireless network was vastly more complex and broader in scope than the NB-IoT network.  Thus, DISH's public insistence that the nationwide 5G wireless network could be completed for $10 billion was entirely fabricated. Defendants repeated the figure merely to assure investors that the 5G buildout could be completed with existing cash and cash flows and without raising additional capital, evidencing their scienter regarding the insufficiency of DISH's existing cash and cashflows to support the construction of the network.

**2. DISH's Plans for Constructing a 5G Network Always Included Raising Additional Capital to Complete the Network**

253.    In October 2020, Defendant Ergen registered a SPAC called CONX and raised $750 million to be held in trust for use in a future de-SPAC transaction.  The CONX registration statement expressly considered and commented on a potential de-SPAC transaction involving a related entity, indicating that Defendants always intended CONX as a means of raising capital for the Company. Indeed, by late 2022, Defendants were actively pursuing a de-SPAC transaction between CONX and DISH, stating in an October 2022 CONX Proxy Statement that CONX had "begun preliminary discussions with DISH Network Corp. ("DISH") regarding a potential initial business combination involving DISH's retail wireless business." Though the combination was

ultimately unsuccessful, Defendant Ergen's decision to register CONX and pursue a de-SPAC transaction between CONX and DISH's wireless segment evidences that the risk that a capital raise would be necessary to complete DISH's 5G network buildout had already materialized—and was already recognized by Defendants—by late 2020.

254.    Defendants' attempt to secure additional financing in 2020 evidences their knowledge that DISH's capital during the Class Period would not be sufficient to fund the 5G buildout.

### 3. Defendants Engaged in Cost-Cutting Efforts at DISH Wireless to the Detriment of the Network and Enterprise Product Development, to Conserve Needed Cash to Meet the FCC 20% Milestone

255.    Defendants' decisions throughout the Class Period demonstrate their commitment to controlling costs no matter the effect. For example, Defendants selected Mavenir to build DISH's radio access network software—an essential element of the network—simply because Mavenir was the lowest bidder for the job. Defendants made this choice knowing that Mavenir was significantly less experienced and therefore had fewer capabilities than its competitors. In May of 2022, after at least a year-long delay, Defendants were forced to correct this decision by bringing in Samsung, an experienced vendor.

256.    Similarly, Defendants chose to sparsely distribute radios in dense population hubs to meet the FCC's technical population requirements, knowing the radio density would be insufficient to provide reliable wireless service and that DISH would need to go back later and, as Defendant Ergen would later acknowledge on May 8, 2023, "densify the current markets that we have" in order to create a functional network. Likewise, CW2 recalled that in late 2020 or early 2021, the enterprise product development budget was reduced to less than $10K so that every

penny could be used towards building the 5G radio towers or sites as part of the push to complete the FCC population coverage deadlines.

257.    Defendants' efforts to cut costs—even when detrimental to the network or enterprise product development—raises a strong inference that Defendants knew they did not have the capital needed to construct the 5G network and would need to raise additional capital.

258.    Even Defendants' much-touted decision to build an open radio access network, instead of using the established single-OEM model, demonstrates that DISH knew it did not have the cash or cash flows to build a 5G network without raising additional capital. And even if Defendants specifically wanted to build an Open-RAN network, Open-RAN simply broadened the range of vendors DISH theoretically could use; it did not in any way preclude DISH from utilizing experienced vendors with proven competencies for the key parts of the network build.

### G. The 5G Network Deployment Was DISH's Core Operation Throughout the Class Period, and Gaining Enterprise Customers Was the Core Component of Monetizing the 5G Network

259.    As the Company actively transitioned away from its prior focus on Pay-TV to a focus on 5G throughout the Class Period, DISH's wireless business became DISH's core operation. DISH's Pay-TV business—which had been the core of its operations in the past—was regarded both internally and externally as simply a means of financing the core, 5G network buildout. Defendant Ergen, himself, expressly acknowledged this transition to a core focus on wireless on the February 2021 Call, noting stress and pressure from competition in the Pay-TV space and continuing consumer trends away from Pay-TV, as below:

> …Normally, I don't make comments, and I -- certainly not one to look in the rearview mirror. But I did want to point out something that I think sometimes gets lost. … But **2020 was a transition year for us**. It's a very successful transition year for us. And it's the third time that we've had a transition in my 40

years in business. And I've always felt that the transition year -- the transition time is always the toughest. And if you can get through the transition, then you can really jump-start -- you can really grow your business in a dramatic way.

