# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:23-cv-00734-GPG-KAS**

SAI NAVEEN LINGAM and WARREN G.
GREGORY, Individually and on Behalf of
All Others Similarly Situated

       Plaintiffs,

v.                                                          JURY TRIAL DEMANDED

DISH NETWORK CORPORATION,
CHARLES W. ERGEN, MARC ROUANNE,
STEPHEN BYE, and DAVE MAYO.

       Defendants.

---

## SECOND AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ............................................................................1

II.   JURISDICTION AND VENUE ....................................................................5

III.  PARTIES .......................................................................................................6

  A.   Plaintiffs ..................................................................................................6

  B.   Defendants ...............................................................................................7

  C.   Relevant Non-Parties ..............................................................................9

IV.   SUBSTANTIVE ALLEGATIONS ............................................................11

  A.   DISH Historically Provided Pay-TV Services ......................................11

  B.   In the Face of Steadily Declining Pay-TV Sales, DISH Pivots to Become a 5G Wireless
       Service Provider .....................................................................................12

    1.   DISH Executives Set Out to Build a 5G Wireless Network Based on Brand New and
         Unproven Technologies ......................................................................12

    2.   Because the Retail Wireless Market Is Already Saturated and Dominated by Large,
         National Providers, Defendants Claim to be Designing DISH's Wireless Network
         Primarily for Wholesale and Enterprise Use.......................................15

  C.   To Meet the June 2022 FCC Deadline Set in Connection with DISH's Acquisition of
       Boost Mobile, and to Avoid Massive Penalties, DISH Builds the 5G Network's
       Physical Infrastructure Without Regard for Network Functionality or Commercial
       Viability .................................................................................................17

  D.   DISH Conceals from Investors that Its Vendors Have Been Unsuccessful at Developing
       the Software Needed to Integrate the Network's Components and Suffers from
       Continuous, Crippling Integration Issues Preventing Commercial Launch .................20

  E.   DISH Experiences Supply Chain Issues and Engages Amazon Web Services as a Work-
       Around for Obtaining Necessary Hardware, Which Adds Eight to Ten Months to
       DISH's Software Development Schedule.................................................27

  F.   DISH Finally Engages Samsung to Provide the Software Solutions that Mavenir and
       Rakuten Could Not, But Years of Building to "Save the License" Means DISH's
       Network Must Be "Densified" and Optimized Before Commercialization Is Possible .29

  G.   Due to DISH's Inability to Build a Functioning 5G Network and Its Decision to Pause
       Enterprise Product Development and Voice Functionality, Defendants Are Unable to
       Attract Enterprise Customers .................................................................32

    1.   DISH's Failure to Fund Enterprise Product Development During the Class Period

Resulted in No Enterprise Functionality on the 5G Network and, thus, No Demand from Enterprise Customers ....................................................32

2.    DISH Pauses the Development of Voice Functionality to Focus on Meeting the FCC Population Coverage Requirements, Prohibiting DISH From Achieving Enterprise or Retail Revenues from Its 5G Wireless Network ...........................................35

V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD ............................................37

A.    2020 Annual Report on Form 10-K ................................................................37

B.    February 22, 2021 Earnings Call ....................................................................38

C.    April 29, 2021 First Quarter 2021 Form 10-Q ...............................................42

D.    April 29, 2021 Earnings Call..........................................................................44

E.    August 9, 2021 Earnings Call.........................................................................51

F.    November 4, 2021 Earnings Call....................................................................54

G.    February 24, 2022 Earnings Call ....................................................................58

H.    May 6, 2022 First Quarter Earnings Call .......................................................61

I.    May 10, 2022 DISH Analyst Day 2022 Presentation .....................................65

J.    November 2, 2022 Earnings Call....................................................................67

VI.    DEFENDANTS REVEALED THE TRUTH IN A SERIES OF PARTIALLY CORRECTIVE DISCLOSURES .....................................................................................69

A.    On November 4, 2021, DISH Reveals that Its Novel Wireless Network Has Been Experiencing Undisclosed Integration Problems Throughout 2021 and Is Not Ready for Commercialization......................................................................69

B.    On May 6, 2022, DISH Discloses Integration Issues Were Far More Expansive and Worse than Previously Represented and Enterprise Sales Are Non-Existent ..............70

C.    On May 10, 2022, DISH Reveals That Its Enterprise Business Opportunity Is Still Highly Uncertain ...........................................................................................72

D.    On February 23, 2023, DISH Reveals that It Has Been Unable to Scale or Commercialize Its 5G Network and, Thus Still Has No Enterprise or Wholesale Customers.......................................................................................................73

VII.    POST-CLASS PERIOD EVENTS ...............................................................................79

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................................80

A.    Defendants' Admissions That They Abandoned Any Efforts to Build a Functioning 5G

Network to, Instead, Focus on Meeting the FCC Milestones Creates a Strong Inference of Scienter ................................................................................................80

B.    Defendants Admitted That the Platforms and Software Necessary to Integrate the Network Were Not Ready During the Class Period and That They Knew from the Outset That Certain Vendors Lacked the Requisite R&D Capacity ............................82

C.    Defendants Attended Regular Meetings Discussing Integration Issues and Resulting Delays in the Network Build and Timeline for Commercialization.............................83

D.    Defendants Actively Tracked Relevant Metrics in Their Internal Communications System.......................................................................................................................85

E.    Defendant Ergen Closely Controlled All Aspects of the 5G Network Deployment and Regularly Visited the Physical Buildout Sites to Apprise Himself of the Progress and Issues........................................................................................................................86

F.    The 5G Network Deployment Was DISH's Core Operation Throughout the Class Period, and Gaining Enterprise Customers Was the Core Component of Monetizing the 5G Network..............................................................................................................87

G.    Defendants Had Motive to Misrepresent DISH's Wireless Network Progress to Meet the FCC Milestone Deadlines ...................................................................................89

IX.  LOSS CAUSATION.............................................................................................90

A.    On November 4, 2021 DISH Discloses Software and Network Integration Problems ..91

B.    On May 6, 2022, DISH Discloses Integration Issues Were Far More Expansive and Worse than Previously Represented and Enterprise Sales Are Non-Existent ...............92

C.    On May 10, 2022, DISH Further Reveals the Enterprise Opportunity Was Far More Uncertain Than Previously Disclosed ........................................................................94

D.    On February 23, 2023, DISH Discloses that It Had Been Unable to Scale or Commercialize Its 5G Network and, Thus Still Had No Enterprise or Wholesale Customers...............................................................................................................95

X.   CLASS ALLEGATIONS....................................................................................98

XI.  PRESUMPTION OF RELIANCE.........................................................................99

XII. NO STATUTORY SAFE HARBOR....................................................................101

XIII.    CLAIMS FOR RELIEF.................................................................................102

COUNT I.....................................................................................................................102

COUNT II....................................................................................................................105

PRAYER FOR RELIEF................................................................................................106

DEMAND FOR JURY TRIAL ................................................................................................107

1.      Lead Plaintiff Sai Naveen Lingam ("Lead Plaintiff") and Additional Plaintiff Warren W. Gregory (collectively, "Plaintiffs") bring this class action pursuant Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of themselves and all persons and entities similarly situated, other than Defendants (defined below), who purchased or otherwise acquired DISH Network Corporation ("DISH" or "Company") Class A common stock between February 22, 2021 and February 22, 2023, inclusive (the "Class Period").

2.      Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding DISH; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews with individuals who are former employees of DISH; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning DISH and the industry in which the Company operates; and (v) pertinent court filings.

## I.      NATURE OF THE ACTION

3.      This is a class action arising out of Defendants' fraudulent scheme to conceal crippling issues concerning the integration and capabilities of DISH's novel 5G network buildout that prevented DISH from scaling and commercializing its network to obtain viable enterprise customers.

4.      For decades, DISH operated a highly profitable business, providing television programming via satellite broadcast. But the years of smooth-sailing came to an end as the TV industry began to evolve from linear broadcast formats to on-demand programming delivered via the internet. Recognizing that DISH-branded Pay-TV service was doomed, DISH executives embarked on an initiative to construct a novel, nationwide 5G wireless network that was intended to become DISH's new core line of business to service mainly enterprise customers because the retail wireless market was already saturated and dominated by three national juggernauts—Verizon, T-Mobile, and AT&T.

5.      DISH's efforts to construct a 5G network began in earnest in 2019, after DISH committed to the FCC that it would build a nationwide 5G network covering 20% of the U.S. population by June 2022 and 70% by June 2023. If DISH failed to meet the FCC deadlines, it would be subject to $2.2 billion dollars in cash penalties and forfeiture of billions more in spectrum licenses. However, the agreement with the FCC did not require that DISH demonstrate that the 5G network was functional until June 2023.

6.      Former DISH employees confirmed that DISH was, thus, singularly focused on reaching the 20% deadline without regard to network functionality or the ability to commercialize the network, instructing employees to build the physical infrastructure of the network and hoping they could figure out how to integrate the network and develop functionality required by enterprise customers, later.

7.      Indeed, instead of engaging an experienced wireless network manufacturer that could build a functioning 5G wireless network based on proven designs and industry standards, DISH chose to design a novel, "Open-RAN" network which, while purporting to offer increased

scalability and interoperability, was based on brand new and unproven technologies. Constructing an Open-RAN network was theoretically cheaper, both in initial construction and in maintenance costs, because it would enable the network operator to select the most competitively priced vendors rather than relying upon just one manufacturer. But it was extremely risky because Open-RAN technology was new and unproven at this scale.

8.      Up against looming FCC deadlines, throughout the Class Period, Defendants abandoned any meaningful attempt to construct a reliable and functioning 5G network so they could focus solely on meeting the June 2022 FCC deadline and avoid massive financial penalties. For example, DISH contracted with software vendors who were the lowest bidders, even though those vendors had not demonstrated they could develop critical software components and integrate an Open-RAN network. Defendants began construction of the physical cell towers and infrastructure before DISH had even developed critical software or had done the proper validation testing to ensure the 5G network would work. It did not. Nevertheless, the Defendants told investors in February 2021 that DISH had validated its 5G network in the field and was "just deploying it now."

9.      According to former DISH employees, DISH began experiencing undisclosed integration issues in the first quarter of 2021, which Defendants admitted in November 2021 had been occurring throughout 2021 and caused massive delays that prevented DISH from launching its first planned 5G network launch in Las Vegas until more than six months after the launch date of Q3 2021 that had been disclosed to investors. Even then, the network did not have the necessary capabilities to be useable by most customers and could not be scaled to a nationwide network for enterprise customer use. Defendant Mayo would later admit, during DISH's November 2021

Earnings Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable." In other words, DISH had still not been able to figure out how to integrate its software in order to make the 5G network functional and ready for commercial use.

10.     Defendants also admittedly decided to put enterprise customer product development on hold, slashing the budget to below $10,000, and delayed development of Voice over New Radio, or "VoNR," the technology that allows voice communication over 5G. As Defendant Ergen admitted in February 2023, VoNR is a required component of the network to scale and commercialize a functioning nationwide network and DISH did not start working to include VoNR on the 5G network until 2023.

11.     Despite DISH's network integration issues, Defendants falsely assured investors throughout the Class Period that DISH had "completed a successful field validation," "tested a lot of vendors," and "brought radios, compute [and] software together" (e.g., integration) so that DISH was "just deploying [the network] now" and DISH would have "service for this market to begin by the end of the third quarter of 2021." Defendants also claimed DISH was "working with [enterprise] customers" on building "private networks that are not limited by geography of our national footprint." None of this was true.

12.     Defendants were aware of the network integration issues and lack of enterprise functionality or sales through their attendance at 5G Summit meetings, Product Defect Meetings, Software Development Meetings, and Vendor Meetings where these issues were discussed. Moreover, Defendant Ergen admittedly "[went] to Las Vegas every month, so [he] [could] see kind of the progress" of the network build. DISH also maintained a large, approximately 55-inch,

TV screen immediately outside of Defendant Rouanne's office (and in several other places throughout DISH's Littleton office building) that displayed in real time all the network development defects listed in Jira in a large, histogram chart.

13.     As Defendants would ultimately reveal through a series of partially corrective disclosures, DISH did not have a fully integrated and functional network, as previously represented. Rather, due to DISH's early decisions to essentially abandon efforts to build a reliable and functioning network that could be scaled and commercialized so that enterprise (or any) customers could use it, DISH experienced years' worth of delays due to, *inter alia*, extensive network integration issues, the need to replace vendors incapable of integrating DISH's network and to belated development of products and functionality such as VoNR that were needed to scale and commercialize the 5G network for enterprise customers.

14.     Upon these disclosures, the price of DISH's common stock plunged from $32.18 at the start of the Class Period to $12.20 per share on February 27, 2023, for an aggregate drop of approximately $20, or ***62%***.

15.     Defendants are culpable for the fraud knowingly perpetrated on the market and Plaintiffs bring this action to hold them responsible for the resulting harm to investors resulting from their purchases of DISH's stock at artificially inflated prices.

**II.     JURISDICTION AND VENUE**

16.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. 21. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. DISH is headquartered in this District, with DISH's principal place of business located at 9601 South Meridian Boulevard, Englewood, Colorado, 80112.

III.    **PARTIES**

   A. **Plaintiffs**

19.    Lead Plaintiff Sai Naveen Lingam purchased DISH Class A common stock during the Class Period, as set forth in his Certification of Plaintiff Pursuant to Federal Securities Laws (ECF 5-2) which Plaintiffs incorporates by reference herein, at prices artificially inflated by Defendants' materially false and misleading public statements and omissions and was damaged thereby.

20.    Additional Plaintiff Warren W. Gregory purchased DISH Class A common stock during the Class Period, as set forth in the Certification of Warren W. Gregory Pursuant to Federal Securities Laws (ECF 41-1) which Plaintiffs incorporate by reference herein, at prices artificially inflated by Defendants' materially false and misleading public statements and omissions and was damaged thereby.

**B. Defendants**

21.     At all times relevant to this action, Defendant DISH was a public corporation, organized and existing under the laws of the State of Nevada with its principal place of business and principal executive offices located in Englewood, Colorado. The Company's Class A common stock was traded on the Nasdaq Global Select Market ("NASDAQ"), a national exchange, under the ticker symbol "DISH."

22.     Defendant Charlie Ergen co-founded DISH, formerly EchoStar Communications Corporation, in 1980 and, at all relevant times hereto, served as the Chairman of the Board of Directors for both DISH and EchoStar. Ergen oversees DISH's long-term business development and strategy and the Company's wireless division ("DISH Wireless").

23.     Defendant Dave Mayo served as Executive Vice President of Network Development at DISH since June 2020 and was responsible for DISH's wireless buildout strategy and the deployment of its 5G network. Defendant Mayo participated in the Company's earnings calls and analyst conferences throughout the Class Period and is responsible for false statements alleged herein.

24.     Defendant Marc Rouanne served as Executive Vice President and Chief Network Officer of DISH's wireless business since December 2019 and was responsible for DISH's 5G network architecture and strategy, radio frequency network and strategy, and 5G device and interoperability testing. Defendant Rouanne participated in the Company's earnings calls and analyst conferences throughout the Class Period and is responsible for false statements alleged herein.

25.     Defendant Stephen Bye served as Chief Commercial Officer and Executive Vice President at DISH from December 2019 through January 2023 and was responsible for efforts to monetize DISH's 5G network, including through enterprise opportunities. Defendant Bye served as a member of DISH's Board of Directors since January 18, 2023.  Defendant Bye participated in the Company's earnings calls and analyst conferences throughout the Class Period and is responsible for false statements alleged herein.

26.     Defendants Ergen, Mayo, Rouanne, and Bye are collectively referred to herein as the "Individual Defendants."

27.     The Company and the Individual Defendants are collectively referred to herein as "Defendants."

28.     The Individual Defendants, by virtue of their high-level positions at DISH, directly participated in the management of DISH and were directly involved in the day-to-day operations of DISH at the highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the individual and collective actions of these individuals.

29.     As senior executives at a publicly held company with securities registered with the SEC and traded on the NASDAQ, the Individual Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of DISH's publicly

traded securities would be based on accurate information. Each Individual Defendant violated these requirements and obligations during the Class Period.

30.     As a result of their positions of control and authority as senior executives, the Individual Defendants were able to and did control the content of the public statements issued by the Company during the Class Period. Each Individual Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Individual Defendants are responsible for the accuracy of the materially false and misleading public statements detailed in this complaint.

31.     As a result of their positions of control and authority as senior executives, the Individual Defendants had access to adverse, undisclosed information about the Company's business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. The Individual Defendants knew or recklessly disregarded that the positive representations made by Defendants about the Company were materially false and misleading and material facts omitted from positive representations made by Defendants about the Company rendered those representations materially false and misleading, as detailed herein.

### C.  Relevant Non-Parties

32.     CW1 was employed at DISH Wireless from 2020 through the end of the Class Period in DISH's Retail Wireless Operations segment. CW1 was responsible for activities such as relationships with DISH Wireless' indirect dealers, marketing and promotion. CW1 reported through an Executive VP of Retail Wireless who reported directly to John Swieringa, President and COO of DISH Wireless.

33.     CW2 was employed at DISH in the Wireless division prior to January 2021 and
continuing at least through October 2022. CW2 was responsible for planning and developing
products to be offered to enterprise customers and reported to multiple individuals at different
times that reported to Defendant Bye.

34.     CW3 was employed by one of DISH's primary software vendors beginning in the
second quarter of 2021 through the second quarter of 2022. DISH contracted this software vendor
to assist with the buildout of DISH's 5G O-RAN network. While CW3 was employed at this
vendor, DISH was one of the vendor's largest accounts. CW3's primary responsibilities included
serving as the engineering services point of contact for the DISH account and developing software
for DISH's 5G O-RAN network. CW3 moved to Colorado in mid-2021 and worked in DISH
Wireless's corporate offices every day alongside DISH executive leadership and regularly
interacted with the Individual Defendants about the 5G network build and issues concerning the
buildout as they arose. DISH hired CW3 as a DISH employee in the second quarter of 2022 to
continue working on the development of the 5G network as an engineer on the National RF ("Radio
Frequency") team. CW3 continued his employment at DISH until the fourth quarter of 2023.

35.     Heather Campbell was Senior Vice President ("SVP") of DISH's National Radio
Frequency ("RF") Engineering team from May 2022 to September 2023. Campbell reported to
Defendant Mayo and knew Defendant Mayo from working together with him at T-Mobile.
Campbell was in charge of providing network coverage maps to the Individual Defendants.
Campbell is currently SVP of Enterprise Delivery and Operations at Lumen Technologies.

36.     John Swieringa was employed at DISH as Group President of Retail Wireless from
June 2020 through January 2022 and was appointed as President and Chief Operating Officer of

DISH Wireless on January 5, 2022, responsible for all operational aspects of DISH's wireless business including the deployment and management of DISH's virtualized, O-RAN 5G broadband network, its retail wireless business, and its day-to-day activities. Swieringa served in a variety of roles at DISH since joining the Company in 2007.

## IV.    SUBSTANTIVE ALLEGATIONS

### A. DISH Historically Provided Pay-TV Services

37.    DISH was founded by Defendant Ergen in 1980 as EchoStar, a distributor of C-band TV systems. Since 1996, DISH has used direct broadcast satellite and fixed satellite service spectrum to provide DISH-branded Pay-TV programming packages to its customers.

38.    In 2008, DISH spun off from EchoStar to allow DISH to focus on growing its Pay-TV service business while EchoStar focused on the satellite and technology business.

