IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Gordon P. Gallagher

Civil Action No. 23-cv-00734-GPG-KAS

SAI NAVEEN LINGAM and
WARREN G. GREGORY, individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

DISH NETWORK CORPORATION,
CHARLES W. ERGEN,
MARC ROUANNE,
STEPHEN BYE, and
DAVE MAYO,

    Defendants.

## ORDER

Before the Court is Defendants' Motion to Dismiss The Second Amended Class Action Complaint (Motion) (D. 66). The Court GRANTS the Motion for the following reasons.

## I. BACKGROUND

This has been a securities class action in search of a fraudulent reason why the stock price of Defendant Dish Network Corporation (DISH) rose and then declined. Originally, it was filed with a theory that DISH had "overstated its operational efficiency and maintained a deficient cybersecurity and information technology infrastructure" (D. 1 at 2). After lead counsel was appointed (D. 67), the Amended Complaint abandoned that theory and shifted to asserting that the price changes were due to statements about DISH's planning and delayed launch of a cellular

1

network (D. 41).  In response to the previous motion to dismiss, Plaintiffs amended their complaint again to dismiss some prior defendants and add a third confidential witness (D. 61-1 at 1, 19).

According to the Second Amended Class Action Complaint For Violations of the Federal Securities Laws (Complaint) (D. 60), DISH undertook an "extremely risky" plan to create a wireless network "based on brand new and unproven technologies" (*id*. at 8). [1]  It did not go well.

On July 1, 2020, DISH acquired Boost Mobile (Boost) from Sprint and Sprint's 800-megahertz spectrum (D. 60 at 22).  Boost used T-Mobile's existing network to provide wireless service, but DISH intended to build its own network (*id*.)

In December 2020, DISH was able to send a text message on a small network to validate that it could perform that function (D. 60 at 27).  DISH, however, experienced significant integration issues beginning in the first quarter of 2021, in part because its plan used hardware from a variety of manufacturers (*id*. at 8).  The integration issues continued "throughout 2021 and caused massive delays that prevented DISH from launching its first planned 5G network launch in Las Vegas until more than six months after the launch date of Q3 2021 that had been disclosed to investors" (*id*. at 8).  Throughout the period, Defendants held frequent meetings to discuss and resolve the integration issues.

In response to deadlines imposed by the Federal Communications Commission (FCC) related to its acquired spectrum leases, DISH shifted strategy to focus on network area coverage (D. 60 at 22).  DISH committed that its "5G network coverage area would cover at least 20% of the U.S. population by June 14, 2022[,] and 70% by June 14, 2023" (*id*.).  DISH could have suffered hundreds of millions of dollars in cash penalties and forfeited spectrum licenses if it did

---

[1] The Court draws the operative facts as set forth in the Complaint.

not meet these deadlines (*id*. at 23). "DISH could technically meet the 2022 deadlines if the network covered 20% of the population, even if the network could not operate reliably or at all" (*id*.). "DISH did not have to verify the functionality of the network until June 2023" (*id*.). To meet these deadlines, DISH installed radios that could reach a wide area but were not yet configured and equipped to provide wireless service (*id*.).

According to Plaintiffs, "Defendants made materially false and misleading statements and omissions relating to the capabilities and progress of DISH's 5G network development and deployment, DISH's purported relationships with enterprise customers, the rate at which DISH expected to achieve enterprise revenues, and the purported demand in the enterprise segment" (D. 60 at 42).

Plaintiffs bring two claims. In Count I of the Complaint, Plaintiff asserts violations of Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b–5(b)), against all Defendants (D. 60 at 107). In Count II, Plaintiff alleges violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(b), by the individual defendants based on the primary violations alleged in Count I (D. 60 at 110).

## II. LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, the complaint must sufficiently allege facts supporting all the elements necessary to establish an

3

entitlement to relief under the legal theory proposed; however, a complaint may be dismissed because it asserts a legal theory not cognizable as a matter of law. *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007); *Golan v. Ashcroft*, 310 F. Supp. 2d 1215, 1217 (D. Colo. 2004). A claim is not plausible on its face "if [the allegations] are so general that they encompass a wide swath of conduct, much of it innocent," and the plaintiff has failed to "nudge[ the] claims across the line from conceivable to plausible." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The standard, however, remains a liberal pleading standard, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotations and citation omitted).