\* \* \*

**The reason the transition is important, is in 1995, we went to the little DISH business, we had 2 other competitors.** We had a cable company and we had DIRECTV. **Today, we probably have over 20 competitors in that very same business. In fact, we compete with our very own suppliers. So that market is very competitive. You've obviously seen the trends in our industry in the last 4 or 5 years. We expect that those trends will probably continue**. The world is becoming an a la carte world with vendors going directly to their customers. But in the wireless world, we're 1 of 4 competitors. So there's 3 $200 billion companies that are out there and we're entering their business with a better network to go compete.** And it's not just about competition for consumers or handsets. It's about what a 5G network can do, which includes a lot more than just consumers.

260.    Analysts, too, recognized that wireless was DISH's core business. In a report dated February 22, 2021, Citigroup analysts observed that "**the market remains focused on learning more details for the multi-year financing plan for the wireless network**," and noted erosion in the Pay-TV business. Likewise, in an April 21, 2021 report, Citigroup analysts observed that "**[t]he investment case for DISH has increasingly pivoted to a wireless DCF**, and we will continue to look for broader disclosures by DISH on its future customer revenue opportunities, anticipated cost structure, multi-year investment requirements to establish a national 5G network."

261.    Similarly, in a February 23, 2021 report, Raymond James analysts reiterated a Strong Buy rating for DISH stock based, at bottom, on DISH's 5G network: "**Bottom line: we believe DISH presents an attractive option on the 5G future, funded significantly by the cash cow Pay-TV business, with 4G Wireless Retail, and in the future, the potential for a large 5G Enterprise business**." The report viewed DISH's Pay-TV business as "obviously in decline," and merely a source of cash for the development of DISH's 5G network. An April 29, 2021 Raymond

James report reiterated the point and emphasized the centrality of the enterprise aspect of DISH's wireless business, stating "**Bottom line: we believe DISH presents a very attractive option on the 5G future, funded significantly by the cash cow Pay-TV business, with 4G wireless retail, and in the future, the potential for a large Amazoning 5G Wholesale/Enterprise business**." Similarly, in a November 4, 2021 report, Morningstar analysts recognized that "**DISH Network's massive bet on wireless spectrum overshadows its declining cash cow satellite television business**."

262. Moreover, Defendant Ergen's own hyperfocus on the 5G project throughout the Class Period also evidences the core nature of the wireless business.

263. The core element of DISH's wireless business, meanwhile, was developing an enterprise customer base, as Defendants themselves acknowledged and analysts recognized. For example, in a May 7, 2020 earnings call, Defendant Ergen stated that DISH did not originally plan the 5G network with the expectation of servicing the retail market and described retail customers as "a cherry on top that we didn't think we were going to get[.]" Similarly, in the November 2021 Call, a BofA securities analyst asked about DISH's go-to-market strategy, and particularly whether the Company intended to focus primarily on retail or on enterprise customers. In response, Defendant Ergen acknowledged steep competition in the retail market and emphasized that Defendants saw opportunity primarily in the enterprise sector, as below:

> **I mean, so on the -- as a fourth player, we're not going to dominate the retail handset business**. And I know a lot of analysts kind of look at us as this retail handset, but we'll get our fair share of that business. And that will be a very profitable business for us. … **And particularly on the enterprise side, where that's kind of a jump ball.** In other words, I think all the carriers are going to do well in enterprise. It's a new market segment. … **We're well positioned for that because our opinion is that you need to be cloud-based and you need to be automated to do it, to slice your network. So we're going to have an**

**advantage there.** But the incumbents have an advantage of incumbency and brand recognition and that kind of stuff. So I think everybody is going to do pretty well. **But I feel like that's a place where we can get more market share than we will in the handset business.**

264.    The primacy of the enterprise sector to DISH's wireless business remained steady throughout the Class Period. On the May 2022 Analyst Day Call, Defendant Bye expressly acknowledged the importance of the sector, stating: "**I do believe that the enterprise market and the revenue for DISH is going to be much bigger than the consumer opportunity**. … **And we believe, especially with the platform that Marc talked about, is that we can capture more than our fair share of that market, because it is a much, much bigger market** than selling smartphones and just net add our postpaid plans."

265.    The critical importance of the wireless business to DISH's operations, as acknowledged by both Defendants and analysts, bolsters the inference of Defendants' scienter.

### H.    Defendants Provided Detailed Responses to Analyst Questions on Earnings Calls, Evidencing and Publicly Representing Themselves as Having Significant Knowledge of the Facts Underlying the Fraud

266.    Throughout the Class Period, Defendants represented themselves as having personal knowledge of the facts underlying the fraud by regularly providing detailed answers to questions from analysts on the status of DISH's 5G buildout, the sufficiency of DISH's capital to achieve the same, and the likelihood that DISH could generate revenue from enterprise sales in the near term.