39.    For decades, DISH operated as a low-cost provider in the Pay-TV industry with a focus on service, value, and technology. DISH offered programming packages that included programming from national and local broadcast networks, premium movie channels, regional and specialty sports channels, and international programming.

40.    Innovations in the Pay-TV industry, like streaming services and other over-the-top internet transmission services (also known as streaming platforms), put pressure on DISH's revenues, margins, and subscribership, forcing DISH to begin offering internet-based TV services. Meanwhile, DISH's Pay-TV subscribership continued to decline steadily, falling from 13.9 million subscribers in 2015 to just 12.0 million by the end of 2019. During that same period, DISH's annual revenues fell from $15.5 billion to $12.8 billion.

41.     As a result of increased competition in the Pay-TV industry from new streaming services and the concomitant decline in DISH's revenues, DISH made the strategic decision to pivot into a new line of business and become a wireless service provider. In a February 19, 2020, earnings call (the "February 2020 Call"), Defendant Ergen explained that DISH's pivot to enter the wireless service industry was to have "another engine to grow the business[.]"

**B.    In the Face of Steadily Declining Pay-TV Sales, DISH Pivots to Become a 5G Wireless Service Provider**

**1.    DISH Executives Set Out to Build a 5G Wireless Network Based on Brand New and Unproven Technologies**

42.     In 2019, after years of declining revenues, DISH set out to build an entirely novel wireless network based on unproven technologies. In a July 26, 2019 letter to the FCC, DISH described the planned network as "a ***first-of-its-kind*** 5G network ***built from the ground up***." Defendant Ergen described it in a February 22, 2021 earnings call (the "February 2021 Call"), stating that "at the end of the day, we're going to have this really, really special 5G cloud native, Open-RAN virtualized network ***that really doesn't exist in the world today***."

43.     Wireless service providers typically rely upon a single Original Equipment Manufacturer ("OEM"), like Ericsson or Nokia, to provide all the hardware and software necessary to build and integrate a Radio Access Network ("RAN"). These components include hardware and software pre-designed to work together seamlessly and to complete integration of the network.

44.     DISH did not follow this industry standard business model—opting for a potentially less costly, yet far riskier strategy. Rather than rely upon well-established and proven OEMs for the network design, hardware and software components, and integration of the network, DISH decided to use recently developed and unproven "Open-RAN" standards. Open-RAN, or

Open Radio Access Network, refers to a network that does not require each of the components to be manufactured by a single OEM. In the more traditional construction of wireless networks, one OEM's proprietary components cannot be substituted for another OEM's components. In contrast, any component that complies with Open-RAN standards should be compatible with and capable of being integrated into an Open-RAN compliant wireless network.

45.    Figure 1, below, is a slide that DISH created illustrating how an Open-RAN network might integrate components from many different vendors into a single wireless network. In this illustration, the Open-RAN network would utilize antennas designed and manufactured by JMA or CommScope, radios units from Fujitsu or Samsung, distributed units ("DUs") from Dell or Cisco running software from VMware, fiber optics from Verizon or Comcast, local data centers running software from Mavenir, cloud services from Amazon Web Services, regional data center services from Nokia, and national data center services from Oracle, all integrated into a functional Open-RAN wireless network.

**Figure 1**



46.     In theory, embracing Open-RAN technologies would allow DISH to use hardware from any manufacturer that complied with certain standards. A primary benefit of building an Open-RAN network was that it was expected to greatly reduce initial construction and maintenance costs and would not lock DISH into relying upon any single OEM to supply the components needed to construct and integrate its wireless network. But in practice, DISH would be required to develop customized software systems to integrate the antennas, radios, DUs, fiber optics, datacenters, and other necessary hardware from disparate manufacturers into a functional, wireless network, a task that had never been achieved before. As Defendants explained, DISH was trying to build a completely new style of network because in the O-RAN world, everything was brand new and nobody else had done this before.

47. Complicating the construction of the network even more, DISH executives and engineers planned DISH's wireless network to be "cloud native" and "virtualized" – meaning that rather than relying upon hardware components specifically engineered for the task, most network operations would be executed by software running in the cloud. In the February 2020 Call, Defendant Ergen explained: "[O]ur network is primarily going to be software and in the cloud versus people's hardware networks today."

48. In theory, DISH's reliance on Open-RAN standards and cloud technology to integrate tens of thousands of radios and other assets from disparate manufacturers would greatly reduce initial equipment and construction costs, as well as maintenance costs, and would permit upgrades more quickly and more efficiently than switching out proprietary hardware components from OEMs. But in practice, constructing an Open-RAN Cloud Native network posed a huge risk because it had never been done before and because it required DISH to develop entirely new software systems to integrate the network's many components.

**2. Because the Retail Wireless Market Is Already Saturated and Dominated by Large, National Providers, Defendants Claim to be Designing DISH's Wireless Network Primarily for Wholesale and Enterprise Use**

49. When DISH first began purchasing wireless spectrum licenses in preparation to enter the wireless service industry, the retail wireless market was already saturated and dominated by several large national providers, including T-Mobile, Verizon, AT&T, and Sprint. The fierce competition between large national providers, and the large amount of capital expenditure needed to construct a network, made entrance into the retail wireless market difficult and unattractive.

50. Thus, DISH and its executives purportedly planned the Company's 5G network primarily to serve the nascent enterprise and wholesale markets that demanded private 5G

networks. Secondarily, DISH's network was also expected to provide wireless service to retail customers.

51.     In a May 7, 2020 earnings call (the "May 2020 Call"), Defendant Ergen stated that DISH did not plan the 5G network with the expectation of servicing the retail market, comprised of individuals who would purchase mobile phone plans. Ergen described retail customers as "a cherry on top that we didn't think we were going to get[.]"

52.     At this time, the enterprise market was largely untapped and forecasted to reach $30 billion by 2025, according to Verizon, and $80 billion by 2026, according to global technology research firm Omdia. According to Defendant Ergen, for DISH to sell to enterprise customers, it first needed to commercialize and scale the 5G network. In a February 23, 2023 earnings call ("February 2023 Call"), Ergen stated that DISH defines scale "as 70% [of the nation's population] with voice coverage." Reliable voice coverage was critical to creating a functional 5G network because voice is a real-time critical service, meaning that any delay in voice transmission significantly impacts user experience of speech and video quality.

53.     According to the Defendants, to service enterprise and wholesale customers, DISH's network was designed to permit network slicing—layering of multiple networks on a single infrastructure—and the creation of private 5G networks to be able to meet each enterprise customer's individual needs, which other wireless service providers could not do. In a November 6, 2020 earnings call (the "November 2020 Call"), Defendant Ergen explained: "So we're building the next-generation of where things go… And so the consumer is going to benefit from our network. It's going to do things in the network that current networks don't do. But the network is

also designed architecturally that if somebody wanted a private network, they could have their own

private network. And it would look like, it would look like their own network."

**C. To Meet the June 2022 FCC Deadline Set in Connection with DISH's Acquisition of Boost Mobile, and to Avoid Massive Penalties, DISH Builds the 5G Network's Physical Infrastructure Without Regard for Network Functionality or Commercial Viability**

54.     Hoping to hit the ground running with a stable of retail customers once the 5G

network was built, DISH acquired Boost Mobile ("Boost") from Sprint. Boost is a retail wireless

provider with approximately 9 million existing customers. When the Boost acquisition was

completed on July 1, 2020, DISH had acquired over 9 million existing Boost customers, and all of

Sprint's 800-megahertz spectrum. The Boost acquisition agreement also gave DISH the right to

use T-Mobile's existing network to provide wireless service to Boost customers for at least seven

years, giving DISH time to construct its own wireless network. Thus, beginning in July 2020,

DISH Wireless operated as a Mobile Virtual Network Provider ("MVNO"), meaning that DISH

provided wireless service to retail customers through another carrier's network.

55.     In connection with the purchase of Boost, DISH committed to the FCC and DOJ

that DISH's 5G network coverage area would cover at least 20% of the U.S. population by June

14, 2022 and 70% by June 14, 2023. Defendant Mayo, who was responsible for DISH's network

buildout, stated in a YouTube video published October 13, 2020 that he had "done this before"

while employed at T-Mobile and that it took T-Mobile 12 years to cover "235 million pops,"

approximately 70% of the U.S. population. Defendant Mayo also stated that to meet the FCC

obligation deadlines that DISH would need to "shatter every buildout record that's ever been

known in this country."

56.     Failure to meet the 2022 commitment could cost DISH nearly $200 million in cash penalties, and failure to meet the 2023 commitment could cost DISH $2.2 billion in cash penalties and billions more in forfeited spectrum licenses. However, the agreement with the FCC did not expressly require DISH to demonstrate *any* functionality of the network in June 2022. Thus, DISH could technically meet the 2022 deadlines if the network covered 20% of the population, even if the network could not operate reliably or at all. Under the FCC agreement, DISH did not have to verify the functionality of the network until June 2023 when DISH was supposed to conduct "drive tests" using a methodology to be agreed upon by the FCC and DISH. CW3 confirmed that the June 2022 deadline did not include any performance requirements.

57.     Accordingly, Defendants instructed employees to build out the physical infrastructure of the network even before the software needed to achieve systems integration was complete and without regard to functionality.

58.     CW3 confirmed that the focus of DISH's network buildout during 2021 and 2022 was primarily to "save the license." In other words, CW3 explained, DISH needed to meet the deadlines set by the FCC to prevent forfeiture of the spectrum licenses that DISH had acquired over the years. CW3 explained that DISH engaged in "license save" by locating a "boomer site" on top of a hill or tall building and transmitting at full power in order for the tower to be "visible" 20 or 25 miles away. However, the boomer site was not usable for connectivity at that range and the software needed to integrate the network was still not complete and had not been successfully tested. Nevertheless, because the boomer site was transmitting radio signals and was "visible," DISH could assert its network was covering a sufficiently large area to "save the license."

59.    CW3 confirmed that the FCC buildout requirements for 2022 had no performance requirement and allowed DISH to engage in a "license save" buildout instead of a network buildout that focused on network functionality. CW3 stated that the concept of "saving the license" was discussed with DISH executives, including the Individual Defendants, during Software Development meetings and Vendor meetings in 2021 and in 5G Summit meetings in 2022, during which they referred to it as "meeting FCC coverage and commitments."

60.    According to CW3, Defendants Ergen, Rouanne, Mayo, and Bye sometimes attended daily and weekly meetings held throughout 2021, 2022 and 2023 by the teams that were developing the software necessary to integrate the 5G network components (the "Software Development Meetings"). CW3 regularly attended these meetings during CW3's tenure at a DISH software vendor and later as a DISH employee. CW3 also attended separate, bi-weekly (and sometimes weekly) meetings that the Individual Defendants held with their vendors (the "Vendor Meetings") throughout CW3's employment at a DISH software vendor. According to CW3, the Vendor Meetings were very "well-attended," and the attendees would wait to begin until a quorum—including Defendants Ergen, Mayo, Rouanne, and Bye—was present. According to CW1, CW2, and CW3, the Individual Defendants held a 5-hour long meeting every two weeks called the "5G Summit meeting" during which they and all VP-level-and-above DISH Wireless employees would gather to discuss the state of the 5G network buildout.

61.    Based on the discussions at these meetings, CW3 stated that the Defendants understood that building the network for license-save mode only would require them to return later and "densify" the network by adding additional radio towers and to optimize the location and orientation of those radios in order for DISH to have a functional, commercial-scale network.

62.     CW3 stated that Heather Campbell, an SVP who reported to Dave Mayo, was responsible for generating the network coverage maps and knew that the maps merely presented theoretical coverage, not actual coverage.

63.     CW3 stated that CW3 had approached Heather Campbell and explained that while the 2022 deadlines may not require any actual performance from the network, the 2023 deadlines did have such requirements and DISH needed to be building for functionality, not just to save the license. Campbell acknowledged that the way DISH was constructing the network and providing maps to the FCC was not the proper way to build a functional network or generate coverage maps, but she replied that DISH needed to do it at this point to show compliance with the first FCC deadline.

64.     Thus, to avoid the $200 million in penalties that would accrue in June 2022, DISH began the construction of the 5G network's physical infrastructure long before DISH selected and onboarded critical software vendors, tested its network design or developed the critical software elements of the network. As Defendants' singular concern was covering 20% of the population before the June 2022 FCC deadline, they instructed employees to build without regard to functionality, ignoring employees who raised concerns that DISH was building a network that would not be functional. Indeed, CW2 stated that DISH was focused on meeting the FCC population coverage deadlines to the detriment of the commercial viability of the 5G network.

**D. DISH Conceals from Investors that Its Vendors Have Been Unsuccessful at Developing the Software Needed to Integrate the Network's Components and Suffers from Continuous, Crippling Integration Issues Preventing Commercial Launch**

65.     From the outset of DISH's network buildout, which began in earnest in 2021, DISH lacked the software needed to integrate the multitude of components into a functional network.

But despite DISH's lack of progress on developing the critical software required to integrate the 5G network, and still not having retained critical software vendors, DISH CEO W. Erik Carlson told investors during the February 2021 Earnings Call that DISH had successfully completed a field validation of its 5G network. During that call, DISH's Chief Network Officer, Defendant Rouanne claimed that DISH had "tested a lot of vendors," "brought radios, compute [and] software together," and was now "transferring this knowledge to [DISH's] teams in the field to build [the network] across the U.S." Defendant Ergen also assured investors during this call that DISH would launch its 5G network in a major city "by the end of the third quarter" and in additional cities by the end of the year. In short, Rouanne explained, DISH was "now moving into the second phase of [DISH's] O-RAN journey" and "*we're just deploying it now*."

66.    Reasonable investors understood Defendants' comments to mean that DISH had successfully integrated its 5G network and its ability to launch its 5G service in the third quarter of 2021 was not in question where DISH would have its 5G network launched in several markets by the end of 2021.

67.    Credit Suisse, whose analyst asked questions during the February 2021 Earnings Call, reported that DISH would launch in Las Vegas in the third quarter 2021 and that "each month starting in 4Q should see several additional markets launched[.]"

68.    Morningstar similarly reported on February 22, 2021 that "DISH expects to have its own wireless network live in one market during the third quarter, with subsequent markets likely following quickly thereafter." UBS and JP Morgan also reported that DISH's 5G network would launch in 3Q 2021 with additional markets launching by the end of 2021.

69.     However, unbeknownst to investors, DISH had not "validated" its 5G network in December 2020 and DISH's 5G network was not functional and far from "just" needing to be deployed.

70.     CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to purportedly "validate" that the 5G network was functional. This validation, limited to a single text transmission under idealized conditions, was insufficient according to industry practice to validate the network actually worked and would be reliable. Indeed, DISH had not validated whether users could establish a data connection, let alone a reliable one, or even make a voice call. And, in fact, the 5G network did not operate consistently or reliably.

71.     CW2 first learned of integration issues with the 5G network in the first quarter of 2021. CW2 recalled that in early 2021, DISH conducted a beta test of the Las Vegas network, and the network was unusable because DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site, and could not perform basic functions, like a voice call or a reliable data session.

72.     CW3 similarly stated that in February 2021, the software needed to integrate the network had not been developed. CW3 explained that Mavenir and Rakuten were the primary vendors responsible for building the software that would integrate the network and recalled that neither Mavenir nor Rakuten were ever successful at verifying the functionality of the software in the field during FOAs.

73.     According to CW3, in 2021, none of the RAN vendors had completely tested their software with the Qualcomm chipsets used in the phones that were expected to connect to the

network. CW3 explained that without testing the phone chipsets with the software, it was impossible to know what worked and what did not work.

74.     CW3 recalled that in September of 2021, both Mavenir and Rakuten were still developing the software necessary to achieve systems integration and that the software had not been tested or validated at that time. CW3 stated that in September 2021, the software was still in such a primitive phase that it lacked even basic functionality. For example, CW3 explained, the software was unable to make calls or even permit a phone to connect to the network.

75.     CW3 explained that new software will typically undergo several phases of testing and that DISH had not even completed the first phase of testing as of September 2021. CW3 recalled that Rakuten's first phase of testing was only conditionally approved in October 2021 because a lot of basic level functionality was not actually working and even elements that worked in certain labs were not working in other labs. Thus, CW3 stated, three more phases of testing were needed to validate Rakuten's software. CW3 stated that Mavenir's software was at the same stage as Rakuten's.

76.     CW3 explained that generally, after all phases of testing are completed, software is deployed in a "FOA" or "first office application." However, according to CW3, neither Mavenir nor Rakuten ever achieved a first office application where they could deliver software that could meet the criteria necessary for use in any market. CW3 recalled that Rakuten pulled out of the project in early 2022 after being unsuccessful at developing the necessary software.

77.     CW3 stated that when CW3 began working with the DISH team in April 2021, Defendants Ergen, Rouanne, Mayo, and Bye knew that the software was behind schedule because it was discussed with them during the Software Development and Vendor meetings with their

primary software vendors at this time and there was no discussion of launching a consumer service in 2021 because the Company was too far behind in developing and testing the software that was needed to integrate the network.

78.    Indeed, CW3 recalled that at the Vendor Meetings, the Individual Defendants would regularly reference a "defect chart," shouting at the vendors to explain why they had "so many defects." In that regard, CW3 explained that every defect preventing the 5G network's software development from progressing was reported in a weekly "Defect Meeting," which CW3 attended during CW3's tenure at a DISH primary software vendor and later as a DISH employee. CW3 explained that during Defect Meetings with the Defendants during 2021 and 2022, CW3's team would present slides describing the major defects and these defects were discussed openly at the meetings. DISH executives would specifically tell vendors that they knew there would be issues and to "just be open and show them everything."

79.    According to CW3, every defect was also explicitly described in Jira, a project management software tool designed to track issues, bugs, and defects during product development, which was updated in real-time. CW3 stated that immediately outside of Defendant Rouanne's office was a large, approximately 55-inch, TV screen that displayed in real time all of the network development defects listed in Jira in a large, histogram chart (*e.g.*, the "defect chart"). CW3 stated that the DISH building where the wireless team was located had several of these defect charts displayed on screens throughout the building to keep everyone apprised of the defects that were impeding development and integration of the 5G network. CW3 confirmed that Rouanne, Bye, Mayo, and Ergen all passed by the screens regularly.

80.    CW3 also recalled that if a vendor at a meeting seemed unaware of a defect, the Individual Defendants would send them screenshots of the defect chart. The chart could also be accessed via Jira, and anybody at DISH would be granted access.

81.    Similarly, CW3 stated that at the Software Meetings, the Individual Defendants asked direct and detailed questions about the challenges facing the development teams and demanded to know what was preventing progress on the development of the 5G network. For example, CW3 recalled that the Individual Defendants would regularly reference specific instances of individual technologies not working as anticipated and demand insight into what was causing the issues. According to CW3, while Defendants were not present at all of these particular meetings, their delegates would attend on their behalf and report back to the Individual Defendants about the issues discussed in the meetings, as evidenced by the Individual Defendants' specific and detailed questions at those meetings they attended.

82.    Such issues were also discussed at the 5G Summit Meetings throughout the Class Period. CW1, CW2, and CW3 stated that the bi-weekly 5G Summit meetings occurred throughout 2020, 2021, and 2022 and were accompanied by slide presentations that contained hundreds of slides concerning the 5G network buildout. CW1 and CW3 noted that Defendant Mayo, as Executive VP of Network Development, was particularly active in discussion of any issues relating to network integration.