Though courts view allegations favorably to plaintiffs at the motion to dismiss stage, federal law creates a heavy burden on claimants alleging securities fraud. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012) ("A plaintiff suing under Section 10(b) [of the Exchange Act] bears a heavy burden at the pleading stage."). The Private Securities Litigation Reform Act of 1995 (PSLRA) imposes "specific and more stringent pleading requirements on complaints alleging securities fraud under Section 10(b)." *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1139 (D. Colo. 2011). With respect to claims under the Exchange Act based on a material misleading statement or omission, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the

4

statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). To determine whether a misleading statement or omission is alleged, courts evaluate whether the facts alleged, "taken as a whole," . . . support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099 (10th Cir. 2003), *as amended on denial of reh'g* (Aug. 29, 2003). In applying this standard, the Tenth Circuit has directed courts to evaluate:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Id.* (citation omitted). After considering these enumerated factors and "measuring the nature of the facts alleged against these indicia, [if] a reasonable person would believe that the defendant's statements were false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *Id.*

A plaintiff must also "state with particularity facts giving rise to a "*strong*" inference that the defendants acted with scienter. *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1216 (10th Cir. 2023). "An inference of scienter is considered 'strong' only if proof of the allegations would lead a reasonable factfinder to determine that an inference of fraudulent intent or recklessness is at least as compelling as an innocent inference." *Id.* "Conduct is considered reckless only if the defendants (1) acted in 'an extreme departure from the standards of ordinary care' and (2) presented 'a danger of misleading buyers or

5

sellers' that was [ ] known to the defendants or [ ] so obvious that the defendants must have been aware of the danger." *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016) (quoting *In re Level 3*, 667 F.3d at 1343 n.12).

### III. ANALYSIS

To plead a claim for violations of Section 10(b), a plaintiff must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ave. Capital Mgmt. II, L.P. v. Schaden*, 131 F.Supp.3d 1118 (D. Colo. 2015) (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460-61 (2013)).  Rule 10b–5(b) makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

Defendants attack Plaintiffs' allegations in Count I at two elements: (1) material misrepresentation or omission and (2) scienter (D. 66 at 9).  Defendants assert that the alleged misstatements are not actionable because they are merely optimistic forward-looking statements and that there is no evidence that Defendants made the misrepresentations knowingly or recklessly as required (*id*. at 26–37).  The Court generally agrees.

Plaintiffs allege nineteen material misleading statements that it divides into two categories: (A) those concerning network integration and launch and (B) those concerning DISH's construction of network infrastructure for enterprise customers (D. 67 at 18–28).  Plaintiffs do not emphasize any particular statement, and none of them stand out as particularly important or

6

definitive. As part of their Response, Plaintiffs present each statement in a chart with all of the allegations that they contend render it misleading and all of the allegations they contend show it was made with the requisite scienter (D. 67-1). Using the allegations in the Complaint cited in this chart, the Court will focus its analysis on one statement representing each category that appears to have the best chance of meeting the required standards.

### A. Statements Concerning Network Integration and Launch

Plaintiffs allege that DISH's Q1 2021 Form 10-Q filed April 29, 2021, contains the following statement:

> During December 2020, we completed a successful field validation, utilizing our fully-virtualized standalone 5G core network and the industry's first O-RAN compliant radio. We began construction of our first major market, Las Vegas, Nevada, during the second quarter of 2021. We anticipate service for this market to begin by the end of the third quarter of 2021.

Plaintiff asserts that this statement was "false and misleading when made because DISH had not 'completed a successful field validation' utilizing a 'fully virtualized standalone 5G core network' but had only sent a single text message which was not sufficient by industry standards to validate the 5G network because it did not validate data, voice, or any other essential element of network functionality and because DISH and its vendors had not yet created the software and other critical technologies needed to integrate the network" (D. 67-1 at 6).

This argument is perplexing because Plaintiffs do not appear to dispute what the statement actually says: that DISH's network was a "fully-virtualized standalone 5G core network" (despite its limited functions at the time), that the test was performed using a "industry's first O-RAN compliant radio," or that the test was a successful field validation of a network functionality, namely, text messaging (*see* D. 67 at 18). *Hampton v. root9B Techs.*, Inc., 897 F.3d 1291, 1300

7

(10th Cir. 2018) (analyzing the specific wording of challenged statements to determine falsity). Plaintiffs' arguments that the validation only involved sending a single text message, was not sufficient for industry standards for validating a whole network, and did not validate every essential aspect are perplexing because the statement is not to the contrary. Despite citing numerous Complaint paragraphs about why this statement is false (D. 67-1 at 6–7), none of the allegations indicate that an investor would have understood the statement to mean something it did not say or imply the same by omission of additional information. None of these allegations dispute the facts actually stated, namely, that DISH had a successful field validation (of something) using its network (that has certain characteristics).