267.    *Progress of 5G Buildout*: Defendants regularly responded in detail to analyst questions about the status and progress of DISH's 5G buildout, in particular the Las Vegas development project. For example, on the August 2021 Call, Defendant Mayo had the below

exchange with an analyst from BofA securities about DISH's progress toward deploying a 5G

network and achieving the FCC coverage requirements:

> **David William Barden**, *BofA Securities, Research Division:*
>
> I guess a couple of questions, if I could. Congratulations on the AT&T network services agreement. Obviously, there's been a lot of talk about it or above, if maybe you probably could give us a little background on how that deal came together, why it came together? And I think specifically, is this a vehicle for DISH to achieve its FCC coverage requirements, specifically the 70%, I think, coverage by June 2023? I think the second question I would have is, obviously, we're obviously waiting for the Las Vegas network launch. I was wondering if you could kind of give us a little bit of a road map between now and, say, the first half 2022, what the network build is going to look like? And what we should expect? I guess some of your partners in the infrastructure side have suggested that you've been contemplating a broad geographic build. And it would be great to get some more color on that.

> **Dave Mayo**, *Executive Vice President of Network Development:*
>
> …David, with respect to our build program, you might be aware, we've implemented a very decentralized approach. We have 4 regions in 36 markets. And the early markets that we'll be building are substantially all colocations, hence, the activity that you saw in some of the tower company calls this last couple of weeks. In that regard, we've signed substantially all the leases that are required to meet our 20% mandate for next June and have received notices to proceed on close to 1/3 of the sites. As we've commenced construction on close to 30 markets -- in 30 geographies within those 36 markets. So in some cases, there may be multiple geographies within a market that we will -- that we've commenced construction on. And then as to your Vegas question, we'll be substantially complete with the construction activities in the next 60 days by the end of the third quarter and we'll -- and as we've talked about, we'll be beta testing customers in the fourth quarter.

268.    *Sufficiency of Capital*: Similarly, Defendants regularly and directly addressed the

capital needed to complete the 5G buildout in detail. For example, on the February 2021 Call,

Defendant Ergen responded to a question from Craig Eder Moffett of MoffettNathanson LLC

about capital financing, as below:

> **Charles William Ergen**, *Co-founder & Chairman of the Board:*

… **And so I think we're probably in a similar situation today in the sense that we do have enough capital to build on our balance sheet today, to build our network to the point where people can see whether OpenRAN cloud-native networks work.** And I know not everybody in this call sees it, but **we see it every day**. The number of resumes and the quality of people that are applying to come work with us is exponentially higher than it was last year. The number of vendors that are putting resources towards us is vastly different than it was last year. The -- I think the whisper confidence level for people in the know is vastly higher.

269.    *Enterprise Revenue*: Similarly, Defendants regularly gave detailed answers to analyst questions throughout the Class Period about DISH's acquisition of and relationships with enterprise customers and the likelihood of achieving revenue therefrom. For example, in the April 2021 Call, Defendant Bye had the following exchange with a Raymond James analyst regarding relationships with enterprise customers:

**Richard Hamilton Prentiss**, *Raymond James & Associates, Research Division*:

Makes sense. A second question on the 5G side is we think the enterprise wholesale side of the business could be actually fairly exciting and significant opportunity. Help us understand what you're hearing from customers as far as what do they need to see from you guys before they could make commitments or contracts? Is it Vegas up and working? Is it a nationwide network? What do the customers want to see from you before they start making commitments? And am I right that wholesale enterprise could be significant?

**Stephen J. Bye**, *Executive VP & Chief Commercial Officer:*

Absolutely. Yes. No, I think we've talked to a number of customers across multiple verticals in different industry segments, and there's an increasing appetite and demand for the kind of network that we're building, which is really to enable them to have more security, more control and also more visibility into the data that's coming off the devices so that they control their business more effectively. So we're seeing a terrific demand. And the network architecture that we're putting in place actually enables and unlocks that opportunity for those enterprise customers. And it's again not restricted to any specific vertical. We're touching a lot of different companies and a lot of different vertical segments across the country. And the other aspect of the opportunity that we see for ourselves is that while we build out a nationwide network, we are in the process of working with customers and prospective customers on private networks that are not limited by the geography of

our national footprint. So we can deploy those within their environments to support their business operations as well. So the demand we're seeing is terrific, and we're already engaged with a number of customers today.