83.    CW1 stated that CW1 sometimes attended 5G Summit meetings during CW1's employment and recalled discussions with the Individual Defendants about critical issues concerning the 5G network. CW3, likewise, recalled attending most 5G Summitt meetings with the Individual Defendants and other DISH executives starting in August 2022 and throughout the

remainder of CW3's employment at DISH where they discussed how far behind DISH was in developing the necessary software.

84.    According to CW3, during CW3's tenure at a DISH primary software vendor, there was "really active conversation" going on with DISH executives about the software for the 5G network, both on the radio side and the core side. Thus, in addition to the above meetings, the Individual Defendants were sometimes in daily conversation with CW3 and other employees of DISH's primary software vendors about the software development and integration issues.

85.    Despite their knowledge that DISH's 5G wireless network would never be ready to launch in 3Q 2021 due to serious integration and stability issues developing by February 2021 and continuing throughout the Class Period, and the fact that no handset testing had been conducted by April 2021 or could be conducted anytime soon, Defendant Bye falsely assured investors during the April 29, 2021 Earnings Call,  that "[t]he infrastructure that we're deploying is optimized for 5G" and "we've proven that O-RAN, from a technology perspective can work." Defendant Bye also reiterated that "we're on a path to launching in the third quarter, but it's one of a number of markets we have coming on. We just haven't announced those markets through the end of the year[.]" Defendant Mayo likewise represented to investors in the August 9, 2021 Earnings Call that "we'll be substantially complete with the [Las Vegas] construction activities in the next 60 days by the end of the third quarter and we'll – and as we've talked about, we'll be beta testing customers in the fourth quarter."

86.    Thus, investors believed that the commercial launch of DISH's 5G network was imminent. In an August 2021 analyst report, Morningstar's Michael Hodel, CFA wrote:

DISH's wireless *network buildout gathered momentum during the second quarter* as it prepares to launch service in Las Vegas, planned within the next 60 days, and construction ramps up in 30 other markets across the country.

### E. DISH Experiences Supply Chain Issues and Engages Amazon Web Services as a Work-Around for Obtaining Necessary Hardware, Which Adds Eight to Ten Months to DISH's Software Development Schedule

87.    DISH initially designed its 5G network to utilize VMware as a cloud platform that would run on DISH's private hardware and equipment, also known as a single-cloud platform. However, according to CW3, by April 2021, DISH was experiencing supply chain issues and was unable to acquire the necessary hardware. DISH's inability to obtain the necessary hardware threatened to derail DISH's buildout schedule which could result in massive penalties from the FCC and possibly even forfeiture of DISH's spectrum licenses.

88.    According to CW3, DISH engaged Amazon Web Services ("AWS") in April 2021 to circumvent the supply chain issues. In addition to the network architecture it had planned with VMware, DISH would add AWS public cloud services to provide compute and other resources that DISH was having difficulty obtaining, thereby changing the network architecture to a multi-cloud platform.

89.    CW3 stated that this decision to change DISH's network architecture from a single platform to a multi-cloud platform "changed the requirements completely" and required that everything be retested, thereby creating a lot of additional work, and pushing the 5G network's software development back by eight or ten more months. CW3 stated that CW3 first learned DISH was bringing another cloud platform into the network architecture when it was announced to the public at the end of April 2021. Thus, it would be impossible for DISH to have a commercial product in the third quarter when the architecture of the product had just changed and needed many more months of software development for the changes to be implemented. Moreover, according

to CW3, if there had been any speed or performance requirement associated with the 2022 FCC deadline, DISH absolutely could not have met the deadline.

90.    Exacerbating the problems, as Defendant Rouanne would later confirm on June 21, 2022, AWS cloud services were not yet ready to support DISH's 5G network. Defendant Rouanne explained that even in 2022, AWS was still upgrading to make its services ready for DISH to use: "When we started we looked at all the clouds, and when we started with AWS, they were not telco ready. Especially when it comes to networking… and ***they are upgrading that platform for us to be telco ready and telco grade***." Defendant Rouanne further stated that it "would've been easier for us" if Amazon had been ready when DISH first began constructing its network. CW3 confirmed that AWS issues were constant across all the vendors because they were platform issues.

91.    Thus, according to CW3, by April 2021, it was generally known at DISH that it would be impossible for DISH to commercially launch the 5G network by the third quarter of 2021 due to the significant delays in software development and testing and Defendants' decision to completely change the network architecture to a multi-cloud platform in late April 2021. Indeed, Defendant Mayo would later admit during the November 2021 Call that launch of the network would be delayed because DISH was unsuccessful at "just getting the radio software and the core network software to work well together and be reliable."

92.    Furthermore, Defendant Mayo later made the startling admission that DISH executives had known from the beginning that Mavenir and the other vendors were unable to integrate the network. In a speech at the 2023 CTIA 5G Summit on May 17, 2023, Defendant Mayo admitted that DISH's difficulties integrating the components from disparate vendors into a

unified, functional network were occurring from the very beginning and that DISH leadership had

recognized those issues immediately:

> I'd say the biggest thing that we learned was **when we first started this** we thought
> the vendors all kind of worked together. **Quickly did we learn that was not going
> to happen**, and we actually became the system integrator.

93.     CW3 confirmed that it was not until a few months after May 2022, when DISH

announced a deal with Samsung for its support in deploying and integrating the Open-RAN

network, that DISH was finally able to achieve FOA. Unlike Rakuten (which exited the DISH

project in April 2022 without ever achieving FOA) and Mavenir (which still has not achieved FOA

as of 2024), DISH was able to achieve FOA with Samsung in 4 months. This was because

Samsung's software was significantly more advanced than Mavenir's or Rakuten's, and Samsung

was able to build on top of the product they had provided to Verizon.

**F.  DISH Finally Engages Samsung to Provide the Software Solutions that
Mavenir and Rakuten Could Not, But Years of Building to "Save the License"
Means DISH's Network Must Be "Densified" and Optimized Before
Commercialization Is Possible**

94.     After more than a year of Mavenir and Rakuten failing to develop the software

needed to integrate the 5G network, DISH was forced to engage a more experienced (yet more

expensive) vendor, Samsung. On May 3, 2022, DISH announced that it would be engaging

Samsung to "supply DISH Wireless with its 5G and RAN solutions, [and] vRAN software[.]"

95.     However, CW3 recalled that Samsung also had "a ton of challenges" integrating

DISH's network" and stated that it wasn't until the first quarter of 2023 that the Samsung software

solution had been tested and was ready to be deployed.

96.     Indeed, DISH announced on February 22, 2023 that Samsung and DISH had

"launched Samsung-supported sites for the DISH 5G network, **marking the beginning** of

Samsung's role in the operator's nation-wide rollout." The press release also announced that "***the
first Samsung-virtualized RAN-supported sites go live*** across the DISH Open RAN cloud-based
5G network."

97.     But even after beginning to deploy Samsung's software solutions in early 2023,
DISH still needed to "densify" and "optimize" its network for it to be marketable. Defendant Ergen
explained in the February 2023 Earnings Call that "to do 5G voice [] you have to have a very dense
network[.]" Defendant Ergen further admitted in the May 8, 2023 Earnings Call, months after the
end of the Class Period, that DISH still needed to "***densify the current markets that we
have***." Similarly, COO Swieringa would later admit during the February 2023 Call that DISH was
only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back
in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from
last year, we're going through each of those markets and doing the optimization and the fill-in so
that we can achieve commercial VoNR KPIs."

98.     DISH also needed to optimize its network. CW3 stated that even after Samsung had
developed functional software for DISH, DISH's 5G network still struggled to have any
commercial value because it was not optimized. CW3 explained that an operational network
usually requires 99.9% availability, and carrier-grade networks require even higher availability
percentages. CW3 explained that when CW3 left DISH in Q4 2023, DISH's network availability
was barely in the 90% range. This means that the network was not accessible about 10% of the
time, even for critical uses like 911 calls. CW3 recalled that in late 2023, DISH began running a
program called R99 to improve network availability. Importantly, that program was not even

aimed at creating the ability to make or retain calls—it was simply about allowing devices to basically attach to the network.

99.     Even now, CW3 explained, most of DISH's mobile users are usually connected to T-Mobile and AT&T networks. CW1 stated that because DISH's 5G network was unproven in January 2023, to mitigate the risk of losing large numbers of existing subscribers, DISH did not transfer existing retail customers onto the 5G network, but instead was only loading a few newly acquired customers onto the network. CW1 stated that DISH had never transferred any existing retail customers onto its network before CW1 left the Company in Q2 2023 because the network still lacked capacity and reliability. CW1 stated that when CW1 left the Company in Q2 2023, approximately 95% of retail wireless customers were still being serviced under the MVNO model, meaning the customers wireless service was being provided by T-Mobile and AT&T.

100.    As of October 2023, DISH's 5G network was still not sufficiently developed to be commercially viable, even for retail use. In a registration statement, dated October 3, 2023, filed with the SEC on Form S-4 by EchoStar, EchoStar disclosed details of the current state DISH's wireless business:

> DISH Network is currently operating its Retail Wireless business unit primarily as a mobile virtual network operator ("MVNO") as it continues its 5G Network Deployment and commercialization of its 5G Network, as defined below. ***As an MVNO, today DISH Network depends on T-Mobile and AT&T to provide it with network services*** under the amended Master Network Services Agreement ("MNSA") and Network Services Agreement (the "NSA"), respectively. ***Under the NSA, DISH Network expects AT&T will become its primary network services provider***.

101.    The October 3, 2023 registration statement also explained: "DISH Network ***plans to commercialize*** its Wireless spectrum licenses ***through the completion*** of the nation's first cloud-native, Open Radio Access Network based 5G network[.]" In other words, as of October 3,

2023, DISH was still operating its retail wireless brands, like Boost, primarily as an MVNO. This meant that DISH was still using T-Mobile and AT&T's networks to provide service to DISH's own customers because the Company's 5G network was still not developed enough to transfer those existing retail customers onto DISH's network, and DISH is still merely *planning to commercialize* its wireless spectrum licenses by *completing* its still unfinished network.

102.    CW3 confirmed that DISH continues to rely heavily on T-Mobile and AT&T to provide customers with network services.

### G. Due to DISH's Inability to Build a Functioning 5G Network and Its Decision to Pause Enterprise Product Development and Voice Functionality, Defendants Are Unable to Attract Enterprise Customers

#### 1. DISH's Failure to Fund Enterprise Product Development During the Class Period Resulted in No Enterprise Functionality on the 5G Network and, thus, No Demand from Enterprise Customers

103.    CW2 recalled that after scoping out opportunities and road-mapping the development of several potential enterprise products, in late 2020 or early 2021, the budget for secondary market research databases was reduced to less than $10K so that every penny could be used towards building the 5G radio towers or sites as part of the push to complete the FCC population coverage deadlines. Thus, CW2 explained the enterprise team had no budget for "primary research activities like customer interviews, focus groups, user observations, and surveys" and throughout 2021 and 2022, the Company had no dedicated engineering team for enterprise product development and no technical subject matter expertise to assist in ideating what enterprise products should be developed, let alone translating a set of product or customer requirements into a tangible product.

104.    As a result of the Defendants' failure to dedicate resources to the engineering of enterprise products, CW2 stated that when CW2 left the Company in or after Q3 2022, DISH

Wireless had no tangible enterprise 5G product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

105.    Throughout CW2's tenure at DISH, CW2 attended weekly meetings with Defendant Bye where the state of DISH's enterprise products was discussed, including decisions to reduce the marketing and product development budgets starting in early 2021.

106.    CW3, likewise, recalled SVP Heather Campbell telling CW3 that she and part of the RF team had done an analysis around Q2 2022 for Defendant Mayo to determine if the network in its current form could support enterprise customers. The analysis consisted of comparing DISH's 5G network coverage maps against the maps of areas where potential enterprise customers would need service. The team presented the conclusions of the analysis to Defendant Mayo: DISH did not have network coverage in the right areas, would not be able to provide the entities they considered potential enterprise customers with the right experience using the network DISH had built, and could not have enterprise customers because its network did not work in the right areas.

107.    Accordingly, CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research. CW2 also explained that while many enterprises expressed interest in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying.

108.    CW2 explained that during CW2's tenure at DISH, the only product DISH had to offer enterprise customers was the opportunity to lease parts of DISH's spectrum holdings, which entailed DISH leasing some portions of its radio frequency spectrum to enterprise customers or operators to use in private network systems that involved radios, equipment and devices that did not come from DISH. Thus, CW2 explained, the only revenue DISH generated from enterprise customers in 2021 and 2022 came from spectrum leases.

109.    However, spectrum leasing, according to CW2, had "nothing to do with DISH's 5G nationwide network under construction" and was not a long-term, sustainable product because when you lease spectrum for a dedicated enterprise customer, you risk deeming it unavailable to use on the national 5G network.

110.    DISH's failure to fund enterprise product marketing and development prevented the Company from achieving any success in the enterprise market during the Class Period and delayed any success long into the future. As Defendants would ultimately disclose in February 2023, DISH would not have any revenue from enterprise customers related to its 5G network until at least 2024, or for at least another year.

111.    Defendant Rouanne confirmed CW2 and CW3's statements when, after the Class Period, he stated in an interview at the Mobile World Congress ("MWC") conference on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed:

**David Nicholson**, *Interview Host*

[Y]ou have on your business card, Chief Network Officer. What potentially either keeps you up at night in terror or gets you very excited about the future of your network? What's out there on the frontier and ***what are those key obstacles that have to be overcome***, that you work with?

**Marc Rouanne**, *Chief Network Officer, DISH Wireless*

Yeah, I think we have the network, ***we have the baseline, but we don't yet have the consumption that is easy***, by the enterprise. You know, in enterprise, they like to say "I have a 4K camera, I connect it to my software. Click. Click." Right? ***And that's where we need to be***. So we're talking about APIs that are so simple that they become a click. And we engineers, have a tendency to want to explain, but we should not. ***It should become a click***. And the phone revolution—with the apps— became those clicks. ***We have to do the same for the enterprise, for video, for surveillance, for analytics—it has to be clicks***.

       **2.  DISH Pauses the Development of Voice Functionality to Focus on Meeting the FCC Population Coverage Requirements, Prohibiting DISH From Achieving Enterprise or Retail Revenues from Its 5G Wireless Network**

112.    The Defendants also paused efforts to integrate Voice over New Radio capabilities into DISH's network during the Class Period so that DISH could focus on meeting the FCC population coverage requirements of 20% coverage by June 2022 and 70% by 2023.

113.    In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges. CW1 likewise recalled that DISH had launched its 5G network in Las Vegas around May 2022, but explained that DISH's network could only support a few users at that time, that the network was not scalable, and that Voice over New Radio (VoNR) was not working at that time.

114.    But DISH did not disclose to the public that the Company had paused efforts to develop or integrate VoNR capabilities into DISH's network. COO Swieringa would ultimately admit at the end of the Class Period during the February 2023 Earnings Call, that DISH had paused development of VoNR, stating that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating:

    So as we look at ***really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve***

*commercial VoNR KPIs*. When that happens, we load that market up with handsets that work on our network."

115.    And in a *Fierce Wireless* news article dated May 10, 2023, Sue Marek reported that Dave Mayo revealed DISH would only restart its efforts to launch VoNR "*once the Company meets the FCC's buildout requirement* of providing coverage to 70% of the U.S. population by June 14, 2023."

116.    DISH's undisclosed decisions to pause work on VoNR during the Class Period had serious repercussions. Critically, DISH was unable to scale and commercialize its 5G network and land any enterprise customers. As Defendant Ergen explained during the February 2023 earnings call, DISH needed voice coverage over 70% of the population before enterprises would be interested in DISH's network.

117.    Moreover, DISH's undisclosed decision to pause work on VoNR prevented DISH from using the network to service its existing Boost Mobile retail customers. Thus, throughout the Class Period, DISH was still relying on, and paying, other network providers like T-Mobile and AT&T to provide network coverage for its retail customers.

118.    Accordingly, despite telling investors that DISH would have material revenue from enterprise customers in 2022 and 2023, Defendants knew that would never happen during the Class Period due to DISH's undisclosed pause of enterprise product development and VoNR integration and massive budget cuts.

## V.    DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD[1]

119.    Throughout the Class Period, Defendants made materially false and misleading statements and omissions relating to the capabilities and progress of DISH's 5G network development and deployment, DISH's purported relationships with enterprise customers, the rate at which DISH expected to achieve enterprise revenues, and the purported demand in the enterprise segment. Specifically, during the Class Period, Defendants made the statements enumerated below, which materially misled investors and artificially inflated the price of DISH securities.

### A.    2020 Annual Report on Form 10-K

120.    On February 22, 2021, DISH filed its Annual Report on Form 10-K for the period-ended December 31, 2020 (the "2020 Form 10-K") with the SEC, signed by Defendant Ergen.

121.    In the 2020 Form 10-K, the Defendants falsely claimed DISH had conducted a "successful field validation" which, in reality, was a single text message sent amounting to no validation at all:

> **During December 2020, we completed a successful field validation, utilizing our fully virtualized standalone 5G core network and the industry's first O-RAN compliant radio**.

122.    The above statement in the 2020 Form 10-K was materially false and misleading when made because DISH had not validated critical technologies, software, and vendors in December 2020, as evidenced by the facts alleged herein, including the following:

1) CW3 explained that validation of the network's software involves four phases of testing, and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in October 2021. CW3 further stated that neither of the software vendors working on the project in December 2020 (Rakuten and Mavenir) *ever* completed FOA.
2) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one

---

[1] All statements alleged to be false and misleading are bolded and underlined. All other statements are included for context.

text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards and did not validate voice functionality or data connections.

3) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a reliable data session.

4) CW3 explained that when this statement was made, none of the RAN vendors had conducted "handset testing," without which it was impossible to know what worked and what did not work.

5) CW3 stated that the software needed to integrate the network had not been developed yet in December 2020, and that the two software vendors working on the project at that time STILL have not been successful at developing that software. CW3 stated that even in Q3 2021, the software was in such a primitive phase that the network lacked basic functionality to make phone calls or permit a phone to connect to the network.

6) Defendant Mayo would later admit, during the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable" throughout 2021.

7) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

8) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready," and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

### B. February 22, 2021 Earnings Call

123. On February 22, 2021, Defendants released DISH's earning results for the fourth quarter and full year 2020 and held an accompanying earnings call ("February 2021 Call"). During the February 2021 Call, DISH CEO Carlson reiterated the false statements the Defendants had made in the 2020 Form 10-K concerning the progress of construction on the 5G network, claiming "**[w]e've also completed our first 5G validation in December**," when, in fact, they had only sent a single text message, which was insufficient to validate anything.

124.    Despite that functioning software had not been developed or integrated, during the February 2021 Call, Defendant Rouanne falsely claimed that the only thing left for DISH to do was deploy the network assets into the field:

> I would say that **we are now moving into the second phase of our O-RAN journey, that is – we're starting to build. We have tested a lot of vendors. We have brought radios, compute [and] software together**. And now what we're doing is that **we are transferring this knowledge to our teams in the field in order to build it across the U.S.** So that's really where we are. **In terms of testing integration**, we – for me, this has been a normal journey, like I've seen in the past for other technologies. This is – **we're coming at a time when there is maturity in the O-RAN industry for us. So we're just deploying it now**.

125.    Defendant Ergen similarly represented during the February 2021 Call that the software elements of DISH's network were well developed and ready for deployment, stating:

> And for us, it has to be automated. And so we spend a lot of time with our cloud partners to be able to do that seamlessly. And I – **like I said, for the O-RAN, we are now in the deployment mode where we have the capability with VMware and with some cloud partners to move the software east, west, north, south**.