Similarly, with respect to scienter on this statement, Plaintiffs point to alleged facts suggesting indirectly that Defendants were aware of the limited nature of validation test, such as the frequent meetings (D. 67 at 29–33; D. 67-1 at 6–7). But even assuming that Defendants knew the limited nature of the validation does not help Plaintiffs. None of the cited allegations support a conclusion that Defendants knew or were reckless about whether saying they had carried out a "successful field validation" would deceive investors into believing that they had accomplished what Plaintiffs assert would be the misleading takeaway, i.e., that Defendants had validated DISH's 5G network according to industry standards for all essential elements of network functionality including data and voice. Indeed, it is hard to see how any investor could have taken such as expansive understanding of the validation when the next sentence states that DISH just "began construction of our first major market," reflecting the nascent stage of DISH's network operations. Had Defendants wanted to deceive investors about their progress, it seems unlikely that they would have immediately reminded them DISH was just starting construction in one city.

8

Plaintiffs also assert that this statement is false because "in April 2021, DISH could not reasonably expect commercial launch in any cities by 3Q or 4Q 2021" due to the integration issues (D. 67-1 at 6). But there is nothing to suggest that this is anything more than hindsight. 15 U.S.C. § 78u-5; *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) ("securities claims will not be based on 'fraud by hindsight'"). Plaintiffs point to various allegations showing that DISH was aware by that point of significant integration issues and that much additional work would be needed to launch by the end of the year (D. 67 at 20; D. 67-1 at 6–7). There is, however, nothing to indicate that DISH was not planning to accomplish those tasks on that timeline. *City of Philadelphia v. Fleming Co., Inc.*, 264 F.3d 1245, 1269 (10th Cir. 2001) (finding generic allegations a shared business motive related to company financial success do not support scienter). Plaintiffs allege that their confidential witnesses sat in on the meetings discussing the integration issues and network construction, but there are no allegations that, for example, Defendants had already pushed back the timeline to something different than what the Q1 2021 Form 10-Q stated. *In re Level 3 Commc'ns*, 667 F.3d at 1347 ("hindsight review . . . contributes nothing to an inference of scienter"). In this light, it is apparent that Defendants' launch prediction was an overly optimistic forward-looking statement, as they argue. *Heiner v. Watford*, No. 20-CV-02652-NYW-STV, 2023 WL 2824288, at *10 (D. Colo. Mar. 27, 2023) (dismissing securities fraud claims where "Plaintiffs fail to meaningfully point to any factual allegations . . . that would permit a factfinder to conclude that the statement was not an opinion, or that it misrepresented [the defendants'] belief based on the underlying facts"). Further, even if it were actionable, there is

nothing supporting a strong inference that Defendants had the requisite scienter.[2] Despite a wealth of allegations about how bad the integration and construction issues turned out to be, Plaintiffs present nothing showing that Defendants knew by April 29, 2021, that it would turn out so badly (D. 67 at 30–33 (generally discussing meetings "throughout 2021 and 2022," site visits discussed on a February 2022 call, and meeting slides dating from "around Q2 2022"). *See Smallen v. The W. Union Co.*, 950 F.3d 1297, 1309 (10th Cir. 2020) ("Plaintiff must provide particularized allegations showing the Individual Defendants . . . knew of or recklessly disregarded the falsity of the challenged statements at the time they made the statements").