**Richard Hamilton Prentiss,** *Raymond James & Associates, Research Division:*

And they don't need nationwide to place on this contract and commitments on for some of these opportunities?

**Stephen J. Bye**, *Executive VP & Chief Commercial Officer:*

Exactly.

270.    That Defendants continually provided detailed responses to analyst questions on all of the above issues raises a strong inference of their scienter.

> I.    **Defendants Had Motive to Misrepresent DISH's Wireless Network Progress to Meet the FCC Milestone Deadlines**

271.    Defendants were motivated to deploy a network that *was not functional* so that they could meet the FCC 20% milestone and avoid paying massive financial penalties. Defendants knew that DISH's novel, one of a kind Open-RAN 5G network was a massive undertaking, that DISH's chosen vendors had no experience building or integrating such a network and that DISH had not conducted any meaningful vendor or network validations.

272.    Given this uncertainty and DISH's insufficient capital to build an actual functioning network, Defendants threw in the towel for the time being to focus exclusively on meeting the June 2022 FCC milestone of 20% coverage, which did not require DISH's network to be functional at that time, so DISH could assure it would not incur the massive financial penalties of approximately $200 million that would be levied if the deadline was missed, while conserving cash for the 5G build.

273.    Defendants' motive contributes to the overall inference of scienter.

## IX.    LOSS CAUSATION

274.    During the Class Period, as detailed herein, Defendants materially misled the investing public by publicly issuing untrue statements of material fact and omitting to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, thereby inflating the price of DISH common stock. The specific statements and omissions enumerated herein were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about DISH's business, operations, and prospects.

275.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about the progress and capability of DISH's 5G network and ability to fund its construction and buildout. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

276.    By not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of DISH's business, risks, and current and future financial prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of DISH's common stock declined significantly as the prior, artificial inflation came out of the prices of the common stock as follows:

### A.  On November 4, 2021 DISH Discloses Network Integration Problems

277.    On November 4, 2021, Defendants revealed during the November 2021 Call that, contrary to Defendants' prior statements that, among others, DISH had purportedly "**completed a successful field validation, utilizing our fully virtualized standalone 5G core network and the industry's first O-RAN compliant radio**"  and was "**deploying it now**" and that the Las Vegas site would have a "**full-fledged product**" ready for commercialization at the start of 2022, DISH had actually been experiencing continuing delays at the Las Vegas site because of undisclosed integration issues. In the November 2021 Call, Defendant Carlson stated: "[w]e were a little delayed as a consequence of frankly, the Vegas network was…[j]ust getting the radio software and the core network software to work together and be reliable."  Defendant Carlson further admitted that DISH was also "still working through T-Mobile roaming and specifically handover issues. So Vegas is, I'd saying coming along, we're in the beta test mode…." Thus, the Las Vegas site was not on track and would not be "ready for prime time at the first of the year," as previously represented.

278.    Upon the news, DISH's stock price declined from $43.09 per share on November 3, 2021 to $37.08 per share on November 4, 2021 on heavy trading volume of over 11 million shares, as compared to the previous day of 2.9 million shares.

279.    Analysts expressed concerns, noting DISH's stock price decline had everything to do with the Company's lack of progress on, and capabilities of, the wireless buildout at the Las Vegas site. As one Barclays analyst stated in a November 5, 2021 report entitled "Why did DISH stock sell off?" reporting on DISH's Q3 2021 results:

> [W]e don't think earnings had much to do with the selloff. The simplest explanation, in our view, was likely positioning ahead of the call as some may have expected details around the company's test launch in Las Vegas… the bigger issue with DISH is that it is a story stock with very little by way of milestones beyond small data points around network build. In that context, management's commentary during the call may have introduced some degree of pessimism around the pace of network build.

280.    Likewise, a November 4, 2021 Morningstar analyst report explained that DISH's stock price decline was a direct result of DISH's inability "to meet network buildout requirements:"

> DISH Network apparently raised some eyebrows with comments about its planned network launch in Las Vegas and its ability to meet network buildout requirements in 2022, sending the stock down sharply.

281.    Morningstar further noted that DISH's integration issues as the main reason for the delay that caused the Company's stock price to decline:

> Last quarter, DISH announced that service in Las Vegas would launch by early October, with beta testing then running for 90 days before commercial launch. While the beta test is running, management indicated that it has hit some snags getting various pieces of software to work together.