126.    The above statements in the February 2021 Call were false and misleading when made because DISH had not yet validated critical technologies, software, and vendors and was building the network to "save the license" with no regard for functionality. Thus, contrary to Defendants' statements, DISH had not tested a lot of vendors or brought the software and hardware together through a successful integration and thus DISH was not in "deployment mode" with respect to the 5G network, as evidenced by the facts alleged herein, including the following:

1) CW3 stated that the software that was needed to integrate the network had not yet been developed in February 2021.
2) CW3 stated that even in Q3 2021, the software was still in such a primitive phase that it lacked basic functionality to make phone calls or permit a phone to connect to the network.
3) CW3 explained that validation of the network's software involves four phases of testing, and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in October 2021. CW3 further stated that neither of the software vendors working on the project in February 2021 (Rakuten and Mavenir) *ever* completed FOA.

4) CW3 explained that to comply with the first FCC milestone and save their license, DISH constructed the network to operate only in "license-save" and not in commercial mode. Defendants understood that building the network for license-save mode only would require them to return later and "densify" the network by adding additional radio towers and to optimize the location and orientation of those radios before the network could be commercialized.

5) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one text message was sent to DISH's headquarters to validate that the 5G network was functional. This was not considered a true validation under industry standards and did not validate voice functionality or data connections.

6) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and the network was unusable where DISH's network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site and could not perform basic functions, like a voice call or a reliable data session.

7) CW3 explained that when this statement was made, none of the RAN vendors had conducted "handset testing," without which it was impossible to know what worked and what did not work.

8) Defendant Mayo would later admit during the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable" throughout 2021.

9) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

10) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

11) Defendants admitted during the February 2023 Earnings Call that DISH was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023 had to go back and add voice and other capabilities and densify and optimize the 5G network to make it functional so DISH could scale and commercialize it.

127. Despite the ongoing integration issues, Defendant Ergen assured investors during the February 2021 Call that DISH would now be able to "execute" and complete the 5G buildout in several major cities by the third quarter 2021:

> So I have a high degree of confidence that we're going to execute in 2021. **That means that we're going to build our first major cities by the end of the third quarter and more to come**.

-40-

\*       \*       \*

**So by the end of the third quarter**, you'll see that, **you'll see the first major city**.
**We'll have other cities**. I don't have a number for you year in, but what we'll be
doing **every month after the third quarter, we'll be doing multiple cities**.

128.    The above statements in the February 2021 Call were materially false and
misleading when made because DISH was building the network to "save the license" with no
regard for functionality and in February 2021, DISH was so far behind in developing the necessary
software and network features that Defendants could not reasonably expect commercial launch in
Las Vegas or any other city by 3Q or 4Q 2021 as evidenced by the facts alleged herein, including
the following:

1) CW3 stated that the software needed to integrate the network had not been developed yet
   in February 2021. CW3 stated that even in Q3 2021, the software was still in such a
   primitive phase that it lacked basic functionality to make phone calls or permit a phone to
   connect to the network.
2) CW3 explained that validation of the network's software involves four phases of testing,
   and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in
   October 2021. CW3 further stated that neither of the software vendors working on the
   project in February 2021 (Rakuten and Mavenir) *ever* completed FOA.
3) CW2 recalled that in December 2020, DISH conducted a single "First Call" wherein one
   text message was sent to DISH's headquarters to validate that the 5G network was
   functional. This was not considered a true validation under industry standards and did not
   validate voice functionality or data connections.
4) CW2 stated that in early 2021, DISH conducted a beta test of the Las Vegas network and
   the network was unusable where DISH's network was not accessible from devices on the
   market, frequently could not establish a reliable connection to a DISH cell site and could
   not perform basic functions, like a voice call or a reliable data session.
5) Defendant Mayo would later admit, during the November 2021 Call, that the Las Vegas
   launch delay occurred because DISH had been unsuccessful at "just getting the radio
   software and the core network software to work well together and be reliable."
6) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was
   never able to handle the integration of DISH's physical infrastructure, requiring DISH to
   ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten
   and Mavenir were unable to develop the software necessary to integrate the network.
7) Defendants admitted during the February 2023 Earnings Call that DISH was focused on
   meeting the FCC June 2022 20% population coverage deadline, regardless of whether the
   network was operational, and in 2023 had to go back and add voice and other capabilities

and densify and optimize the 5G network to make it functional so DISH could scale and commercialize it.

8) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

9) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties from the very beginning because vendors were not capable of integrating the network.

10) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs.*"

129. Analysts were specifically attuned to these disclosures regarding DISH's 5G network validation and plans for 5G network launch. In a February 22, 2021 report released after the Defendants announced earnings but prior to the February 2021 Call, Credit Suisse analysts noted, first and foremost:

> **What We Learned About Wireless: Chairman Mr. Ergen notes "as we enter 2021, we have everything that we need to build this one-of-a-kind 5G network. And now, for us, it's execution."**

130. The Credit Suisse report further observed that, based on Defendants' disclosures, it expected DISH's first large 5G market would launch in 3Q 2021, "while each month starting in 4Q should see several additional markets launched[.]"

131. Defendants' false statements in the February 2021 Earnings Call served to artificially inflate and/or maintain the artificial inflation in DISH's stock price.

### C. April 29, 2021 First Quarter 2021 Form 10-Q

132. On April 29, 2021, Defendants filed with the SEC, DISH's First Quarter Form 10-Q for the three-month period ended March 31, 2021 (the "Q1 2021 Form 10-Q"), which was signed by DISH's CEO Carlson and CFO Orban. The Q1 2021 Form 10-Q contained material

misstatements reiterating Defendants' earlier claims that DISH had successfully validated its

network in the field and would launch its network service in Q3 2021:

> **During December 2020, we completed a successful field validation, utilizing our fully-virtualized standalone 5G core network and the industry's first O-RAN compliant radio**. We began construction of our first major market, Las Vegas, Nevada, during the second quarter of 2021. **We anticipate service for this market to begin by the end of the third quarter of 2021**.

133.    The above statements in the Q1 2021 Form 10-Q were materially false and

misleading when made because DISH had not validated critical technologies, software, and

vendors in December 2020 and DISH was so far behind in developing the necessary software and

network features that Defendants could not reasonably expect commercial launch in any cities by

3Q or 4Q 2021 as evidenced by the facts alleged herein, including the following:

1) CW3 stated that the software needed to integrate the network had not been developed yet in April 2021. CW3 stated that even in Q3 2021, the software was still in such a primitive phase that it lacked basic functionality to make phone calls or permit a phone to connect to the network.

2) CW3 explained that validation of the network's software involves four phases of testing, and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in October 2021. CW3 further stated that neither of the software vendors working on the project in February 2021 (Rakuten and Mavenir) *ever* completed FOA.

3) CW3 stated that, as of April 2021, achieving commercial traffic on the Las Vegas network in Q3 2021 would have been completely impossible because not one of the vendors had done handset testing (testing chips with the software) yet. Without handset testing, it was impossible to know which features worked and which did not.

4) Defendant Mayo would later admit, during the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable" throughout 2021.

5) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties from the very beginning because vendors were not capable of integrating the network.

6) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

7) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after

software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

8) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs*."

### D. April 29, 2021 Earnings Call

134. Defendants also held an investor call on April 29, 2021 to discuss DISH's first quarter 2021 results (the "April 2021 Call"). During the April 2021 Call, Defendants falsely claimed that DISH had strong demand from enterprise customers and that the Company was "in the process of" working with enterprise customers to build private networks for them:

**Richard Hamilton Prentiss,** *Raymond James & Associates, Research Division*

A second question on the 5G side is we think the enterprise wholesale side of the business could be actually fairly exciting and significant opportunity. Help us understand what you're hearing from customers as far as what do they need to see from you guys before they could make commitments or contracts? Is it Vegas up and working? Is it a nationwide network? What do the customers want to see from you before they start making commitments? And am I right that wholesale enterprise could be significant?

\*      \*      \*

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*

Absolutely. Yes. No, I think we've talked to a number of customers across multiple verticals in different industry segments, and there's an increasing appetite and demand for the kind of network that we're building, which is really to enable them to have more security, more control and also more visibility into the data that's coming off the devices so that they control their business more effectively. So we're seeing a terrific demand. And the network architecture that we're putting in place actually enables and unlocks that opportunity for those enterprise customers. And it's again not restricted to any specific vertical. We're touching a lot of different companies and a lot of different vertical segments across the country. And the other aspect of the opportunity that we see for ourselves is that while we build out a nationwide network, **we are in the process of working with customers and prospective customers on private networks that are not limited by the geography of our national footprint**. So we can deploy those within their environments to support their business operations as well. **So the demand we're**

**seeing is terrific, and we're already engaged with a number of customers today**.

135.    The above statements in the April 2021 Call were materially false and misleading when made because DISH had not been successful in integrating its network and was not, in fact, working with enterprise customers on private networks. Rather, as CWs confirmed and Defendants would later admit during the February 2023 Call, DISH was solely focused on building the bare minimum needed to comply with the FCC directive and DISH's engagement with enterprise customers was limited to spectrum-lease agreements, which did not require any network development, were merely a means of monetizing assets for the short term, and did not include DISH working on private networks with customers, as evidenced by the fact alleged herein, including the following:

1)  CW2 stated that when CW2 left the Company, DISH still had no tangible enterprise products and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

2)  CW2 stated that in late 2020 or early 2021, the enterprise team budget was cut to less than $10,000 for market research and enterprise had no technical engineering team or budget to engineer or test any enterprise products that had been conceptualized, let alone translate a set of product or customer requirements into a tangible product.

3)  CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness-to-pay research.

4)  CW2 explained that while many enterprises expressed interest in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

5)  CW2 explained that during CW2's tenure at DISH, DISH had no 5G network product to market or sell.  The only thing DISH had to market was the opportunity to lease parts of DISH's spectrum holdings, "which entailed DISH leasing some portions of its radio frequency spectrum to enterprise customers or operators to use in private network systems that involved radios, equipment and devices that did not come from DISH." CW2 stated

that spectrum leasing had "nothing to do with DISH's 5G nationwide network under construction" and was not a long-term, sustainable solution for DISH because "when you lease spectrum for a dedicated enterprise customer, you risk deeming it unavailable to use on the national 5G network."

6) Defendant Rouanne stated in an interview at the MWC on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed.

7) Defendant Ergen stated that voice coverage was a prerequisite for sales to enterprise customers, and COO Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone.

136.    When asked by David William Barden of BofA Securities, about the status of the 5G buildout in Las Vegas, Defendant Bye stated the following, in response to an analyst question:

**David William Barden,** *BofA Securities, Research Division*:

…And then I know we don't have Dave on, but Stephen, maybe on the Las Vegas build. Could you talk to us about what does that build look like? What are you going to do? When is it going to happen? What are you trying to get out of that in terms of showing people what this network is capable of?

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*:

Yes. So just in terms of what the Las Vegas build looks like, I think there are several attributes that are really important to what we're doing, to build on Charlie's comment. One is we are building a cloud-native infrastructure. We are using an open radio access architecture, but it's also a 5G-native network. We're not trying to put 5G on top of in 2G, 3G and 4G. The infrastructure that we're deploying is optimized for 5G. And the way we've designed in or work from an RF perspective and a deployment perspective is to take advantage of the 5G architecture as well as the 5G platform.

And so what does that look like? It's basically a new network. It's a new infrastructure. It's designed using all of the spectrum bands that we have, and the RF is up in line to take advantage of that. **So -- and we're on a path to launching that in the third quarter, but it's one of a number of markets we have coming on**. We just haven't announced those markets through the end of the year, but it's the first of, obviously, a number that we have in flight today, and we've got activity going on across the country to actually build out this network.

So we'll be the first one that people can touch and feel and get the experience, but it is really a 5G-native network. **And we've proven that O-RAN, from a**

**technology perspective can work.** Compared to that at the end of last year, now we're in the execution phase. Now we're in the deployment phase. **And so Vegas will happen to be the first one that it will be a fully deployed market that people will be able to touch and feel and experience.**

137. The above statements in the April 2021 Call were materially false and misleading when made because in April 2021, DISH could not reasonably expect commercial launch in any cities by 3Q or 4Q 2021 and because DISH had not yet proven its Open-RAN network could be integrated and was suffering serious integration problems at the time. DISH was building the network to "save the license" with no regard for functionality. Thus, Defendants had "proven" nothing and were not "on a path" to launch the 5G network in the third quarter, as evidenced by the facts alleged herein, including the following:

1) CW3 stated that, as of April 2021, achieving commercial traffic on the Las Vegas network in Q3 2021 would have been completely impossible because not one of the vendors had done handset testing (testing chips with the software) yet. Without handset testing, it was impossible to know which features worked and which did not.
2) CW3 stated that the software needed to integrate the network had not been developed yet in April 2021. CW3 stated that even in Q3 2021, the software was still in such a primitive phase that it lacked basic functionality to make phone calls or permit a phone to connect to the network.
3) CW3 explained that validation of the network's software involves four phases of testing, and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in October 2021. CW3 further stated that neither of the software vendors working on the project in April 2021 (Rakuten and Mavenir) *ever* completed FOA.
4) CW3 explained that to comply with the first FCC milestone and save their license, DISH constructed the network to operate only in "license-save" and not in commercial mode. Defendants understood that building the network for license-save mode only would require them to return later and "densify" the network by adding additional radio towers and to optimize the location and orientation of those radios before the network could be commercialized.
5) Defendant Mayo would later admit, during the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable" throughout 2021.
6) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to

ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

7) Defendants admitted during the February 2023 Earnings Call that DISH was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023 had to go back and add voice and other capabilities to make the 5G network functional.

8) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

9) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties from the very beginning because vendors were not capable of integrating the network.

10) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs.*"

138.    During the April 2021 Call, Defendant Ergen stated he did not think DISH could have done anything better in designing the 5G network, while Defendant Rouanne assured investors that DISH had onboarded "all the telco software" into the cloud and boasted that, unlike a traditional telco network where "everything is frozen," DISH's network was fast, impressive, and easily scaled:

**Charles William Ergen,** *Co-Founder & Executive Chairman*:

I think from an architectural point of view, and Marc really is the architect here. I don't know, but you spent a lot of time on it, and you talked to a lot of people. **I don't know if you'd change anything today**.

**Marc Rouanne,** *Executive VP & Chief Network Officer*:

No, absolutely. I mean, **the more we play with it, the more we're impressed**. When we are -- of course, **we've onboarded a software, all the telco software on the cloud, and it's fascinating how fast it is, how we can make changes, how we can scale it**. I mean just scaling it. In the telco network, everything is frozen and you plan your investment 18 years ahead. We scale. We scale up and down during the day, during the night. We need a new platform to test a new private use case; we just scale it. **It's quite fascinating for engineers to see what we can do now**.

139.    Defendant Rouanne gave investors further assurances that DISH had an operational

network, differentiated from competitors, with latency "way better than what you see in the current

networks":

> I mean, **currently, we have today**, we've designed the network, **we have the latency required, which is** -- I'm not going to give a number, but it's **way better than what you see in the current networks**. **So we have enough local zone situation, availability zones to create a differentiated latency network**.

140.    When analyst Michael Ian Rollins of Citigroup Inc. Exchange Research asked

whether some of DISH's purchase of a small retail wireless brand satisfied certain regulatory

requirements, Defendant Ergen assured investors that DISH's focus was not on FCC obligations

or regulatory requirements, but rather on building a "world-class network":

> The answer is yes, it would qualify. Yes. It satisfies the final judgment as is. But we believe as we add Republic and other growth into the market, we will further reinforce that. **But I think you're being a little too anal on -- we got FCC obligations, but we -- what we're really doing is building a world-class network that takes telecom to the next level**. It really is an IT network that looks like a telecom network.

141.    The above statements in the April 2021 Call were materially false and misleading

when made because DISH had not even developed the necessary software in April 2021, let alone

onboarded it, had not conducted any testing that would support technical confidence, had not yet

validated its critical technologies, was experiencing serious integration issues, and had abandoned

efforts to create a functioning network while it frantically attempted to meet the FCC 2022 deadline

and "save the license." Thus, DISH could not develop the necessary software or integrate the

network's software and hardware components, as evidenced by the facts alleged herein, including

the following:

1) CW3 stated that the software needed to integrate the network had not been developed yet in April 2021. CW3 stated that even in Q3 2021, the software was still in such a primitive

phase that it lacked basic functionality to make phone calls or permit a phone to connect to the network.

2) CW3 explained that validation of the network's software involves four phases of testing, and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in October 2021. CW3 further stated that neither of the software vendors working on the project in April 2021 (Rakuten and Mavenir) *ever* completed FOA.

3) CW3 stated that, as of April 2021, achieving commercial traffic on the Las Vegas network in Q3 2021 would have been completely impossible because not one of the vendors had done handset testing (testing chips with the software) yet. Without handset testing, it was impossible to know which features worked and which did not. CW3 explained that to comply with the first FCC milestone and save their license, DISH constructed the network to operate only in "license-save" and not in commercial mode. Defendants understood that building the network for license-save mode only would require them to return later and "densify" the network by adding additional radio towers and to optimize the location and orientation of those radios before the network could be commercialized.

4) Defendant Mayo would later admit, during the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable" throughout 2021.

5) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

6) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

7) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties from the very beginning because vendors were not capable of integrating the network.

8) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs*."

9) Defendant Ergen explained on February 23, 2023 that the Company would not be able to scale the network before the end of 2023 at the earliest.

142. In response to Defendants' positive, but false statements, DISH's stock price increased from $41.59 per share on April 28, 2021 to $45.05 per share on April 29, 2021 on heavy trading volume of over 10 million shares.

143.    Analysts took note of Defendants' comments about the progress of DISH's 5G network and its purported relationships with enterprise customers and incorporated the information into their valuations of DISH's stock price. For example, in an April 29, 2021 report, Credit Suisse analysts noted Defendants' statements that "(a) ***Las Vegas launch in 3Q***, with several more markets later this year; (b) enterprise vs. consumer service launches will be "done in phases"; (c) ***they are  "technically now confident"*** – Ergen believes the network architecture/paradigm shift was 10x more risky than the network build / wireless execution will be; [and] (d) ***enterprise demand is "terrific."*** As a result, the Credit Suisse analysts assessed that "[n]ear-term catalysts favor DISH, with the formal launch of its first markets likely to prove out the O-RAN / native 5G cloud-based architecture and push the Street to start formally modeling wireless operational scenarios for the company."

**E.  August 9, 2021 Earnings Call**

144.    Defendants held an investor call on August 9, 2021 to discuss DISH's second quarter 2021 results (the "August 2021 Call"). Despite undisclosed ongoing integration issues, during the August 2021 Call, Defendant Ergen assured investors that "things work in a lab today" and the Las Vegas site would "be deployed by the end of September" with "retail" and other cities following soon after:

**John Christopher Hodulik,** *UBS Investment Bank, Research Division*

Yes. Just what the service looks like when you guys turn that network on. Is it going to be in beta for the rest of the year? Or do you actually start adding customers to it?

**Charles William Ergen,** *Co-Founder & Executive Chairman*

So we've got a lot of – so we think that's going to be at least a 90- day kind of beta integration. **Things work in a lab today,** but when you take them out of the lab

and we get them on [Dave Mayo's] network, **that will be deployed by the end of September, we can light up Vegas in total**[,] [t]hat goes from the lab to the reality. In my experiences, things don't work exactly right the first month or 2, and you've got to integrate that. But – and then we'll go from there. **We will have retail. Obviously, Vegas, as in other cities, it will light up very quickly after Las Vegas. We'll have a retail presence and we'll have offers for consumers that we think will be competitive**.