### B. Statements Concerning DISH's Construction of Network Infrastructure for Enterprise Customers

Plaintiffs allege that on May 10, 2022, Defendant Stephen Bye made the following statement during DISH's Analyst Day:

> So the best way to think about it is we're starting to grow that revenue this year. We already got customers, we're growing that revenue this year. Think of it as sort of the private 5G network space. We see that scaling in 2023 and clearly picking up momentum as we go into '24 and beyond. But as I said, there's a long sales cycle when you're dealing with enterprise. So it's a ramp that's going to take some time to kind of ramp up. The way to look at the sort of revenue as it builds up is really going to be about private 5G networks. And then over time, it becomes far more transactional as enterprise customers take advantage of the API gateway and the transactions that are available through that gateway.
>
> I'm not going to give you a year-by-year forecast of what that looks like. But think of it as early revenue this year, scaling into '23, and then picking up momentum into '24 and then '25. If I look at the size of the opportunity, I said it's about $30 billion in 2025 for the

---

[2] Defendants also cite and discuss numerous other statements that provide context for the challenged statements and indicate to investors that the network construction plan was risky and would likely be subject to setbacks (D. 66 at 14–15). These statements also suggest that Defendants statements would not have been taken as concrete assurances about future launch dates and that Defendants did not have a scienter consistent with deceiving investors about the risks involved with project delays. *See* 15 U.S.C. § 78u-5(e).

> private 5G as a service. And what I really was pointing out with the 20% is that's where we see our long-term sustainable market share over time. So think of that as beyond 2025 is where we think our sustainable competitive market share position will be. I actually I think it will be a little higher than 20%, given the advantages that we have today, but I think it's going to scale up over time.
>
> So I won't give you specific numbers through those years, but you'll see it picking up through '23, '24 and clearly into '25, as we get more momentum into '25.

Plaintiffs assert that this statement was "materially false and misleading when made because Defendants were focusing on developing the bare infrastructure to meet the FCC requirements at the expense of the other elements that were necessary to make the network functional and relevant to enterprise customers and, therefore, were not seeing growth, momentum, or revenue from enterprise customers" (D. 67-1 at 22).

This argument appears contrary to Plaintiffs allegations about their confidential witness 2's (CW2) explanations. According to CW2, DISH had enterprise customers and revenue in 2021 and 2022 from spectrum leases, which is entirely consistent with Rye's statement (D. 60 at 39). None of the allegations that Plaintiffs cite are contrary to Bye's statements that DISH had enterprise customers, its revenue was growing, and it anticipated further growth in the "private 5G network space" for enterprise customers (*see* D. 67-1 at 22–23). And even if, for whatever unstated reason such as omission, Bye would be understood by investors to be speaking about future plans to service enterprise customers through DISH's network,[3] there are no allegations that show DISH was not planning to be able to do so in the referenced years even though it was incapable of doing

---

[3] Although it is unclear from context, the reference to an ability to "take advantage of the API gateway and the transactions that are available through that gateway" may be a feature that would only available through the DISH network and not by leasing spectrum. Regardless, this is only suggested as an option that would be available "over time," i.e., in the future.

11

so in May 2022.[4]  Plaintiffs cited allegations do not even suggest that this optimistic forward-looking statement have turned out to be false in hindsight, much less that Bye knew of or was reckless about its falsity (D. 67-1 at 22–23).  *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1249 (10th Cir. 2022) ("positive generalizations about a company's performance will typically not give rise to liability under section 10(b); rather, to be actionable, the statements must be grounded in concrete metrics or other objectively verifiable data").

With regard to these two specifically analyzed statements and the remainder of the alleged misrepresentations, Plaintiffs' allegations simply do not support a conclusion that the statements were false when made, as required, and Defendants acted with scienter, particularly under the stringent pleading requirements of the PSLRA.  *Meitav Dash Provident Funds & Pension Ltd.*, 79 F.4th at 1216 (balancing the reasonable inferences of scienter to determine whether the inference of scienter is "strong").  Taken as whole in context, the allegations in the Complaint suggest DISH was overly ambitious about its deadlines for what Plaintiffs acknowledge was an extremely risky plan reliant on developing unproven technologies.  This is insufficient to state a claim for securities fraud in Count I and to support the derivative claims in Count II.  *See Fleming Co., Inc.*, 264 F.3d at 1270.  Accordingly, the Court grants the Motion and dismisses the claims.

---

[4] Here too, Defendants cite and discuss numerous additional comments that provide context for the challenged statements and suggest that DISH disclosed that building out a network capable of supporting enterprise customers represented a long-term goal, rather than something it had already achieved, and that significant work remained before it could realize substantial revenue in that market (D. 66 at 16–18).

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendants' Motion To Dismiss The Second Amended Class Action Complaint (D. 66) is GRANTED and Plaintiffs' claims are dismissed. The Clerk of Court shall close this case.

DATED March 20, 2025.

BY THE COURT:

Gordon P. Gallagher
United States District Judge