**B.    On May 6, 2022, DISH Discloses Enterprise Sales are Non-Existent and that it Needs to Raise Capital to Complete its 5G Network**

282.    On May 6, 2022, Defendants shocked the market when they revealed in the Q1 2022 Form 10-Q that DISH would need to raise additional capital to fund the construction and buildout of its 5G network, despite telling the market just three months earlier that DISH had "everything we need" in terms of cashflow, disclosing:

> In addition, as we complete our 5G Network Deployment we have and will continue to incur significant additional expenses related to, among other things, research and development, wireless testing and ongoing upgrades to the wireless network infrastructure. As a result of these investments, among other factors, ***we plan to raise additional capital***, depending on market conditions, which may not be available on favorable terms.

283.    DISH also conspicuously changed its "Acquisition and Capital Structure Risks" disclosure in the 2021 Form 10-K from "[w]e *may* need to raise significant additional capital in the future to fund the efforts described above," which DISH described as all relating to completion of the 5G network to "[w]e *will* need additional capital" to complete the 5G network in the Q1 2022 Form 10-Q.

284.    During the May 2022 Call, Defendants elaborated on the Company's cash flow issues, stating that "[f]or the first time in many years, we're *in the negative*, but that's because of the investment we're making in our network," explaining that DISH only had "the necessary capital to fund *portions* of the [capex] bill happening this year" (emphasis added).

285.    Moreover, in response to a question from analyst Richard Prentiss of Raymond James & Associates about the size and timing of DISH's expected capital needs, Defendant Ergen admitted that DISH would run out of cash flow in less than one year:

**Richard Hamilton Prentiss**, *Raymond James & Associates, Research Division:*

...And then, obviously, the 10-Q points out now you are -- will need to raise capital plan to raise capital. Can you help us understand just framework about sizing it, timing it, what type of capital you might be interested in? Does the spectrum purchase of the low band in 3Q '23 option, the debt maturity 1Q '23 and how any wholesale or private network contracts might fit into your timing also? But just a question kind of on the sizing, timing and type as you're thinking about it.

**Charles William Ergen**, *Co-Founder & Executive Chairman:*

…As far as -- the exact problem in terms of raising money, I think you can look at it that the -- we have capital on hand and cash flow to continue our build-out. But we get to March of next year with the next -- I think it's $1.5 billion bond repayment. We'll need to refinance or willing to raise capital or refinance part of that in that time frame, but that gives you an order of the magnitude of what might look at.

-117-

286.    Defendants' disclosures corrected their prior misstatements just two months earlier that DISH had "everything we need" to complete the 5G network and the prior misstated risk disclosures that DISH "*may* need" to raise additional capital to fund the 5G network buildout.

287.    Defendants further revealed that, while investors expected the commercial launch in Las Vegas in early 2022, the delays they previously disclosed were going to be much longer than previously represented and, accordingly, DISH had not actually launched its 5G services until May 4, just two days before the earnings call, stating "[o]n Wednesday of this week, we commercially launched Project Genesis in Las Vegas."

288.    Moreover, although Defendants previously claimed DISH had a strong interest from enterprise customers and would begin servicing enterprise customers in 2022, Defendants revealed during the Q1 2022 Earnings disclosure that DISH had "FCC obligations that are focused on retail wireless" and DISH was not yet servicing any enterprise customers. Thus, Defendant Ergen admitted, while DISH would hit the 20% requirement in June 2022, "it's not going to be a robust offering. *The commitment that we have to make is we have to do data*. We have to do data 20% of the population in the United States, so it's not going to be a robust offering as robust as we'd like," meaning DISH was still not ready to service enterprise customers. Thus, Defendants characterized DISH's enterprise business as a "potential" opportunity that, as of May 2022, DISH had not begun, stating, "we think that there's significant potential with the enterprise business. And the capabilities of our network actually enable that as we go forward."

289.    Upon the news, DISH's stock price declined from $27.48 per share on May 5, 2022 to $22.22 per share on May 6, 2022 on heavy trading volume of over 13 million shares, as compared to the previous day of 4.4 million shares.

290.    Analysts took note and were concerned about DISH's need to raise more capital in a challenging economic environment. For example, according to a May 6, 2022 Barclays report:

> **Overall Take**: DISH reported result[s] that were worse than expected across the board (Figure 1). The company also turned FCF negative for the first time, on account of the wireless build and given the early stage of the build, is likely to remain negative FCF for many years to come.

291.    Barclays identified as one of its "key takeaways" that rising interest rates would make it more difficult for DISH to raise capital, leaving significant uncertainty around DISH's capital structure:

> With meaningful debt maturities next year and acceleration of network capex and retail rollout, we believe the company will need to raise more capital in a much more challenged macro growth backdrop amid rising interest rates. In our opinion, uncertainty around its capital structure represents a significant overhang for valuations, although the company doesn't seem to be in a rush to lock in funding despite the macro uncertainty.