145.    The above statements in the August 2021 Call were materially false and misleading when made because as of August 2021, DISH had not even conditionally approved the first phase of software testing, was still unable to get the radio software and core network software to work together, did not have software that worked consistently in the lab, and was building the network to "save the license" with no regard for functionality. Thus, the Defendants could not reasonably expect commercial launch in Las Vegas by the end of September 2021 or in any other cities very quickly afterward, as evidenced by the facts alleged herein, including the following:

1) CW3 stated that the software needed to integrate the network had not been developed yet and that even in Q3 2021, the software was still in such a primitive phase that it lacked basic functionality to make phone calls or permit a phone to connect to the network.
2) CW3 stated that, as of August 2021, achieving commercial traffic on the Las Vegas network in Q3 2021 would have been completely impossible because not one of the vendors had done handset testing (testing chips with the software) yet. Without handset testing, it was impossible to know which features worked and which did not.
3) CW3 explained that validation of the network's software involves four phases of testing, and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in October 2021. CW3 further stated that neither Rakuten nor Mavenir *ever* completed FOA.
4) CW3 explained that Rakuten's phase-one October 2021 approval was conditional because a lot of basic level functionality was not there and even the functioning elements did not work consistently across labs. CW3 stated that Mavenir and Rakuten were at the same stage of testing and development and neither had software products that consistently worked in labs.
5) Defendant Mayo would later admit, during the November 2021 Call, that the Las Vegas launch delay occurred because DISH had been unsuccessful at "just getting the radio software and the core network software to work well together and be reliable" throughout 2021.
6) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to

ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

7) Defendants admitted during the February 2023 Earnings Call that DISH was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023 had to go back and add voice and other capabilities to make the 5G network functional.

8) CW3 explained that to comply with the first FCC milestone and save their license, DISH constructed the network to operate only in "license-save" and not in commercial mode. Defendants understood that building the network for license-save mode only would require them to return later and "densify" the network by adding additional radio towers and to optimize the location and orientation of those radios before the network could be commercialized.

9) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

10) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties from the very beginning because vendors were not capable of integrating the network.

11) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs.*"

12) Defendant Ergen explained on February 23, 2023 that that the Company would not be able to scale the network before the end of 2023 at the earliest.

146.    In response to Defendants' positive and false statements, DISH's stock price increased from $41.97 per share on the prior trading day, August 6, 2021, to $42.25 per share on August 9, 2021.

147.    Analysts considered the above information in their assessment and valuation of DISH securities. In an August 9, 2021 report, for example, Raymond James analysts gave the stock a "Strong Buy" rating, noting that DISH's 5G buildout was "underway in earnest" and stating "Bottom line: we believe DISH presents a very attractive option on the 5G future, funded significantly by the cash cow Pay-TV business, with 4G wireless retail, and in the future, the potential for a large 5G Wholesale/Enterprise business."

### F.  November 4, 2021 Earnings Call

148.    Defendants held an investor call on November 4, 2021 to discuss DISH's third quarter 2021 results (the "November 2021 Call"). During the November 2021 Call, in response to a follow-up question from Credit Suisse analyst Douglas Mitchelson about the timeline for when DISH would begin servicing enterprise customers, Defendant Bye falsely claimed that DISH had "traction now in the enterprise segment," was deploying to enterprise customers and that DISH was ready to scale:

**Douglas David Mitchelson,** *Crédit Suisse AG, Research Division*:

And last one, your comments on consumer versus wholesale are always interesting -- and versus enterprise. *I was hoping you could help us understand time frame a little bit for the enterprise opportunity*. So you've talked about it being a big opportunity but it's one that might take a while to emerge. Like what's a good time frame for investors to think about when enterprise becomes a really big business for DISH? And I'm just curious the capital intensity of that business versus consumer, are there big upfront cost to help enterprises activate that service? Or is the thought that enterprises will bear those costs?

**Stephen J. Bye,** *Executive VP & Chief Commercial Officer*:

**Yes. On the enterprise, we're actually -- we're -- we have traction now in the enterprise segment. But the revenue is still fairly small. Obviously, that business scales as we grow the business. So we already have some really positive traction right now. That will grow as we go into '22,** but I don't anticipate that to become material until we get into 2023. And so we'll continue to grow that business scale out. We can grow that while they're building the network because it's not constrained by geography. And so we can actually -- and we are pursuing opportunities that aren't limited by the geographies and footprint we're deploying. But as we build that footprint out, then it expands the market opportunity for us. So we'll see that sort of begin to pick up as we go through '22, but really not having a material impact until we get into '23. So that's kind of where we see the enterprise.

149.    The above statements in the November 2021 Call were materially false and misleading when made because: DISH was not actively working with any enterprise customers

because it did not have a 5G wireless product to sell at all, as evidenced by the facts alleged herein,

including the following:

1) CW2 stated that in late 2020 or early 2021, the enterprise team budget was cut to less than $10,000 for market research and enterprise had no technical engineering team or budget to engineer or test any enterprise products that had been conceptualized, let alone translate a set of product or customer requirements into a tangible product.

2) CW2 stated that when CW2 left the Company, DISH still had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

3) CW2 recalled that DISH's purported "strong demand" from enterprise customers seemed to be biased market research findings based on intrigue with DISH's new 5G standalone, virtualized, cloud-native network and the idea of a 4th disruptive wireless carrier. The market research conclusions did not seem to be founded on concrete willingness to pay research.

4) CW2 explained that while many enterprises expressed interest in private 5G networks and other enterprise products, there was inconclusive research for these products because the products had not yet been developed and the proposed pricing was often much more than enterprises were interested in paying. Many of these products required 5G chipsets and other components that were barely introduced to the market in 2021, and many of these were not yet compatible with the various spectrum channels that DISH had acquired.

5) CW2 explained that during CW2's tenure at DISH, DISH had no 5G network product to market or sell. The only thing DISH had to market was the opportunity to lease parts of DISH's spectrum holdings, "which entailed DISH leasing some portions of its radio frequency spectrum to enterprise customers or operators to use in private network systems that involved radios, equipment and devices that did not come from DISH." CW2 stated that spectrum leasing had "nothing to do with DISH's 5G nationwide network under construction" and was not a long-term, sustainable solution for DISH because "when you lease spectrum for a dedicated enterprise customer, you risk deeming it unavailable to use on the national 5G network."

6) Defendant Rouanne explained in the May 10, 2022 Investor Day that, while AWS was the core network, DISH was relying on VMware and Mavenir for its enterprise products. As CW3 explained, Mavenir still has not achieved FOA as of 2024.

7) Defendant Rouanne stated in an interview at the MWC conference on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed.

8) COO Swieringa would ultimately admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone. Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

9) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified,

functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

10) Defendants would ultimately disclose in February 2023 that DISH would not have any revenue from enterprise customers related to its 5G network until at least 2024, or for at least another year, due to DISH's undisclosed decisions to cut the enterprise product budget, pause VoNR development and integration and "save the license" throughout the Class Period.

11) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

12) CW1 recalled that in May 2022, DISH's network still could only support a few users at that time and network was not scalable.

13) CW1 explained that Voice over New Radio (VoNR) was still not working in May 2022.

14) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

15) Defendant Rouanne admitted in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

150. Defendant Ergen also assured analysts and investors that DISH's purported product offering to enterprise customers included the "fastest 5G" and that DISH's level of automation in the cloud and use of artificial intelligence was on the "leading edge" and differentiated DISH from the other carriers in the industry, even though, unbeknownst to investors, DISH had cut the enterprise product development budget at the end of 2020 or early 2021 and had not been working to develop any such products:

**Charles William Ergen**, *Co-Founder & Executive Chairman*:

…we think that the enterprise business has more profitability, probably, that's our guess. That has a lot more profitability than kind of a very competitive retail wireless business, where everybody is selling the same thing. **We're the best 5G, we're the fastest 5G. We can differentiate a lot more on the enterprise business, where we can say we're in the cloud** -- I don't think the business survives the next decade. If you don't -- if you're not -- if you don't have automation, then you don't have -- you're not using the artificial intelligence and you're not cloud-based. I just don't think you should. But rare exception, some old school industries maybe do, but you're just not going to survive. And we're on the leading edge of that. And so

we think that we move people there in a way that – or help move them there in a way with our partners, in a way that they couldn't otherwise get there with the other carriers.

151.    The above statements in the November 2021 Call were materially false and misleading when made because DISH had no functional commercial network at that time, let alone the best 5G," and the factors Defendants claimed differentiated the network and created a competitive advantage did not yet exist, as evidenced by the fact alleged herein, including the following:

1)  CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

2)  CW2 stated that in late 2020 or early 2021, the enterprise team budget was cut to less than $10,000 for market research and enterprise had no technical engineering team or budget to engineer or test any enterprise products that had been conceptualized, let alone translate a set of product or customer requirements into a tangible product.

3)  CW2 explained that during CW2's tenure at DISH, DISH had no 5G network product to market or sell.  The only thing DISH had to market was the opportunity to lease parts of DISH's spectrum holdings, "which entailed DISH leasing some portions of its radio frequency spectrum to enterprise customers or operators to use in private network systems that involved radios, equipment and devices that did not come from DISH." CW2 stated that spectrum leasing had "nothing to do with DISH's 5G nationwide network under construction" and was not a long-term, sustainable solution for DISH because "when you lease spectrum for a dedicated enterprise customer, you risk deeming it unavailable to use on the national 5G network."

4)  Defendant Rouanne stated in an interview at the Mobile World Congress conference on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed.

5)  COO Swieringa admitted during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites it had built back in June 2022 to meet the FCC milestone, and Defendant Ergen had stated that voice coverage was a prerequisite for sales to enterprise customers.

6)  Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

7)  Defendants would ultimately disclose in February 2023 that DISH would not have any revenue from enterprise customers related to its 5G network until at least 2024, or for at least another year, due to DISH's undisclosed decisions to cut the enterprise product

budget, pause VoNR development and integration and "save the license" throughout the Class Period.

8) In mid-2021, CW2 learned from CW2's boss that efforts to develop voice functionality were behind schedule and facing numerous challenges.

9) CW1 recalled that in May 2022, DISH's network still could only support a few users at that time and network was not scalable.

10) CW1 explained that Voice over New Radio (VoNR) was still not working in May 2022.

11) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

12) Defendant Rouanne admitted in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

13) COO Swieringa admitted during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

14) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties integrating the components from disparate vendors into a unified, functional network from the very beginning.

### G. February 24, 2022 Earnings Call

152.    Defendants also held an investor call on February 24, 2022 to discuss DISH's fourth quarter and annual 2021 results (the "February 2022 Call"). During the February 2022 Call, Defendant Ergen falsely assured investors that DISH's 5G network in Las Vegas supported voice and was the most advanced network in the world, but failed to mention that the Company was building the network without regard to functionality and had "shelved" any effort to implement VoNR and cut the enterprise product development budget to focus all efforts and funding on meeting the FCC deadline:

> The second positive is that our network in Vegas, **we actually have operational now a 5G stand-alone network that operates in O-RAN with O-RAN principles. It's cloud native in the AWS cloud, with VoNR voice. So that is the most advanced network in the world.** We probably ended up doing a lot more

development than we thought in some of the technologies with our vendors. But that is up and operational and when it works, it works pretty well. As always we still have work to do. We're not ready to spike the football, we have work to do to develop through all the cities and to optimize the network. But the technical challenge has been resolved for some of the core things that we needed to do.

153.    On the same February 2022 Call, Defendant Rouanne touted that DISH's 5G network in Las Vegas and other markets was already "working" and had significant speed and capability, but failed to mention that the Company was building out the rest of the network without regard to functionality and only to meet the FCC deadline:

**Brett Joseph Feldman**
*Goldman Sachs Group, Inc., Research Division*

So you guys for a long time, have said that as you build out a wireless network built on cloud technology, that you'll inevitably have a cost advantage. I think, conceptually, that's always made sense. As you've noted, you are now actually operating a network on this technology that sometimes works the way you want it to.

So you haven't scaled it yet, but can you start to maybe give us some insight as to what you think that sustainable operating cost advantage is going to be, now that you have some evidence as to what you've been able to do in the field?

And then just as a follow-up to that, I think we all anticipate that when you launch and go to market, you're going to be offering consumers a really great value for the quality of service that you're delivering as you sort of flow through some of those cost savings to the consumer. But I'm wondering if the architecture that you've chosen is also going to allow you to deliver features and functionalities that might be a competitive advantage we're not putting enough thought into?

**Marc Rouanne**
*Executive VP & Chief Network Officer*

Yes, we're starting to see benefits. We're certainly seeing benefits in the cloud now of something that is pretty costly for existing operators, which is to test new software and to embark on new innovation. **And we have the speed and capability to do that, that is truly comparable to the cloud and with much more automation**. So we require much smaller of people and when we scale, we think that will give us both benefits of speed innovation but also of cost.

**We are also seeing with the OpenRAN -- the OpenRAN today is working in Vegas and in other markets**. But we are starting to see a lot of new ideas and benefits from the OpenRAN observability, which means you can see things, you can see how the quality of service is evolving. You can see how -- the benefits of your footprint. You can see if you need new small cells or not in a way that was hidden inside Nokia and Ericsson in the past….

154.    The above statements in the February 2022 Call were materially false and misleading when made because the network was not, in fact, operational, functional, or advanced at the time the statements were made and DISH had stopped efforts to include voice (VoNR). To the contrary, the network was experiencing significant integration issues and did not have functional voice capabilities or optimized functionality, as evidenced by the facts alleged herein, including the following:

1) CW1 recalled that even in May 2022, DISH's network could only support a few users and was not scalable.
2) CW1 explained that Voice over New Radio (VoNR) was not yet working even in May 2022.
3) COO Swieringa admitted during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."
4) CW3 recalled that neither Mavenir nor Rakuten ever achieved a first office application. Up until the time CW3 left DISH in November 2023, Mavenir had still not been paid for the software it was attempting to develop because it had never achieved FOA.
5) CW3 explained that to comply with the first FCC milestone and save their license, DISH constructed the network to operate only in "license-save" and not in commercial mode. Defendants understood that building the network for license-save mode only would require them to return later and "densify" the network by adding additional radio towers and to optimize the location and orientation of those radios before the network could be commercialized.
6) Defendants admitted during the February 2023 Earnings Call that DISH was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023, was now going back to add voice and other capabilities to make the 5G network functional.
7) Defendant Rouanne admitted in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after

software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

8) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties integrating the components from disparate vendors into a unified, functional network from the very beginning.

155.    Upon the news, DISH's stock price increased from $27.57 per share on February 23, 2022 to $32.80 per share on February 25, 2022 on heavy trading volume.

156.    Analysts integrated the information into their analyses and valuation of DISH's securities. For example, a February 24, 2022 report, Credit Suisse analysts gave a "favorable update" on the stock, specifically noting Defendants' remarks that DISH's 5G network was "now functional" in Las Vegas, that well over 100 markets were set to launch by June 2022, and that financing would not be needed until the next year.

### H. May 6, 2022 First Quarter Earnings Call

157.    Defendants also held an investor call on May 6, 2022 to discuss DISH's first quarter 2022 results (the "May 2022 Earnings Call"). During the May 2022 Earnings Call, Defendant Bye continued to misrepresent the capabilities of DISH's 5G network and the Company's ability to service enterprise customers, stating, "[a]nd as we've talked about in the past, we think that there's significant potential with the enterprise business. **And the capabilities of our network actually enable that as we go forward**."

158.    The above statement in the May 2022 Earnings Call was false and misleading because DISH had shelved development of enterprise products, was not actively working with any enterprise customers and demand from enterprise customers was, thus, non-existent at this time because the network lacked capabilities that were critical to enterprise customers, as evidenced by the facts alleged herein, including the following:

1) CW1 recalled that in May 2022, DISH's network could only support a few users at that time and network was not scalable.

2) CW1 explained that Voice over New Radio (VoNR) was not working in May 2022.

3) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

4) CW3 was told by SVP Heather Campbell, that she and the RF team had done an analysis around Q2 2022 for to determine if the network in its current form could support enterprise customers, which concluded that: DISH did not have network coverage in the right areas and would not be able to provide the entities they considered potential enterprise customers with the right experience using the network DISH had built.

5) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

6) CW2 stated that in late 2020 or early 2021, the enterprise team budget was cut to less than $10,000 for market research and enterprise had no technical engineering team or budget to engineer or test any enterprise products that had been conceptualized, let alone translate a set of product or customer requirements into a tangible product.

7) CW2 explained that during his tenure at DISH, DISH had no 5G network product to market or sell. The only thing DISH had to market was the opportunity to lease parts of DISH's spectrum holdings, "which entailed DISH leasing some portions of its radio frequency spectrum to enterprise customers or operators to use in private network systems that involved radios, equipment and devices that did not come from DISH." CW2 stated that spectrum leasing had "nothing to do with DISH's 5G nationwide network under construction" and was not a long-term, sustainable solution for DISH because "when you lease spectrum for a dedicated enterprise customer, you risk deeming it unavailable to use on the national 5G network."

8) Defendant Rouanne stated in an interview at the Mobile World Congress conference on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed.

9) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

10) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

11) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

159. During the May 2022 Earnings Call, in response to a question from a BofA Securities analyst about DISH's objectives for the 5G network, DISH CEO Carlson emphatically denied that the network was being built just to minimum specifications to meet the FCC requirement, falsely assuring that the Company had "things in place to make sure" DISH was both meeting FCC requirements and building a 5G network that would be profitable:

David William Barden, *BofA Securities*, *Research Division*

… When we look at Las Vegas from the outside, DISH looks like a last-to-market, single-device, consumer wireless broadband player, which doesn't really seem to be as novel an approach to return as the approach you're trying to take towards investment. And maybe this is something that's going to come out on Tuesday, but I think we ask this every quarter, which is what does the pot of gold at the end of the rainbow look like?

W. Erik Carlson, *President, CEO & Director*:

Yes. I think I'll take the retail wireless part and then maybe on the network side would be Stephen and if there's something left over for John. On the retail side, I mean, we'll talk more about this in Vegas. But obviously, as a fourth player, we certainly have historical data where we think that goes, and it certainly should be a very profitable business for us. Obviously, as the fourth player, you're going to have to be innovative to get people. You certainly are going to look at price. You're certainly going to look at innovation in terms -- our network allows us to be more innovative, so that is interesting stuff. As John mentioned, right, the time to do that is when you've got a fully loaded -- a bag of tricks, which we do need Band 70. We do need lower-cost phones, right? You wouldn't hit the gas on that today with one phone that's $899, right? So on the other hand -- so we -- but we have FCC obligations that are focused on retail wireless, and they're not focused as much on maybe some of the other things that we think our network does. So we're -- we didn't make the rules. And so we would probably approach it a little bit different way if it was all P&L. **But we have things in place to make sure that we can kind of walk and chew gum at the same time, which is meet the FCC obligations and also make that a profitable business**. So I think we'll go a little bit more detail on this in Vegas, and then...

160. The above statement in the May 2022 Earnings Call was materially false and misleading when made because Defendants were focusing on developing the bare infrastructure

to meet the FCC requirements at the expense of the other elements necessary to make the network

functional, as evidenced by the facts alleged herein, including the following:

1) CW1 recalled that in May 2022, DISH's network could only support a few users and was not scalable.

2) CW1 explained that Voice over New Radio (VoNR) was not working in May 2022.