*292.*    Likewise, a May 6, 2022 Credit Suisse report highlighted that "***[m]ost important, DISH mgmt noted they plan to raise additional capital***" and that "though the Company still has $3.2B of cash ***and FCF just dipped negative this qtr for the first time since 2015***."

293.    A May 6, 2022 Morningstar analyst report likewise focused on the fact that DISH "***burned cash for the first time in years*** as wireless network construction accelerated."

294.    Analysts also focused on DISH's delay in constructing its 5G network and lack of enterprise customers. A May 11, 2022 Morningstar Equity report noted that, while "DISH spent far more time, however, discussing the opportunities it sees to develop enterprise services utilizing the flexibility its new network provides," Morningstar's valuation of the Company was "more conservative than management's targets" due to "very high uncertainty as its unconventional

wireless network buildout progresses, with major questions around network quality and the cost to fill coverage gaps, either on its own or through agreements with AT&T and T-Mobile."

295.    A May 20, 2022 Citi report similarly stated that Citi had updated its model to "recognize DISH will need incremental funding" for its 5G network and warned that, to be competitive, DISH needed to start focusing more on enterprise and wholesale customers:

> **Implications** — While DISH remains a long-term competitive threat within the wireless category, management commentary recognizes DISH needs to take greater control of its long-term destiny with a more significant retail strategy, *while it retains focus on future monetization opportunities from B2B, IoT, and wholesale*. The latter wholesale opportunities could provide DISH with a more efficient path to access the wireless mass market, which generates recurring service revenue of over $200B.

### C. On May 10, 2022, DISH Further Reveals the Enterprise Opportunity Was Far More Uncertain Than Previously Disclosed and the Extent of the Capital Raise Necessary to Build the 5G Network

296.    On May 10, 2022, Defendants held a rare and highly anticipated analyst day in Las Vegas, Nevada to discuss Dish's 5G network buildout and the status of the Las Vegas project.  At the analyst day conference, Defendants disclosed that the state of Dish's enterprise opportunity was more uncertain than they previously let on, and that DISH would need to raise significant, additional capital in order to complete its 5G buildout and meet its debt obligations.

297.    Acknowledging the complete lack of enterprise customers DISH had to date and that Defendants were unsure of when DISH would begin to acquire enterprise customers, Defendant Bye pleaded with investors that "**all of this being said, the pitch to close sales process within the enterprise customer is longer. It takes time.**" This was directly contrary to Defendants' prior assurances that DISH was on "the leading edge" of the enterprise market,

already working with enterprise customers, and seeing traction and interest from enterprise customers since over a year prior.

298.    In addition, Defendants further disclosed the extent of the capital raise that would be required so that DISH could both complete its 5G buildout in compliance with the FCC milestone requirements and meet its quickly approaching debt obligations. In response to an analyst who noted Defendants' earlier reticence to discuss the financing that would be necessary, Defendant Ergen stated:

> [W]e know that in March of next year, we have a debt payment of $1.5 billion, and we think we'll have to raise money or refinance part of that or raise money at that point in time. And then it's another, I think, 14 or 18 months before we have another debt payment and the world is kind of a different place for us at that point in time…. I believe that the cost of capital for us today would be higher than it will be after the market settles down at wherever it settles down, I think the volatility is not a good thing right now. So -- but we're -- but it's certainly something that we'll look at and make sure that we raise capital prior to that time.

299.    On the news, DISH's stock price declined $4.29 per share, or 19.7%, from a close of $21.75 on May 10, 2022 to a close of $17.46 on May 11, 2022 on heavy trading volume of 18.69 million shares, compared with the previous day's volume of 7.35 million shares.

300.    Analysts were disappointed to learn that DISH was not, in fact, leading with enterprise customers and that the Company would need to raise substantial capital to complete the buildout and might wait to do that "until the market settled," thereby posing additional risk for the network's development.

301.    In a May 11, 2022 report entitled "DISH Network Provided Little Detail at Its Analyst Day, Likely Because Much Remains Unknown," Morningstar analysts observed that "DISH Network provided few new details at its May 10 analyst day" and that "[t]he firm still faces

very high uncertainty as its unconventional wireless network buildout progresses, with major questions around network quality and the cost to fill coverage gaps."