3) CW2 stated that in late 2020 or early 2021, the enterprise team budget was cut to less than $10,000 for market research and enterprise had no technical engineering team or budget to engineer or test any enterprise products that had been conceptualized, let alone translate a set of product or customer requirements into a tangible product. Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

4) CW3 explained that validation of the network's software involves four phases of testing, and DISH's primary software vendors only "conditional[ly]" completed the *first* phase in October 2021. CW3 stated that neither Rakuten nor Mavenir *ever* completed FOA.

5) Defendants admitted during the February 2023 Earnings Call that DISH was focused on meeting the FCC June 2022 20% population coverage deadline, regardless of whether the network was operational, and in 2023 had to go back and add voice and other capabilities to make the 5G network functional.

6) CW3 explained that to comply with the first FCC milestone and save their license, DISH constructed the network to operate only in "license-save" and not in commercial mode. Defendants understood that building the network for license-save mode only would require them to return later and "densify" the network by adding additional radio towers and to optimize the location and orientation of those radios before the network could be commercialized.

7) Defendant Rouanne would admit in June 2022 that Amazon's AWS was still not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

8) Defendant Mayo admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH had difficulties from the very beginning because vendors were not capable of integrating the network.

9) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at *really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs*."

10) As of October 3, 2023, despite having constructed radio sites covering more than 70% of the U.S. population, DISH was still operating its retail wireless brands, including Boost, primarily as an MVNO.

11) Defendant Ergen explained on February 23, 2023 that that the Company would not be able to scale the network before the end of 2023 at the earliest.

### I. May 10, 2022 DISH Analyst Day 2022 Presentation

161.    On May 10, 2022, DISH held an Analyst Day (the "May 2022 Analyst Day") in Las Vegas in which DISH executives discussed DISH's 5G network buildout. At the May 2022 Analyst Day, DISH's Executive VP and Chief Commercial Officer, Defendant Bye, misrepresented the state of DISH's enterprise sales, stating:

> So the best way to think about it is **we're starting to grow that revenue this year. We already got customers, we're growing that revenue this year**. Think of it as sort of the private 5G network space. **We see that scaling in 2023 and clearly picking up momentum as we go into '24 and beyond**. But as I said, there's a long sales cycle when you're dealing with enterprise. So it's a ramp that's going to take some time to kind of ramp up. The way to look at the sort of revenue as it builds up is really going to be about private 5G networks. And then over time, it becomes far more transactional as enterprise customers take advantage of the API gateway and the transactions that are available through that gateway.
>
> I'm not going to give you a year-by-year forecast of what that looks like. But **think of it as early revenue this year, scaling into '23, and then picking up momentum into '24 and then '25**. If I look at the size of the opportunity, I said it's about $30 billion in 2025 for the private 5G as a service. And what I really was pointing out with the 20% is that's where we see our long-term sustainable market share over time. So think of that as beyond 2025 is where we think our sustainable competitive market share position will be. I actually I think it will be a little higher than 20%, given the advantages that we have today, but I think it's going to scale up over time.
>
> So I won't give you specific numbers through those years, but **you'll see it picking up through '23, '24 and clearly into '25, as we get more momentum into '25**.

162.    The above statements at the May 2022 Analyst Day were materially false and misleading when made because Defendants were focusing on developing the bare infrastructure to meet the FCC requirements at the expense of the other elements that were necessary to make the network functional and relevant to enterprise customers and, therefore, were not seeing growth,

momentum, or revenue from enterprise customers, as evidenced by the facts alleged herein, including the following:

1) CW1 recalled that in May 2022, DISH's network could only support a few users and was not scalable.

2) CW1 explained that Voice over New Radio (VoNR) was not working in May 2022.

3) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

4) CW3 was told by SVP Heather Campbell, that she and the RF team had done an analysis around Q2 2022 to determine if the network in its current form could support enterprise customers, which concluded that: DISH did not have network coverage in the right areas and would not be able to provide the entities they considered potential enterprise customers with the right experience using the network DISH had built.

5) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

6) CW2 stated that in late 2020 or early 2021, the enterprise team budget was cut to less than $10,000 for market research and enterprise had no technical engineering team or budget to engineer or test any enterprise products that had been conceptualized, let alone translate a set of product or customer requirements into a tangible product.

7) CW2 explained that during CW2's tenure at DISH, DISH had no 5G network product to market or sell. The only thing DISH had to market was the opportunity to lease parts of DISH's spectrum holdings, "which entailed DISH leasing some portions of its radio frequency spectrum to enterprise customers or operators to use in private network systems that involved radios, equipment and devices that did not come from DISH." CW2 stated that spectrum leasing had "nothing to do with DISH's 5G nationwide network under construction" and was not a long-term, sustainable solution for DISH because "when you lease spectrum for a dedicated enterprise customer, you risk deeming it unavailable to use on the national 5G network."

8) Defendant Rouanne stated in an interview at the Mobile World Congress conference on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed.

9) Defendant Rouanne would later admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

10) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

11) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

### J.  November 2, 2022 Earnings Call

163.    Defendants also held an investor call on November 2, 2022 to discuss second quarter results (the "November 2022 Call"). During the November 2022 Call, Defendant Bye continued to mislead investors about DISH's prospects in the enterprise segment, stating:

> As we talked about in the Analyst Day, we started out with sort of private 5G and we're sort of evolving that product into a private 5G as a service solution. We talked about the early success we had with DoD. We continue to win more projects and take on more opportunity with the Department of Defense. It's very exciting projects. Unfortunately, I can't go into a lot of details specifically about those projects. But **we're also very active in several other verticals and industry sectors, not the least of which includes hospitality**, given the DISH business from the video side of the business, **we are actively engaged with different hotel groups for private networks. Also industrial manufacturing, we're responding to more and more RFPs in that space** as companies are looking at how do they invest in more sophisticated solutions to take cost out of the manufacturing facility in the plant. So **we're actively engaged in responding to a number of RFPs there, we're seeing more and more RFP flow coming to us**, which is very encouraging. And then we're also active with utilities. And you've seen different stuff being published recently about utilities and their activity in sort of the private space, and we see movement there in a very positive direction, and we're actively engaged in those conversations. I think the point that I would leave you with is **we've got some really strong proof points in '22. We're seeing growing momentum as we step into '23. We expect that deal flow to continue to grow**, and we're excited about that opportunity. I think on the projects we have won, we're very focused on the execution and gains of those projects. It's very important for us to deliver against those commitments, execution is key. **As we've done on the macro network, we're shifting that focus on to the enterprise side**.

164.    The above statements in the November 2022 Earnings Call were false and misleading because DISH was not "done" with development of the network and was not experiencing momentum or deal flow with enterprise customers, as evidenced by the following:

1) CW2 explained that during CW2's tenure at DISH, DISH had no 5G network product to market or sell, let alone enterprise products. The only thing DISH had to market was the opportunity to lease parts of DISH's spectrum holdings, "which entailed DISH leasing some portions of its radio frequency spectrum to enterprise customers or operators to use in private network systems that involved radios, equipment and devices that did not come from DISH." CW2 stated that spectrum leasing had "nothing to do with DISH's 5G nationwide network under construction" and was not a long-term, sustainable solution for DISH because "when you lease spectrum for a dedicated enterprise customer, you risk deeming it unavailable to use on the national 5G network."

2) CW3 was told by SVP Heather Campbell, that she and the RF team had done an analysis around Q2 2022 to determine if the network in its current form could support enterprise customers, which concluded that: DISH did not have network coverage in the right areas and would not be able to provide the entities they considered potential enterprise customers with the right experience using the network DISH had built.

3) CW2 stated that when CW2 left the Company, DISH Wireless had no tangible enterprise product and it was estimated that it would take at least 15-18 more months before any of the planned enterprise products could be engineered, tested, and offered to the market.

4) CW2 stated that in late 2020 or early 2021, the enterprise team budget was cut to less than $10,000 for market research and enterprise had no technical engineering team or budget to engineer or test any enterprise products that had been conceptualized, let alone translate a set of product or customer requirements into a tangible product.

5) Defendant Rouanne stated in an interview at the Mobile World Congress conference on March 1, 2023 that DISH merely had a baseline network and that DISH had not yet developed products that enterprise customers wanted or needed.

6) COO Swieringa would later admit during the February 2023 Call that DISH was only then beginning to put VoNR in the first 20% of sites the Company had rushed to build back in June 2022 to meet the FCC milestone, stating: "[s]o as we look at really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs."

7) Defendants disclosed in May 2023 that DISH's critical software vendor, Mavenir, was never able to handle the integration of DISH's physical infrastructure, requiring DISH to ultimately hire Samsung. CW3 confirmed that DISH hired Samsung in 2022 after Rakuten and Mavenir were unable to develop the software necessary to integrate the network.

8) Defendant Rouanne would admit in June 2022 that Amazon's AWS was not ready for DISH and was still in the process of being upgraded to be "telco ready" and that even after software vendors were retained, they needed to "rewrite their software from scratch" to be able to integrate DISH's Open-RAN network.

9) Defendant Mayo later admitted in a speech at the 2023 CTIA 5G Summit on May 17, 2023 that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately.

## VI.    DEFENDANTS REVEALED THE TRUTH IN A SERIES OF PARTIALLY CORRECTIVE DISCLOSURES

### A.    On November 4, 2021, DISH Reveals that Its Novel Wireless Network Has Been Experiencing Undisclosed Integration Problems Throughout 2021 and Is Not Ready for Commercialization

165.    On November 4, 2021, Defendants filed with the SEC, DISH's Third Quarter Form 10-Q for the three and nine-month periods ended September 30, 2021 (the "Q3 2021 Form 10-Q"). The Q3 2021 Form 10-Q reported on, among other things, DISH's third quarter financial results. Defendants also issued a press release on November 4, 2021 reporting DISH's third quarter financial results (the "Q3 2021 Press Release") and held an investor call the same day to discuss DISH's results (the "November 2021 Call").

166.    In the Q3 2021 Press Release, Defendants reported earnings and revenue below analyst expectations. In explaining the Company's poor financial performance during the November 2021 Call, Defendant Mayo revealed that, contrary to Defendants' prior statements that DISH had purportedly "**completed a successful field validation, utilizing our fully virtualized standalone 5G core network and the industry's first O-RAN compliant radio**" and was "**deploying it now**" and that the Las Vegas site would have a "**full-fledged product**" ready for commercialization in Q3 2021, DISH had actually been experiencing significant delays at the Las Vegas site because of undisclosed integration issues and, thus, DISH had been unable to, and was not, deploying the 5G network.

167.    During the November 2021 Call, Defendant Mayo admitted, "[w]e were a little delayed as a consequence of frankly, the Vegas network was…just getting the radio software and the core network software to work together and be reliable."  Defendant Mayo further admitted that DISH was also "still working through T-Mobile roaming and specifically handover issues. So

Vegas is, I'd say, coming along." Thus, the Las Vegas site was not on track and would not be ready

for "prime time," as previously represented.

168.    Upon the news, DISH's stock price declined from $43.09 per share on November

3, 2021 to $37.08 per share on November 4, 2021 on heavy trading volume of over 11 million

shares, as compared to the previous day of 2.9 million shares.

169.    Analysts expressed concerns, noting DISH's stock price decline was likely less to

do with earnings and everything to do with the lack of progress on, and capabilities of, the Las

Vegas site. As one Barclays analyst stated in a November 5, 2021 report entitled "Why did DISH

stock sell off?" reporting on DISH's Q3 2021 results:

> [W]e don't think earnings had much to do with the selloff. The simplest
> explanation, in our view, was likely positioning ahead of the call as some may
> have expected details around the company's test launch in Las Vegas… the bigger
> issue with DISH is that it is a story stock with very little by way of milestones
> beyond small data points around network build. In that context, management's
> commentary during the call may have introduced some degree of pessimism
> around the pace of network build.

**B.    On May 6, 2022, DISH Discloses Integration Issues Were Far More Expansive
and Worse than Previously Represented and Enterprise Sales Are Non-
Existent**

170.    On May 6, 2022, Defendants filed with the SEC DISH's First Quarter Form 10-Q

for the three-month period ended March 31, 2022 (the "Q1 2022 Form 10-Q"), which was signed

by DISH's CEO Carlson and CFO Orban. Defendants also issued a press release on May 6, 2022

reporting DISH's first quarter financial results (the "Q1 2022 Press Release") and held an investor

call that same day to discuss DISH's first quarter results (the "May 2022 Call").

171.    During the May 2022 Call, Defendants revealed that, although they told investors

in November 2021 that Las Vegas would launch in early 2022, integration issues were much worse

than they let on and, thus, the delays would be much longer. Indeed, investors learned for the first time that DISH had not actually launched its 5G services until May 4, just two days before the earnings call, stating "[o]n Wednesday of this week, we commercially launched [] in Las Vegas." Moreover, DISH revealed that the Las Vegas network was still in "beta user mode" and that DISH needed to "sort of nail it there [in Las Vegas]" before DISH could then "scale it out across all the other markets." But what Defendants did not disclose was that DISH had paused efforts to launch voice functionality in mid-2021 and was merely building out the network to comply with the minimum FCC population coverage deadlines.

172. Defendant Ergen further admitted that, as a result of the integration issues, while DISH would hit the 20% FCC requirement in June 2022, "***it's not going to be a robust offering. The commitment that we have to make is we have to do data***. We have to do data 20% of the population in the United States, so it's not going to be a robust offering as robust as we'd like," meaning DISH was still not ready to service enterprise customers. Defendant Bye sought to quell investor concerns by assuring them that DISH's 5G network already had the capabilities needed to service enterprise customers, stating "we think that there's significant potential with the enterprise business. And the capabilities of our network actually enable that as we go forward" such that DISH would meet the FCC deadline while building a profitable business.

173. Upon the news, DISH's stock price declined from $27.48 per share on May 5, 2022 to $22.22 per share on May 6, 2022 on heavy trading volume of over 13 million shares, as compared to the previous day of 4.4 million shares.

174. Analysts expressed concern about the delay in the commercial launch of DISH's 5G network and the negative impact it was having on DISH's cash flows from the additional

expense and being unable to start generating meaningful revenue. For example, according to a

May 6, 2022 Barclays report:

> **Overall Take**: DISH reported result[s] that were worse than expected across the
> board (Figure 1). The company also turned FCF negative for the first time, on
> account of the wireless build and given the early stage of the build, is likely to
> remain negative FCF for many years to come.

175.    Analysts were also plain fed up and complained about Defendants' lack of

transparency, characterizing Defendants' disclosures concerning the network status as a "black

box" to which Defendant Ergen admitted, "we need to do a better job of communicating."

### C. On May 10, 2022, DISH Reveals That Its Enterprise Business Opportunity Is Still Highly Uncertain

176.    On May 10, 2022, DISH held an analyst day at the Caesars Forum in Las Vegas to

discuss the status of its 5G buildout. Call participants included Defendants Ergen, Mayo, Rouanne,

and Bye.

177.    At the Analyst Day, Defendant Ergen revealed that the network was "not perfect

yet" and Defendants "certainly have to scale" it. Accordingly, Defendant Bye revealed that DISH

was actually a long way away from being able to service enterprise customers, contrary to

Defendants' prior statements that, among others, DISH was actively engaged with building

enterprise customer private networks. Thus, Bye admitted "all of this being said, the pitch to close

sales process within the enterprise customer is longer. It takes time."

178.    To allay investor worries over non-existent enterprise revenue from the 5G

network, Defendants reassured investors that DISH would be growing enterprise revenue "this

year" and "already got customers" where DISH would see "scaling in 2023 and clearly picking up

momentum as we go into '24 and beyond."

179.    On this news, the price of DISH common stock fell $4.29 per share, or 19.7%, from

a close of $21.75 on May 10, 2022 to a close of $17.46 on May 11, 2022 on heavy trading volume

of 18.69 million shares, compared with the previous day's volume of 7.35 million shares.

> **D. On February 23, 2023, DISH Reveals that It Has Been Unable to Scale or Commercialize Its 5G Network and, Thus Still Has No Enterprise or Wholesale Customers**

180.    On February 23, 2023, Defendants filed with the SEC, DISH's 2022 Form 10-K for

the year-ended December 31, 2022 (the "2022 Form 10-K"). Defendants also held an investor call

that same day to discuss DISH's fourth quarter 2022 and annual 2022 results.

181.    During the February 2023 Call, Defendants revealed for the first time that: DISH

had paused efforts to develop and integrate VoNR and, thus, DISH would not have any enterprise

or wholesale customers until at least 2024, or at least one more year; that DISH had only began

integrating VoNR at the sites it had set up last June 2022 which accounted for 20% coverage; and

that DISH could not market to enterprise customers or scale until it had achieved VoNR at 70% of

sites.

182.    Analysts expressed concerns during the February 2023 Call about Defendant Bye

stepping down as DISH's Head of Enterprise, prior to DISH obtaining any real enterprise

customers. In response to a follow-on question about when investors could finally expect to see

the enterprise and wholesale business going, Defendant Ergen revealed that, contrary to

Defendants' prior statements, it would now be another whole year before DISH expected to see

revenue from enterprise:

**Richard Hamilton Prentiss,** *Raymond James & Associates, Research Division*:

…The second question is more strategic. With Stephen leaving the operations and
joining the Board, TMobile/AWS had an announcement this week talking about

private networks and working together with 5G, how should we think about the enterprise wholesale side? What's needed to get that business going? And when could it become meaningful?

**Charles William Ergen,** *Co-Founder & Executive Chairman*:

…And so I think we've said *we would expect that you'll start seeing real revenue from that next year from us, and you'll start seeing -- you'll see some movement this year*.

183.    Analysts spent a large portion of the February 2023 Call probing why enterprise customer revenue was delayed and when investors could hope to see enterprise and wholesale revenue. For example, Richard Hamilton Prentiss of Raymond James asked whether VoNR was something enterprise customers needed before they would sign up, to which Defendant Ergen disclosed for the first time that, not only did enterprise customers require VoNR, it had to be at scale and DISH had only recently "got it up and working" due to "technical challenges" and now DISH was finally "starting" to "roll that out as fast as we can," which was needed for commercial launch:

**Richard Hamilton Prentiss**
*Raymond James & Associates, Inc., Research Division*

And do you think VoNR or Voice over New Radio, is that something the enterprise wholesale people want to see working? Or is it more nationwide coverage? But what's kind of one of the hurdles to that long sales cycle that they're really wanting to see that box checked? Anything in particular?

…

**Charles William Ergen**
*Co-Founder & Executive Chairman*

I'll answer briefly, maybe turn that over to John. But we're going -- we have 2 paths. One is the FCC requirements for data, right? So to build that in a network, that's where we're covering going to cover 70% of the POPs and data. *The problem that we've run into is that we are -- for commercial launch of it, we need voice, and we're doing 5G voice or VoNR*. We made the strategic call not to do 2G, 3G, 4G

-74-

voice and have all that legacy and carry that around for the rest of our life, right?

So we're thinking long term about that and saying, "Look, let's have the best voice in the industry. Let's go with 5G voice." That was -- there are many companies are working on that. Obviously, T-Mobile has launched a couple of markets. The Chinese are working on that. But we're now the largest -- as far as we know, the largest company that has real time VoNR in the United -- the voice of 5G in the United States. *And John will give you a little bit more detail on that. That -- we've got -- so now we've got it up and working. That was probably one of our biggest technical challenges,* and we're very thankful to the Mavenirs of the world and our vendors that kind of f helped us get there. We wouldn't have got there without them. *And so -- now we -- we're starting to roll that out as fast as we can, but we've kind of got over those hurdles. But that's what we need for commercial launch*. So what happens is you're going to see a 6-month lag. I'm going to say 6 months. It could be a little less than that. *But a 6-month lag from the time we get data to the time that we optimize that network fully to be able to do voice -- to do 5G voice* because it's very tricky, and you have to have a very dense network to do it. John?