302.    In a May 11, 2022 report, entitled "DISH Investor Day Takeaways: DISH's Investor Day Yesterday Left Some of the Biggest Questions Unanswered," Barclays analysts decried that the Company had not provided any indication of how the network would be monetized, stating:

> [T]he biggest unknown is the company's capital structure but there was little disclosure on this front. In fact, management commentary seems to indicate that the company may wait for market volatility to die down before raising more capital, but given that scaling growth is partly a capital problem, this also means growth scaling will be partly constrained by present macro environment and could be a lot more back-end weighted. Given the macro backdrop, combined with the potential size of the company's capital needs (which could be a significant part of its present EV), attributing equity value with this unknown is quite difficult.

### D. On February 23, 2023, DISH Discloses that it Had Been Unable to Scale or Commercialize its 5G Network and, Thus Still Had No Enterprise or Wholesale Customers

303.    During the February 2023 Call, Defendants revealed for the first time that DISH would not have any enterprise or wholesale customers for at least one more year, that the reason DISH had no enterprise customers was because it was unable to scale and commercialize its 5G network, as previously represented, that DISH had only begun integrating VoNR at the sites it had set up last June 2022 which accounted for 20% coverage and that DISH could not market to enterprise customers until it had achieved VoNR at 70% of sites.

304.    Analysts expressed concerns during the February 2023 Call about Defendant Bye stepping down as DISH's Head of Enterprise, prior to DISH obtaining any real enterprise customers. In response to a follow-on question about when investors could finally expect to see the enterprise and wholesale business going, Defendant Ergen revealed that, contrary to

Defendants' prior statements, it would now be another whole year before DISH expected to see revenue from enterprise.

305.    For example, in the February 2023 Call, analyst Michael Rollins asked about the expected timeline to sign "large" deals and whether this would require "certain commercial milestones that [DISH] need[ed] to reach potentially different than what [DISH] outlined on the retail side[.]" In response, Defendant Ergen explained that the Company would need to scale the network—which it was now targeting to achieve by the *end* of the year at the earliest—and *then* optimize it, *before* DISH would be positioned to acquire customers outside of retail:

> **[W]e'd have to have scale in the network, and we have -- two things have to happen. We have to be off TSA from T-Mobile[.] [A]gain, our focus on for the first half of the year by end of June. And the second one, we have to have scale, which, again, we're focused on by the end of this year.** Then I think we have a really neat platform for people who might be interested from a wholesale perspective, but that's very similar to what the enterprise opportunity is as well. **And then on the second -- I think that once we hit 70%, that, that 1,000 a month will decline. In other words, what -- at that point, there's -- I think Dave's focus -- I shouldn't talk for him, but since I'm talking, his focus will be to optimize the network within the markets that we are [in].**

306.    Defendants' disclosures corrected their prior misstatements, including, among others, on May 10, 2022 that "**[w]e already got customers, we're growing that revenue this year**" and "**[w]e see that scaling in 2023 and clearly picking up momentum as we go into '24 and beyond.**"

307.    Analysts understood the disclosure to mean that, even if the Company met its technical FCC build deadlines, it would be a long time before the Company achieved a functional network that would enable enterprise commercialization. For example, in a February 24, 2023 report, JP Morgan analysts noted:

**Retail wireless maintains its base, but wholesale effort and Boost Infinite will**

**take time to ramp; network build on pace**. Dish is on track to meet the coverage requirement of at least 75% of pop coverage for the 600 MHz by June 14, 2025, and has 10k towers built for 35% coverage, **but not all the sites are turned on due to a lack of needed capacity.** The company expects to meet 70% pop coverage by June 14, 2023, for its AWS-4, Lower 700 MHz, and AWS H Block spectrum bands…. **The wireless wholesale business is the highest margin opportunity, but the effort continues to lack any significant momentum, and we reduce our wholesale revenue estimate to $171m for 2023, a much slower ramp than before, and assume it takes much longer for that business to scale.**

308.     Upon the news, DISH's stock price declined from $13.76 per share on February 23, 2023 to $11.41 per share on February 28, 2023 on heavy trading volume.

## X.     CLASS ALLEGATIONS

309.     Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired DISH Class A common stock between February 22, 2021 and February 23, 2023, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are DISH and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

310.     Because DISH has approximately 246.7 million shares of common stock in the float, which actively trades on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by DISH or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

311.    Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel who are experienced in class action and securities litigation.