184.    Defendant Ergen revealed that that DISH defined scale as "70% with voice coverage" before the Company could hope to sell its 5G network to enterprise customers:

**Charles William Ergen**
*Co-Founder & Executive Chairman*

*You'll start seeing some numbers, but you won't see -- you're going to see a material ramp when you have scale, which I define as 70% with voice coverage.* So again, given our build-out, take 6 months from build-out to optimize, so that gets you to *70% by the end of this year optimized*. And then you can do things like national market and things because you have scale to do it….

185.    In response to a question from Bryan Kraft of Deutsche Bank asking whether DISH's "slower-than-expected pace of 5G adoption among enterprises" had anything to do with Defendant Bye's departure, Swieringa admitted that enterprise sales would be delayed another full year because DISH had not been able to yet scale its 5G network, as previously claimed and, thus, "Job 1 is getting our 5G network up and operating at scale":

**Bryan D. Kraft**
*Deutsche Bank AG, Research Division*

It's Bryan Kraft from Deutsche Bank. As Dave Barden alluded to in his question earlier, **there's been a lot of discussion lately about the slower-than-expected pace of 5G adoption among enterprises. Many investors are asking the question as to whether there's some connection between that and Stephen Bye leaving his management role at DISH as Head of Enterprise. Can you just talk about what's going on there from a demand perspective**? If you can share anything on maybe why Stephen decided to leave. And lastly, how you're managing the enterprise sales effort now? Who's leading that?

**John W. Swieringa**
*President & COO of DISH Wireless*

Yes. It's John Swieringa. Look, we've been building our team for the last 4 years. There's a lot of talent inside DISH Wireless now. So I don't think it's about any one person. **And I'm personally calling on a number of enterprise customers as our several members of our senior management team. And I think the momentum is picking up** to echo Charlie's comments. We're really busy having really good discussions with a lot of big companies, and that's what we expect to be doing. And I think we said earlier, **we'd be seeing some of that business start to pick up next year**. But we're not confused. **Job 1 is getting our 5G network up and operating at scale**. And there's a lot of focus there, and I can take the eye off the ball looking at other things that -- it's really about sequencing. **We need to get the network up and running first, and then there's lots of opportunities in the pipeline we can take advantage of**.

186.    Defendant Ergen further confirmed that the same would be required before DISH

could sign up wholesale customers:

**Charles William Ergen**
*Co-Founder & Executive Chairman*

… but the – **from an enterprise side or private network side of the business, we're already positioned because we've got the architecture that we believe is required to do that properly, right? And that's before you get into things like AI and ChatGPT only a positive for what we're doing, which we properly foresaw as part of what we needed to be able to do. Scale will matter, and reaching 70% of the country will start opening up a lot more opportunities because now some conversations are only on a regional basis today. So that is probably the one thing that's missing**, but we're not having to change the architecture of what we're doing. So we're already positioned and so forth. And I think the thing is, ultimately,

regardless of who signs private network deals, it's going to be a positive because if your competition does it -- if Uber signs a deal, then Lyft has to sign a deal or just going to be out of business as an example. So that's that part. And then on the -- what was the second part?

        *     *     *

Yes. Same answer **because we'd have to have scale in the network,** and we have -- 2 things have to happen. We have to be off TSA from T-Mobile unless we -- again, our focus on for the first half of the year by end of June. **And the second one, we have to have scale, which, again, we're focused on by the end of** this **year. Then I think we have a really neat platform for people who might be interested from a wholesale perspective, but that's very similar to what the enterprise opportunity is as well….**

187.    When asked whether DISH even had the VoNR up and running, Swieringa revealed

for the first time that DISH was so far behind on scaling its 5G network and that the Company

only started, in 2023, to roll out VoNR to the 20% of markets it began servicing one year ago

pursuant to the FCC requirement:

**Mike Dano**

…I had 2 separate questions. One is, can you just kind of explain how the network launch is going to work throughout the rest of this year? I mean do you have the voice VoNR service up and running now? And how is that going to be expanded? And how does that -- how does the rest of that like commercial launch of the DISH Network work throughout the rest of this year?...

**John W. Swieringa**
*President & COO of DISH Wireless*

…So I made a few comments on this earlier in the call. First of all, all of our on-air sites are providing 5G broadband. And now as a subset of those, we're going market by market to tune the market for commercial VoNR. As I said earlier, we now have handsets that are available through Boost Mobile that run on our DISH 5G network with commercial VoNR, and we view that as going pretty well. So as we look at **really the 20% markets from last year, we're going through each of those markets and doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs**. When that happens, we load that market up with handsets that work on our network. And we start marketing services with those devices, and we are basically going to be launching new markets every -- sometimes every week.

        *     *     *

And we're doing quite a bit of work to prepare our indirect distribution to market and provide those devices to our customers. And you'll see us really picking up speed there as we do that throughout the year. *And really by this time next year, we'd expect to have commercial VoNR available throughout the 70% footprint, as we've said earlier*.

188.    The analyst reports published on February 23, 2023 only reflected a small portion of the information that was discussed during the February 2023 Earnings Call. It was not until the following day, February 24, 2023, that analysts were able to digest that information and J.P. Morgan published a report explaining that DISH had not made significant progress in driving revenues from retail, wholesale, or enterprise. The J.P. Morgan report also explained that DISH's voice solution could not be implemented until the Company first densified and optimized its network and revised its estimates to account for a much slower ramp than previously assumed:

> *Dish has not made significant progress in moving subscribers on to its network or driving wholesale revenue from enterprise private networks*. The company has 30m pops covered for Boost Infinite across 12 markets and is working to get more devices on the network from Motorola and Samsung and eventually Apple. *While the company has engineered a 5G voice solution, the network needs to be optimized and dense enough to carry the voice traffic, which will typically run six months after data service is available*.
>
> ***
>
> We maintain our Neutral rating but *lower our Dec 2023 price target to $18*.
>
> ***
>
> The wireless wholesale business is the highest margin opportunity, *but the effort continues to lack any significant momentum*, and we reduce our wholesale revenue estimate to $171m for 2023, *a much slower ramp than before, and assume it takes much longer for that business to scale*.

189.    Upon the news, DISH's stock price declined from a closing price of $13.76 per share on February 23, 2023 to a closing price of $13.27 on February 24, 2023 on unusually heavy

trading volume. DISH's stock price continued to decline over the next month, closing at just $8.75

per share on March 24, 2023, a 34% decline from one month earlier.

## VII.    POST-CLASS PERIOD EVENTS

190.    Events after the Class Period further confirm that DISH's 5G network is still not

sufficiently developed to be commercially viable, even for retail use. In a registration statement,

dated October 3, 2023, filed with the SEC on Form S-4 by EchoStar, EchoStar disclosed details of

the current state of DISH's wireless business:

> DISH Network is currently operating its Retail Wireless business unit primarily as
> a mobile virtual network operator ("MVNO") as it continues its 5G Network
> Deployment and commercialization of its 5G Network, as defined below. ***As an
> MVNO, today DISH Network depends on T-Mobile and AT&T to provide it with
> network services*** under the amended Master Network Services Agreement
> ("MNSA") and Network Services Agreement (the "NSA"), respectively. ***Under the
> NSA, DISH Network expects AT&T will become its primary network services
> provider***.

191.    The October 3, 2023 registration statement also explained: "DISH Network ***plans

to commercialize*** its Wireless spectrum licenses ***through the completion*** of the nation's first

cloud-native, Open Radio Access Network based 5G network[.]"

192.    In other words, as of October 3, 2023, DISH was still operating its retail wireless

brands, like Boost, primarily as an MVNO—meaning DISH was still using T-Mobile and AT&T's

networks to provide service to DISH's own customers because the 5G network was still not

developed enough transfer those existing retail customers onto DISH's network, and DISH is still

merely *planning to commercialize* its wireless spectrum licenses by *completing* its still unfinished

network.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

193.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true facts regarding DISH, and their control over and/or receipt and/or modification of DISH's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

### A. Defendants' Admissions That They Abandoned Any Efforts to Build a Functioning 5G Network to, Instead, Focus on Meeting the FCC Milestones Creates a Strong Inference of Scienter

194.    Defendants made startling admissions at the end of, and after the Class Period which, alone, create a strong inference of scienter.

195.    Defendants secretly abandoned any effort to build a functioning network so that they could focus on meeting the FCC milestone of 20% coverage by June 2022. Defendants also covertly took funding away from the enterprise product development teams and paused efforts to develop or integrate voice functionality into the 5G network. Yet, throughout the Class Period, Defendants concealed these facts from investors and, instead, misrepresented that DISH had completed "successful field validation" of the O-RAN network, was "just deploying it now," would launch service for its "first major cities by the end of the third quarter [2021]," was "working with customers and prospective customers on private networks," and had "really positive traction" in the enterprise market with revenues that "will grow as we go into [2022.]"

196.    Defendants were later forced to admit during the November 2021 Call that DISH
had actually been experiencing ongoing and continuous integration issues throughout 2021 that
caused significant delays in the launch of the Las Vegas site. Then, on the February 2023 Call,
Defendants further admitted that, consistent with the CW accounts, DISH had abandoned any
attempt to build a functioning network that could be commercialized and scaled as required by
enterprise customers. Rather, DISH was only *then*, in early 2023, beginning to put VoNR in the
first 20% of sites it had built back in June 2022 to meet the FCC milestone, stating: "[s]o as we
look at *really the 20% markets from last year, we're going through each of those markets and
doing the optimization and the fill-in so that we can achieve commercial VoNR KPIs*. When that
happens, we load that market up with handsets that work on our network." Indeed, Defendants
admitted that DISH "*now* we -- *we're starting* to roll that out as fast as we can, but we've kind of
got over those hurdles. *But that's what we need for commercial launch*."

197.    Thus, Defendants stated, DISH would not have any enterprise customers or
revenues until at least 2024. As Swieringa stated in the February 2023 Call in response to an analyst
question regarding the reason(s) for "slower-than-expected pace of 5G adoption among
enterprises," DISH had not even built its 5G network to scale—a key requirement for enterprise
customers—by 2023:

> We're really busy having really good discussions with a lot of big companies, and
> that's what we expect to be doing. And I think we said earlier, *we'd be seeing some
> of that business start to pick up next year*. But we're not confused. *Job 1 is getting
> our 5G network up and operating at scale*. And there's a lot of focus there, and I
> can take the eye off the ball looking at other things that -- it's really about
> sequencing. *We need to get the network up and running first, and then there's
> lots of opportunities in the pipeline we can take advantage of.*

198.    Defendant Mayo made a similar admission, reported by Sue Marek *of Fierce Wireless* on May 10, 2023. According to that article, Defendant Mayo revealed DISH would only restart its efforts to launch VoNR "***once the Company meets the FCC's buildout requirement*** of providing coverage to 70% of the U.S. population by June 14, 2023."

199.    Thus, Defendants' admissions that they had chosen to build out a network to meet FCC population coverage deadlines while not taking any actions to make the network functional, including building and implementing VoNR and ensuring network integration was possible, support a strong inference of scienter.

**B.  Defendants Admitted That the Platforms and Software Necessary to Integrate the Network Were Not Ready During the Class Period and That They Knew from the Outset That Certain Vendors Lacked the Requisite R&D Capacity**

200.    In an interview posted to YouTube on June 21, 2022, Defendant Rouanne expressly admitted that (a) Amazon's AWS cloud services (engaged back in April 2021) were still not yet ready to support DISH's 5G network; (b) critical software developers had not yet developed the software needed to integrate the network; and (c) Defendants had recklessly assumed vendors like Mavenir would be able to integrate the network, but quickly learned in early 2021 of integration problems and knew that those vendors were not capable of integrating the network.

201.    Defendant Rouanne explained that, as late as June 2022, AWS was still upgrading to make its services ready for DISH to use, stating: "When we started we looked at all the clouds, and when we started with AWS, they were not telco ready. Especially when it comes to networking… and ***they are upgrading that platform for us to be telco ready and telco grade***." Defendant Rouanne further stated that it "would have been easier for us" if Amazon had been ready when DISH first began constructing its network.

202.    Furthermore, Defendant Mayo made the startling admission that DISH executives had known from the beginning that Mavenir and the other vendors were unable to integrate the network. In a speech at the 2023 CTIA 5G Summit on May 17, 2023, Defendant Mayo admitted that DISH's difficulties integrating the components from disparate vendors into a unified, functional network were occurring from the very beginning and that DISH leadership had recognized those issues immediately:

> I'd say the biggest thing that we learned was **when we first started this** we thought the vendors all kind of worked together. **Quickly did we learn that was not going to happen**, and we actually became the system integrator.

203.    Defendants' admissions that they knew from the beginning of the Class Period that the vendors they hired were incapable of developing software that could integrate the 5G network supports a strong inference of scienter.

### C. Defendants Attended Regular Meetings Discussing Integration Issues and Resulting Delays in the Network Build and Timeline for Commercialization

204.    Defendants had knowledge of the true status of DISH's 5G network design and integration progress because, as former DISH employees recall, the Individual Defendants regularly attended meetings at which network integration issues were discussed.

205.    CW1, CW2 and CW3 stated that, during at least 2021 and 2022, Defendants and all VP-level-and-above DISH Wireless employees gathered at five-hour 5G Summit meetings where critical issues, including network integration problems, were discussed.

206.    CW1 also attended several meetings with Defendant Ergen soon after the Boost acquisition at which the budget for the 5G buildout was discussed. In these meetings, Defendant Ergen made it clear that he did not want to spend money on national marketing.

207.    CW2 also attended weekly meetings with Defendant Bye during CW2's tenure at DISH where the state of DISH's enterprise products and decision to cut the enterprise budget were discussed. Thus, Defendant Bye would have been aware that DISH had no viable enterprise products throughout the Class Period.

208.    In 2021 and 2022, while employed at one of DISH's primary software vendors, CW3 attended daily and weekly Software Development meetings and weekly and bi-weekly Vendor meetings which the Individual Defendants would frequently attend. When the Individual Defendants were not present, their delegates would attend and report back to the Individual Defendants about the issues discussed in the meetings. When the Individual Defendants did attend these meetings, they asked direct and detailed questions about the challenges and defects that were preventing progress on the 5G network. During these meetings, the Individual Defendants would demand to know what was preventing progress on the development of the network.

209.    During CW3's tenure at one of DISH's primary software vendors, CW3 recalled there was "really active conversation" going on with the Individual Defendants about the software for the 5G network, both on the radio side and the core side and that the Individual Defendants were sometimes in daily conversation with CW3 and other software vendor employees about defects and issues with the software. CW3 also recalled that there was no discussion of launching a consumer service in 2021 because DISH was too far behind in developing and testing software necessary to integrate the network and that the Individual Defendants were solely focused on resolving those issues.

210.    Throughout CW3's employment at one of DISH's primary software vendors and at DISH, CW3 attended "Daily Defect Meetings," which the Individual Defendants often attended,

wherein software and network integration issues were discussed. CW3 recalls that the Individual Defendants would regularly shout at vendors during Daily Defect Meetings about the number of defects in their products and resulting delays in the progress of the 5G network. CW3 stated that slide decks presented at these meetings regularly included slides discussing the major defects each vendor was experiencing with software integration for the 5G network. DISH would specifically tell vendors that they knew there would be issues and to "just be open and show them everything." CW3 stated that these meetings were very well-attended and that they would wait to begin these meetings until attendees were present, including Defendants Ergen, Mayo, Rouanne, and Bye.

211.    In August 2022, CW3 began attending the 5G Summit meetings with the Individual Defendants. CW3 recalled the Individual Defendants discussing how far behind the DISH was in developing the software needed to integrate the network. CW3 recalled Defendant Mayo and Bye focusing on network architecture, the solutions that needed to be deployed, timelines, challenges, and integration issues. CW3 recalled that questions coming from Bye during these calls revolved around why certain things are working, why certain things are not working, and defects.

212.    Defendants' attendance at, and active participation in, regularly held meetings discussing the status of the 5G network and difficulties integrating the network creates a strong inference of their scienter.

### D. Defendants Actively Tracked Relevant Metrics in Their Internal Communications System

213.    CW3, who worked at DISH's main, Littleton location, stated that during 2021, 2022, and 2023, outside Defendant Rouanne's office at DISH's Littleton location, there was a 55-inch screen displaying a histogram chart of the defects in each vendor's software, products, and the network that was updated in real-time by a software called Jira. CW3 confirmed that Rouanne,

Bye, Mayo, and Ergen all passed by the screens regularly. CW3 also recalled that if a vendor at a meeting seemed unaware of a defect, the Individual Defendants would send them screenshots of the defect chart. The chart could also be accessed via Jira, and anybody at DISH would be granted access. Indeed, Defendant Ergen, himself, acknowledged reviewing the defect tickets to address network integration issues, stating the following in the November 2021 Call: "And then ***every day, we go through the tickets of the stuff that doesn't work***, and there's stuff that doesn't work, and then we go fix that."

214. That Defendants had access to and reviewed data evidencing significant network integration issues "every day" supports a strong inference of scienter.

### E. Defendant Ergen Closely Controlled All Aspects of the 5G Network Deployment and Regularly Visited the Physical Buildout Sites to Apprise Himself of the Progress and Issues

215. By his own admission, Defendant Ergen was closely involved in all aspects of the 5G network design and deployment. In the February 2022 Call, for example, Defendant Ergen touted: "I was in – I've been – I go to Las Vegas every month, so I can see kind of the progress, but I was there yesterday." Similarly, in disclosing that DISH would not be ready to launch the Las Vegas network by the targeted date, Defendant Ergen took personal responsibility for the miss, stating: "First of all, we're six months behind where we thought we'd be. It's my fault."

216. Indeed, Ergen's primary focus throughout the Class Period was on DISH Wireless. In a December 2017 Press Release, DISH announced that Defendant Ergen would relinquish his position as CEO to "devote more attention to the company's emerging wireless business." Similarly, Defendant Ergen's own LinkedIn profile emphasizes his focus on DISH's wireless and 5G projects, stating:

> In 1980 I co-founded DISH, formerly EchoStar Communications Corporation, and currently act as Chairman of the Board of Directors for both DISH and EchoStar. Today, I oversee DISH's long-term business development and #strategy as well as the company's emerging #wireless division. **Most recently, I am focused on our opportunity in wireless and #5G.**[2]

217.    Defendant Ergen's hands-on involvement in DISH's 5G design and buildout, as supported by his own admissions and site visits, strongly evidences his scienter.

**F.    The 5G Network Deployment Was DISH's Core Operation Throughout the Class Period, and Gaining Enterprise Customers Was the Core Component of Monetizing the 5G Network**

218.    As the Company was forced to transition away from its declining Pay-TV business, DISH put all its eggs into the 5G basket, making DISH's wireless business its core operation. DISH's Pay-TV business—which had been the core of its operations in the past—was regarded both internally and externally as simply a means of financing the core, 5G network buildout.

219.    Indeed, analysts recognized that wireless was DISH's core business. In a report dated February 22, 2021, Citigroup analysts observed that "**the market remains focused on learning more details for the multi-year financing plan for the wireless network**," and noted erosion in the Pay-TV business. Likewise, in an April 21, 2021 report, Citigroup analysts observed that "**[t]he investment case for DISH has increasingly pivoted to a wireless DCF**, and we will continue to look for broader disclosures by DISH on its future customer revenue opportunities, anticipated cost structure, multi-year investment requirements to establish a national 5G network."