312.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

- Whether Defendants violated the federal securities laws as alleged herein;

- Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about DISH's business and operations;

- Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period; and

- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

313.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    PRESUMPTION OF RELIANCE

314.    Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for DISH's common stock was an efficient market that promptly digested current information related to the Company

from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- DISH's common stock was actively traded on the NASDAQ;

- The market price of DISH common stock reacted promptly to the dissemination of public information regarding the Company;

- DISH's stock was followed by several financial analysts, including those cited in this Complaint;

- The average weekly trading volume for DISH stock during the Class Period was approximately ten million shares;

- As a regulated issuer, DISH filed with the SEC periodic public reports during the Class Period;

- DISH regularly communicated with public investors via established market communication mechanisms; and

- During the Class Period, DISH had over 246 million shares in the public float and the Company's market capitalization was over 20 billion.

315.    Throughout the Class Period, DISH was consistently followed by the market, including securities analysts and the media. The market relies upon DISH's financial results and management to accurately present the Company's financial results. During the Class Period, Defendants continued to pump materially false and misleading information into the marketplace regarding DISH and material facts concerning the status and capability of DISH's 5G network and the Company's ability to finance its construction using current cash and cash flows, as well as demand from enterprise customers. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of DISH's common stock.

316.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for DISH common stock was artificially inflated.

Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

317.    Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of DISH common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

318.    Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated* Ute *Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

319.    Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased DISH common stock at artificially inflated prices.

## XII.    NO STATUTORY SAFE HARBOR

320.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

321.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

322.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DISH who knew that the statement was false when made.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

323.    Plaintiffs reallege each allegation as if fully set forth herein.

324.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

325.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DISH common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire DISH common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

326.    During the Class Period, Defendants, by the use of means and instrumentalities of

interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue

statements of material fact and/or omitted material facts necessary to make the statements made

not misleading; and (c) engaged in acts, practices and a course of business which operated as a

fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market

prices for DISH common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder. Defendants acted individually and in concert in a continuous course of

conduct to conceal non-public, adverse material information about the Company's outlook and

condition, as reflected in the misrepresentations and omissions set forth above.

327.    During the Class Period, Defendants acted with scienter in that they knew that the

public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the

securities laws. By virtue of their receipt of information reflecting the true facts of the Company,

their control over, and/or receipt and/or modification of DISH's allegedly materially misleading

statements, and/or their associations with DISH which made them privy to confidential proprietary

information concerning the Company, Defendants participated in the fraudulent scheme alleged

herein.

328.    The Individual Defendants, who are the senior officers and/or directors of the

Company, had actual knowledge of the material omissions and/or the falsity of the material

statements set forth above, and intended to deceive Plaintiffs and the other members of the Class,

or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of DISH to members of the investing public, including Plaintiffs and the Class.

329.    As a result of the foregoing, the market price of DISH common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of DISH common stock during the Class Period in purchasing DISH common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

330.    Had Plaintiffs and the other members of the Class been aware that the market price of DISH common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased DISH common stock at the artificially inflated prices that they did, or at all.

331.    As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs' and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiffs and other members of the Class purchased DISH common stock in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of DISH common stock through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants'

concealment of, among other things, Defendants' concealment of material facts related to DISH's

business and operations, in violation of federal and state laws.

332.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of

the Class for substantial damages which they suffered in connection with their purchases of DISH

common stock during the Class Period.

**COUNT II**

**FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE
INDIVIDUAL DEFENDANTS**

333.     Plaintiffs reallege each allegation as if fully set forth herein.

334.     This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t,

against the Individual Defendants.

335.     DISH and the Individual Defendants are liable as primary violators of Section 10(b)

of the Exchange Act and Rule 10b-5 as set forth herein.

336.     The Individual Defendants acted as controlling persons of DISH within the

meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual

Defendants had the power and authority to cause DISH to engage in the wrongful conduct

complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to

Section 20(a) of the Exchange Act.

337.     Specifically, the Individual Defendants, by reason of their status as senior executive

officers and/or directors of DISH, directly or indirectly, controlled the conduct of the Company's

business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of

the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the

Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiffs' and the Class's investments in DISH common stock within the meaning of Section 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

338. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

339. The Individual Defendants knew or recklessly disregarded the fact that DISH's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

340. By virtue of their high-level positions and their participation in and awareness of DISH's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

341. As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

342.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of DISH common stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as Class representatives;

2.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

3.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

4.    Granting Plaintiffs leave to amend this complaint to conform to the evidence; and

5.    Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: October 20, 2023

Respectfully submitted,
LEVI & KORSINSKY, LLP


/s/ *Shannon L. Hopkins*
Shannon L. Hopkins
Gregory M. Potrepka
David C. Jaynes
Rachel A. Berger

-133-

1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: djaynes@zlk.com
Email: rberger@zlk.com

*Lead Counsel for Plaintiffs and the Class*