220.    Similarly, in a February 23, 2021 report, Raymond James analysts reiterated a Strong Buy rating for DISH stock based, at bottom, on DISH's 5G network: "**Bottom line: we believe DISH presents an attractive option on the 5G future, funded significantly by the cash**

---

[2] https://www.linkedin.com/in/charlieergen/ (visited 10/20/2023).

cow Pay-TV business, with 4G Wireless Retail, and in the future, the potential for a large 5G
Enterprise business.** The report viewed DISH's Pay-TV business as "obviously in decline," and
merely a source of cash for the development of DISH's 5G network. An April 29, 2021 Raymond
James report reiterated the point and emphasized the centrality of the enterprise aspect of DISH's
wireless business, stating "**Bottom line: we believe DISH presents a very attractive option on
the 5G future, funded significantly by the cash cow Pay-TV business, with 4G wireless retail,
and in the future, the potential for a large Amazoning 5G Wholesale/Enterprise business.**"
Similarly, in a November 4, 2021 report, Morningstar analysts recognized that "**DISH Network's
massive bet on wireless spectrum overshadows its declining cash cow satellite television
business.**"

221.    Moreover, Defendant Ergen's own hyperfocus on the 5G project throughout the
Class Period also evidences the core nature of the wireless business.

222.    The core element of DISH's wireless business, meanwhile, was developing an
enterprise customer base, as Defendants themselves acknowledged and analysts recognized. For
example, in a May 7, 2020 earnings call, Defendant Ergen stated that DISH did not originally plan
the 5G network with the expectation of servicing the retail market and described retail customers
as "a cherry on top that we didn't think we were going to get[.]" Similarly, in the November 2021
Call, a BofA securities analyst asked about DISH's go-to-market strategy, and particularly whether
the Company intended to focus primarily on retail or on enterprise customers. In response,
Defendant Ergen acknowledged steep competition in the retail market and emphasized that
Defendants saw opportunity primarily in the enterprise sector, as below:

> **I mean, so on the -- as a fourth player, we're not going to dominate the retail
> handset business**. And I know a lot of analysts kind of look at us as this retail

handset, but we'll get our fair share of that business. And that will be a very profitable business for us. … **And particularly on the enterprise side, where that's kind of a jump ball.** In other words, I think all the carriers are going to do well in enterprise. It's a new market segment. … **We're well positioned for that because our opinion is that you need to be cloud-based and you need to be automated to do it, to slice your network. So we're going to have an advantage there.** But the incumbents have an advantage of incumbency and brand recognition and that kind of stuff. So I think everybody is going to do pretty well. **But I feel like that's a place where we can get more market share than we will in the handset business.**

223.    The primacy of the enterprise sector to DISH's wireless business remained steady throughout the Class Period. On the May 2022 Analyst Day Call, Defendant Bye expressly acknowledged the importance of the sector, stating: "**I do believe that the enterprise market and the revenue for DISH is going to be much bigger than the consumer opportunity**. … **And we believe, especially with the platform that Marc talked about, is that we can capture more than our fair share of that market, because it is a much, much bigger market** than selling smartphones and just net add our postpaid plans." Defendant Bye also remarked during that same call that "we're starting to grow that [enterprise] revenue this year" and that DISH's enterprise revenues would be "scaling in 2023 and clearly picking up momentum as we go into '24 and beyond." Defendant Bye continued: "**If I look at the size of the opportunity, I said it's about $30 billion in 2025 for the private 5G as a service**."

224.    The critical importance of the wireless business to DISH's operations, as acknowledged by both Defendants and analysts, bolsters the inference of Defendants' scienter.

### G. Defendants Had Motive to Misrepresent DISH's Wireless Network Progress to Meet the FCC Milestone Deadlines

225.    Defendants were motivated to deploy a network that was not functional so that they could meet the FCC 20% milestone and avoid paying massive financial penalties. Defendants

knew that DISH's novel, one of a kind Open-RAN 5G network was a massive undertaking, that DISH's chosen vendors had no experience building or integrating such a network and that DISH had not conducted any meaningful vendor or network validations. Defendants also admittedly knew from the outset that its vendors were unable to integrate the network.

226.    Given this uncertainty and DISH's insufficient capital to build an actual functioning network, Defendants threw in the towel for the time being to focus exclusively on meeting the June 2022 FCC milestone of 20% coverage, which did not require DISH's network to be functional at that time, so DISH could assure it would not incur the massive financial penalties of approximately $200 million that would be levied if the deadline was missed.

227.    Defendants' motive contributes to the overall inference of scienter.

## IX.    LOSS CAUSATION

228.    During the Class Period, as detailed herein, Defendants materially misled the investing public by issuing untrue statements of material fact and omitting to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, thereby inflating the price of DISH common stock. The specific statements and omissions enumerated herein were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about DISH's business, operations, and prospects.

229.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about the progress and capability of DISH's 5G network and enterprise customer engagement and revenue. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.

230.    By not disclosing the adverse facts detailed herein, Defendants presented a misleading picture of DISH's business, risks, and current and future financial prospects. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of DISH's common stock declined significantly as the prior, artificial inflation came out of the prices of the common stock as follows:

**A. On November 4, 2021 DISH Discloses Software and Network Integration Problems**

231.    On November 4, 2021, Defendants revealed during the November 2021 Call that, contrary to Defendants' prior statements that, among others, DISH had purportedly "completed a successful field validation, utilizing our fully virtualized standalone 5G core network and the industry's first O-RAN compliant radio" and was "deploying it now" and that the Las Vegas site would have a "full-fledged product" ready for commercialization at the start of 2022, DISH had actually been experiencing continuing delays at the Las Vegas site because of undisclosed software development and network integration issues. In the November 2021 Call, Defendant Mayo stated: "[w]e were a little delayed as a consequence of frankly, the Vegas network was…just getting the radio software and the core network software to work together and be reliable."  Thus, the Las Vegas site would not be "ready for prime time at the first of the year," as previously represented.

232.    Upon the news, DISH's stock price declined from $43.09 per share on November 3, 2021 to $37.08 per share on November 4, 2021 on heavy trading volume of over 11 million shares, as compared to the previous day of 2.9 million shares.

233.    Analysts expressed concerns, noting DISH's stock price decline had everything to do with the Company's lack of progress on, and capabilities of, the wireless buildout at the Las Vegas site. As one Barclays analyst stated in a November 5, 2021 report entitled "Why did DISH stock sell off?" reporting on DISH's Q3 2021 results:

> [W]e don't think earnings had much to do with the selloff. The simplest explanation, in our view, was likely positioning ahead of the call as some may have expected details around the company's test launch in Las Vegas… the bigger issue with DISH is that it is a story stock with very little by way of milestones beyond small data points around network build. In that context, management's commentary during the call may have introduced some degree of pessimism around the pace of network build.

234.    Likewise, a November 4, 2021 Morningstar analyst report explained that DISH's stock price decline was a direct result of DISH's inability "to meet network buildout requirements":

> DISH Network apparently raised some eyebrows with comments about its planned network launch in Las Vegas and its ability to meet network buildout requirements in 2022, sending the stock down sharply.

235.    Morningstar further noted that DISH's integration issues as the main reason for the delay that caused the Company's stock price to decline:

> Last quarter, DISH announced that service in Las Vegas would launch by early October, with beta testing then running for 90 days before commercial launch. While the beta test is running, management indicated that it has hit some snags getting various pieces of software to work together.

**B.    On May 6, 2022, DISH Discloses Integration Issues Were Far More Expansive and Worse than Previously Represented and Enterprise Sales Are Non-Existent**

236.     On May 6, 2022, Defendants shocked the market when they revealed that, while investors expected the commercial launch in Las Vegas in early 2022, the delays they previously disclosed were going to be much longer than previously represented and, accordingly, DISH had not actually launched its 5G services until May 4, just two days before the earnings call, stating "[o]n Wednesday of this week, we commercially launched Project Genesis in Las Vegas." Moreover, DISH revealed that the Las Vegas network was still in "beta user mode" and that DISH needed to "sort of nail it there [in Las Vegas]" before DISH could then "scale it out across all the other markets."

237.     Defendant Ergen further admitted that, as a result of the integration issues, while DISH would hit the 20% FCC requirement in June 2022, "it's not going to be a robust offering. The commitment that we have to make is we have to do data. We have to do data 20% of the population in the United States, so it's not going to be a robust offering as robust as we'd like," meaning DISH was still not ready to service enterprise customers. Thus, Defendants characterized DISH's enterprise business as a "future" opportunity that, as of May 2022, DISH had not begun. Defendant Bye, for example, stated, "we think that there's significant potential with the enterprise business. And the capabilities of our network actually enable that as we go forward."

238.     Upon the news, DISH's stock price declined from $27.48 per share on May 5, 2022 to $22.22 per share on May 6, 2022 on heavy trading volume of over 13 million shares, as compared to the previous day of 4.4 million shares.

239.     Analysts expressed concerns about the negative impact the integration issues and network launch delays were having on DISH's cash flows and DISH's lack of enterprise customers. For example, according to a May 6, 2022 Barclays report:

> **Overall Take**: DISH reported result[s] that were worse than expected across the board (Figure 1). The company also turned FCF negative for the first time, on account of the wireless build and given the early stage of the build, is likely to remain negative FCF for many years to come.

240.    A May 11, 2022 Morningstar Equity report noted that Morningstar's valuation of the Company was "more conservative than management's targets" due to "very high uncertainty as its unconventional wireless network buildout progresses, with major questions around network quality and the cost to fill coverage gaps, either on its own or through agreements with AT&T and T-Mobile."

241.    A May 20, 2022 Citi report similarly stated that Citi had updated its model to "recognize DISH will need incremental funding" for its 5G network and warned that, to be competitive, DISH needed to start focusing more on enterprise and wholesale customers:

> **Implications** — While DISH remains a long-term competitive threat within the wireless category, management commentary recognizes DISH needs to take greater control of its long-term destiny with a more significant retail strategy, ***while it retains focus on future monetization opportunities from B2B, IoT, and wholesale***. The latter wholesale opportunities could provide DISH with a more efficient path to access the wireless mass market, which generates recurring service revenue of over $200B.

**C.    On May 10, 2022, DISH Further Reveals the Enterprise Opportunity Was Far More Uncertain Than Previously Disclosed**

242.    On May 10, 2022, Defendants held a rare and highly anticipated analyst day in Las Vegas, Nevada to discuss DISH's 5G network buildout and the status of the Las Vegas project. At the analyst day conference, Defendants disclosed that the state of DISH's enterprise opportunity was more uncertain than they previously let on.

243.    Acknowledging the complete lack of enterprise customers DISH had to date and that Defendants were unsure of when DISH would begin to acquire enterprise customers,

Defendant Bye pleaded with investors that "all of this being said, the pitch to close sales process within the enterprise customer is longer. It takes time." This was directly contrary to Defendants' prior assurances that DISH was on "the leading edge" of the enterprise market and was "working with customers and prospective customers on private networks" and had "really positive traction" in the enterprise market with revenues that "will grow as we go into [2022.]" Nevertheless, at the May 10 Analyst Day, Defendant Bye reassured investors that "we're starting to grow that [enterprise] revenue this year" and that DISH's enterprise revenues would be "scaling into '23, and then picking up momentum into '24 and then '25."

244.    On the news, DISH's stock price declined $4.29 per share, or 19.7%, from a close of $21.75 on May 10, 2022 to a close of $17.46 on May 11, 2022 on heavy trading volume of 18.69 million shares, compared with the previous day's volume of 7.35 million shares.

245.    Analysts were disappointed in the continued lack of transparency from DISH and the uncertainty as to the 5G network capabilities.

246.    In a May 11, 2022 report entitled "DISH Network Provided Little Detail at Its Analyst Day, Likely Because Much Remains Unknown," Morningstar analysts observed that "DISH Network provided few new details at its May 10 analyst day" and that "[t]he firm still faces very high uncertainty as its unconventional wireless network buildout progresses, with major questions around network quality and the cost to fill coverage gaps."

**D. On February 23, 2023, DISH Discloses that It Had Been Unable to Scale or Commercialize Its 5G Network and, Thus Still Had No Enterprise or Wholesale Customers**

247.    During the February 2023 Call, Defendants revealed for the first time that DISH had paused efforts to develop and integrate VoNR and, thus, DISH would not have any enterprise

or wholesale customers until at least 2024, or at least one more year; that DISH had only began integrating VoNR at the sites it had set up last June 2022 which accounted for 20% coverage; and that DISH could not market to enterprise customers until it had achieved VoNR at 70% of sites.

248.    Analysts expressed concerns during the February 2023 Call about Defendant Bye stepping down as DISH's Head of Enterprise, prior to DISH obtaining any real enterprise customers. In response to a follow-on question about when investors could finally expect to see the enterprise and wholesale business going, Defendant Ergen revealed that, contrary to Defendants' prior statements, it would now be another whole year before DISH expected to see revenue from enterprise.

249.    For example, in the February 2023 Call, analyst Michael Rollins asked about the expected timeline to sign "large" deals and whether this would require "certain commercial milestones that [DISH] need[ed] to reach potentially different than what [DISH] outlined on the retail side[.]" In response, Defendant Ergen explained that the Company would need to scale the network—which it was now targeting to achieve by the end of the year at the earliest—and then optimize it, before DISH would be positioned to acquire customers outside of retail:

> **[W]e'd have to have scale in the network, and we have -- two things have to happen. We have to be off TSA from T-Mobile[.] [A]gain, our focus on for the first half of the year by end of June. And the second one, we have to have scale, which, again, we're focused on by the end of this year.** Then I think we have a really neat platform for people who might be interested from a wholesale perspective, but that's very similar to what the enterprise opportunity is as well. **And then on the second -- I think that once we hit 70%, that, that 1,000 a month will decline. In other words, what -- at that point, there's -- I think Dave's focus -- I shouldn't talk for him, but since I'm talking, his focus will be to optimize the network within the markets that we are [in].**

250.    The analyst reports published on February 23, 2023 only reflected a small portion of the information that was discussed during the February 2023 Earnings Call. It was not until the

following day, February 24, 2023, that analysts were able to digest that information. After having

an opportunity to digest the information, analysts understood these disclosures to mean that, even

if the Company met its technical FCC build deadlines, it would be a long time before the Company

achieved a functional network that would enable enterprise commercialization. For example, in a

February 24, 2023 report, JP Morgan analysts noted:

> **Dish has not made significant progress in moving subscribers on to its network or driving wholesale revenue from enterprise private networks**. The company has 30m pops covered for Boost Infinite across 12 markets and is working to get more devices on the network from Motorola and Samsung and eventually Apple. **While the company has engineered a 5G voice solution, the network needs to be optimized and dense enough to carry the voice traffic, which will typically run six months after data service is available**.
>
> ***
>
> **The wireless wholesale business is the highest margin opportunity, but the effort continues to lack any significant momentum, and we reduce our wholesale revenue estimate to $171m for 2023, a much slower ramp than before, and assume it takes much longer for that business to scale.**

251.    After digesting the disappointing news from the February 2023 Call, in a February

24, 2023 report, RBC Capital Markets analysts slashed their price target for DISH stock from $20

to $15 and stated: "We are incrementally more cautious on DISH as the opportunity with wireless

across both enterprise and retail postpaid seems to perennially get pushed out and less clear. While

management had previously laid out expectations for P5GaaS revenue to scale in 2023 and gain

momentum in 2024/25, it now expects "real" revenue to kick in closer to 2024."

252.    Upon the news, DISH's stock price declined from $13.76 per share on February 23,

2023 to $12.20 per share on February 27, 2023 on heavy trading volume.

## X.    CLASS ALLEGATIONS

253.    Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired DISH Class A common stock between February 22, 2021 and February 22, 2023, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are DISH and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

254.    Because DISH had approximately 246.7 million shares of common stock in the float, which actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by DISH or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

255.    Plaintiffs' claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel who are experienced in class action and securities litigation.

256.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

- Whether Defendants violated the federal securities laws as alleged herein;

- Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about DISH's business and operations;

- Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period; and

- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

257.    A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI.    PRESUMPTION OF RELIANCE

258.    Plaintiffs are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for DISH's common stock was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- DISH's common stock was actively traded on the NASDAQ;

- The market price of DISH common stock reacted promptly to the dissemination of public information regarding the Company;

- DISH's stock was followed by several financial analysts, including those cited in this Complaint;

- The average weekly trading volume for DISH stock during the Class Period was approximately ten million shares;

- As a regulated issuer, DISH filed with the SEC periodic public reports during the Class Period;

- DISH regularly communicated with public investors via established market communication mechanisms; and

- During the Class Period, DISH had over 246 million shares in the public float and the Company's market capitalization was over 20 billion.

259.    Throughout the Class Period, DISH was consistently followed by the market, including securities analysts and the media. The market relies upon DISH's financial results and management to accurately present the Company's financial results. During the Class Period, Defendants continued to pump materially false and misleading information into the marketplace regarding DISH and material facts concerning the status and capability of DISH's 5G network, as well as demand from enterprise customers. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of DISH's common stock.

260.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for DISH common stock was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

261.    Plaintiffs and other Class members justifiably relied on the integrity of the market price for the Company's common stock and were substantially damaged as a direct and proximate result of their purchases of DISH common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

262.     Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

263.     Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased DISH common stock at artificially inflated prices.

## XII.   NO STATUTORY SAFE HARBOR

264.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

265.     In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

266.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DISH who knew that the statement was false when made.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

267.     Plaintiffs reallege each allegation as if fully set forth herein.

268.     This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

269.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DISH common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire DISH common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

270.     During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for DISH common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of

conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

271.    During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of DISH's allegedly materially misleading statements, and/or their associations with DISH which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

272.    The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of DISH to members of the investing public, including Plaintiffs and the Class.

273.    As a result of the foregoing, the market price of DISH common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or

the integrity of the market price of DISH common stock during the Class Period in purchasing DISH common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

274.     Had Plaintiffs and the other members of the Class been aware that the market price of DISH common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased DISH common stock at the artificially inflated prices that they did, or at all.

275.     As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs' and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiffs and other members of the Class purchased DISH common stock in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of DISH common stock through their misconduct as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, Defendants' concealment of material facts related to DISH's business and operations, in violation of federal and state laws.

276.     By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of DISH common stock during the Class Period.

## COUNT II

## FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

277.     Plaintiffs reallege each allegation as if fully set forth herein.

278.     This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

279.     DISH and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

280.     The Individual Defendants acted as controlling persons of DISH within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause DISH to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

281.     Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of DISH, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiffs' and the Class's investments in DISH common stock within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

282.     The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their

close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

283.    The Individual Defendants knew or recklessly disregarded the fact that DISH's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

284.    By virtue of their high-level positions and their participation in and awareness of DISH's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

285.    As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

286.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of DISH common stock.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiffs as Class representatives;

2.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

3.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

4.      Granting Plaintiffs leave to amend this complaint to conform to the evidence; and

5.      Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: February 23, 2024

Respectfully submitted,
LEVI & KORSINSKY, LLP


/s/ *Shannon L. Hopkins*
Shannon L. Hopkins
Gregory M. Potrepka
David C. Jaynes
Rachel A. Berger
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: djaynes@zlk.com
Email: rberger@zlk.com

*Lead Counsel for Plaintiffs and the Class*