FILED
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**February 17, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

SAI NAVEEN LINGAM; WARREN W.
GREGORY, individually and on behalf of
all others similarly situated,

       Plaintiffs - Appellants,

v.

DISH NETWORK CORPORATION;
CHARLES W. ERGEN; MARC
ROUANNE; STEPHEN BYE; DAVE
MAYO,

       Defendants - Appellees.

No. 25-1157

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:23-CV-00734-GPG-KAS)**

_____

Christopher M. Jackson, Holland & Hart LLP, Denver, Colorado (Shannon L. Hopkins,
Gregory M. Potrepka, and David C. Jaynes, Levi & Korsinsky, LLP, Stamford,
Connecticut, with him on the briefs), appearing for Appellants.

Brian T. Frawley, Sullivan & Cromwell, LLP, New York, New York (James K. Vincenti
and Matthew J. Seelig, Sullivan & Cromwell, LLP, New York, New York; and Kelley B.
Duke, Ireland, Stapleton, Pryor & Pascoe, P.C. Denver, Colorado, with him on the brief),
appearing for Appellees.

_____

Before **HOLMES**, Chief Judge, **MATHESON**, Circuit Judge, and **HEIL**,[*] Chief District Judge.

_____

**MATHESON**, Circuit Judge.

_____

Plaintiffs Sai Lingam and Warren Gregory, both purchasers of stock in Defendant Dish Network Corporation ("DISH"), filed this securities class action against DISH and certain DISH executives.  They asserted fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and U.S. Securities Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5.

The operative second amended complaint ("SAC") alleged that "DISH undertook an 'extremely risky' plan to create a wireless [5G[1]] network 'based on brand new and unproven technologies.'"  *Lingam v. Dish Network Corp.*, No. 23-cv-00734-GPG-KAS, 2025 WL 872464, at *1 (D. Colo. Mar. 20, 2025) (quoting Aplt. App. at 22).  It further alleged that Defendants "made materially false

_____

[*] The Honorable John F. Heil, Chief District Judge, United States District Court, Northern District of Oklahoma, sitting by designation.

[1] According to the Federal Communications Commission ("FCC"), "5G stands for the fifth generation of mobile communications. This next generation of technology promises consumers faster data rates with lower latency, or delays, in transmitting data. It also promises more capacity for a more efficient network. 5G is being designed with flexibility in mind, to support future services and applications that may not even exist today."  5G FAQs, Fed. Commc'n Comm'n, www.fcc.gov/5g-faqs [https://perma.cc/C4TA-PL6N].

and misleading statements and omissions relating to the capabilities and progress of

DISH's 5G network development and deployment, DISH's purported relationships

with enterprise customers, the rate at which DISH expected to achieve enterprise

revenues, and the purported demand in the enterprise segment." *Id.* at *2 (quoting

Aplt. App. at 56).

Defendants moved to dismiss the SAC for failure to state a claim upon which

relief could be granted. The district court granted that motion, dismissed the SAC,

and entered judgment in favor of defendants. Plaintiffs now appeal. Exercising

jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

### A. *Legal Background*

To aid in understanding the SAC's allegations, the district court's analysis,

and the parties' arguments, we provide a brief overview of the applicable law.

### 1.  Section 10(b) and Rule 10b-5

"Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated

thereunder 'prohibit making any material misstatement or omission in connection

with the purchase or sale of any security.'" *Smallen v. W. Union Co.*, 950 F.3d 1297,

1304 (10th Cir. 2020) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S.

258, 267 (2014)). "To establish a violation under Section 10(b) and Rule 10b-5, a

plaintiff must prove" five essential elements:

> (1) the defendant made an untrue or misleading statement of material
> fact, or failed to state a material fact necessary to make statements not
> misleading; (2) the statement complained of was made in connection

3

> with the purchase or sale of securities; (3) *the defendant acted with
> scienter, that is, with intent to defraud or recklessness*; (4) the plaintiff
> relied on the misleading statements; and (5) the plaintiff suffered
> damages as a result of his reliance.

*Id.* (quoting *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1200 (10th Cir. 2015)).  Only
the first and third elements are at issue in this appeal.

"Scienter is a mental state embracing [1] intent to deceive, manipulate, or
defraud, or [2] recklessness."  *Id.* (quotations omitted).  "Intentional misconduct is
easily identified since it encompasses deliberate illegal behavior."  *Id.* (quotations
omitted).  "Recklessness, on the other hand, is defined as conduct that is an extreme
departure from the standards of ordinary care, and which presents a danger of
misleading buyers or sellers that is either known to the defendant or is so obvious
that the actor must have been aware of it."  *Id.* at 1304-05 (quotations omitted).  "In
the securities-fraud context, recklessness is akin to conscious disregard—allegations
of negligence or even gross negligence fall below the high threshold for liability
under Section 10(b) of the Exchange Act."  *Id.* at 1305 (quotations omitted).

"Although an inference of scienter need not be irrefutable, . . . it must be more
than merely plausible or reasonable."  *Id.* (quotations omitted).  "Because the
inference must be powerful or cogent not only in its own right but strong in light of
other explanations, we must consider plausible, nonculpable explanations for the
defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* (alterations and
quotations omitted).  "Under this standard, a complaint survives dismissal only if a
reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *Id.*
(quotations omitted).

### 2. Section 20(a)

Section 20(a) "creates liability for certain controlling persons of entities who
violate securities laws." *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1246
(10th Cir. 2022). "Section 20(a) liability is" thus "derivative of [Section] 10(b)."
*Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 894 n.8 (4th Cir. 2014). In other
words, "there can be no liability under § 20(a) without an underlying violation of
securities law." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th
802, 816 (6th Cir. 2022).

### 3. Pleading requirements

"We review de novo a district court's grant of a motion to dismiss for failure
to state a claim." *In re Overstock Sec. Litig.*, 119 F.4th 787, 798 (10th Cir. 2024).
"To survive a motion to dismiss, a complaint must contain sufficient factual matter,
accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.
Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). "Federal Rule of Civil
Procedure 9(b) requires all litigants alleging fraud or mistake to state with
particularity the circumstances constituting fraud, but allows plaintiffs to generally

allege that the defendant acted with the requisite state of mind." *In re Overstock*,

119 F.4th at 798 (quotations omitted).[2]

    "But private parties alleging securities fraud face a heavier pleading burden."

*Id.* "The Private Securities Litigation Reform Act of 1995 ('PSLRA') requires

plaintiffs alleging securities fraud to plead with particularity (1) the facts constituting

the alleged violation and (2) the facts showing the defendant's intention to deceive,

manipulate, or defraud." *Id.* (quotations omitted).[3] "Accordingly, securities

---

    [2] Federal Rule of Civil Procedure 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

    [3] The PSLRA, 15 U.S.C. § 78u-4, provides:

**(b) Requirements for securities fraud actions**
**(1) Misleading statements and omissions**
In any private action arising under this chapter in which the plaintiff alleges that the defendant--
**(A)** made an untrue statement of a material fact; or
**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
**(2) Required state of mind**
**(A) In general**
Except as provided in subparagraph (B), in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

plaintiffs cannot allege generally that the defendant acted with scienter, as Fed. R.

Civ. P. 9(b) allows." *Id.* "Securities plaintiffs must instead, 'with respect to each act

or omission alleged . . . state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C.

§ 78u-4(b)(2)). "The inference of scienter 'must be more than merely "reasonable"

or "permissible"—it must be cogent and compelling.'" *Id.* (quoting *Tellabs, Inc. v.*

*Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007)).

### B. *Factual Background*

The following facts are based on the allegations in the SAC.[4]

### 1. The Parties

Plaintiffs Lingam and Gregory each purchased DISH Class A common stock

between February 22, 2021 and February 22, 2023 (the "Class Period").[5]

DISH is a Nevada corporation with its principal place of business in Colorado.

DISH's Class A common stock was traded on the Nasdaq Global Select Market

("NASDAQ").

The individual DISH Defendants ("DISH Executives") are Charlie Ergen,

co-founder and Chairman of the Board of Directors; Dave Mayo, Executive Vice

---

[4] *See Thomas v. Kaven*, 765 F.3d 1183, 1188 n.1 (10th Cir. 2014) (holding that, in
the context of an appeal from a motion to dismiss for failure to state a claim, this court
accepts all well-pled factual allegations in the complaint as true).

[5] In addition to Mr. Lingam and Mr. Gregory, the SAC designated as plaintiffs "all
others similarly situated." Aplt. App. at 15. The case has not proceeded beyond a
putative class action.

President of Network Development; Marc Rouanne, Executive Vice President and
Chief Network Officer; and Stephen Bye, Chief Commercial Officer, Executive Vice
President, and a Board member.

2. **The 5G Network Plan**

Since its inception, DISH has provided television programming to its
customers via satellite broadcast.  Although the business was profitable for decades,
the DISH Executives became concerned that the rapid rise in "on-demand
programming delivered via the internet" endangered the business.  Aplt. App. at 21.
They decided to change course and "construct a novel, nationwide 5G wireless
network . . . to service mainly enterprise [i.e., business and wholesale] customers
because the retail wireless market was already saturated."  *Id.*  They intended for the
network "to permit network slicing—layering of multiple networks on a single
infrastructure—and the creation of private 5G networks to be able to meet each
enterprise customer's individual needs."  *Id.* at 35.

To pursue this plan, DISH acquired Boost Mobile ("Boost") from Sprint in
July 2020.  Boost is a retail wireless provider with approximately nine million
customers.  When DISH completed the acquisition of Boost, DISH also obtained "the
right to use T-Mobile's existing network to provide wireless service to Boost
customers for at least seven years."  *Id.* at 36.  When it acquired Boost, DISH
committed to the FCC and the Department of Justice that DISH's 5G network would
cover at least 20 percent of the United States population by June 2022 and 70 percent
by June 2023.  Failure to meet the first deadline could cost DISH nearly $200 million

in cash penalties.  Failure to meet the second deadline "could cost DISH $2.2 billion in cash penalties and billions more in forfeited spectrum licenses."  *Id.* at 37.

### 3.  **Plan Implementation**

DISH began constructing its 5G network in 2019.  "[I]nstead of engaging an experienced wireless network manufacturer that could build a functioning 5G wireless network based on proven designs and industry standards, DISH chose to design a novel, 'Open-RAN' network"[6] that "was based on brand new and unproven technologies."  *Id.* at 21-22.  "Constructing an Open-RAN network was theoretically cheaper . . . because it would enable the network operator to select the most competitively priced vendors rather than relying upon . . . one manufacturer."  *Id.* at 22.  "But it was extremely risky because Open-RAN technology was new and unproven at this scale."  *Id.*  Using an Open-RAN network would require DISH "to develop customized software systems to integrate the antenna, radios . . . and other necessary hardware from disparate manufacturers."  *Id.* at 33.

Because DISH's commitment to the FCC did not require DISH to demonstrate any functionality of its network by the initial June 2022 deadline, at some point in 2021 and 2022 the DISH Executives instructed employees to build out the physical infrastructure of the network before the associated software was complete and without regard to functionality.  A confidential witness ("CW3") who worked as a

---

[6] "Open-RAN" means "Open Radio Access Network" and "refers to a network that does not require each of the components to be manufactured by a single [Original Equipment Manufacturer]."  Aplt. App. at 31-32.

DISH software vendor and later as a DISH employee referred to this approach as "a 'license save' buildout instead of a network buildout that focused on network functionality." *Id.* at 38. CW3 also said the DISH Executives understood that doing this "would require them to return later and 'densify' the network by adding additional radio towers and to optimize the location and orientation of those radios in order for DISH to have a functional, commercial-scale network." *Id.*

"[I]n December 2020, DISH conducted a single 'First Call' wherein one text message was sent to DISH's headquarters to purportedly 'validate' that the 5G network was functional." *Id.* at 41. At that time, however, DISH's network "did not operate consistently or reliably." *Id.*

In early 2021, "DISH conducted a beta test of [its] Las Vegas network." *Id.* The test indicated "the network was unusable because [the] network was not accessible from devices on the market, frequently could not establish a reliable connection to a DISH cell site, and could not perform basic functions, like a voice call or a reliable data session." *Id.*

"[B]y April 2021, DISH was experiencing supply chain issues and was unable to acquire the necessary hardware" for its network. *Id.* at 46. DISH decided to engage Amazon Web Services ("AWS") in April 2021 "to circumvent the supply chain issues." *Id.* This decision meant that DISH would change its "network architecture from a single platform to a multi-cloud platform." *Id.* That in turn "required that everything be retested" and effectively delayed "the 5G network's software development . . . by eight or ten more months." *Id.*

By September 2021, the primary vendors responsible for building the software to integrate the network, Mavenir and Rakuten, had not yet tested or validated the software. Indeed, "the software was still in such a primitive phase that it lacked even basic functionality." *Id.* at 42. In early 2022, "Rakuten pulled out of the project . . . after being unsuccessful at developing the necessary software." *Id.*

In May 2022, DISH engaged Samsung to provide software for the network. DISH first deployed the Samsung software in February 2023. But DISH "still needed to 'densify' and 'optimize' its network for it to be marketable." *Id.* at 49. As a result, "DISH merely had a baseline network and . . . had not yet developed products that enterprise customers wanted or needed." *Id.* at 53.

In late 2023, DISH's network continued to lack optimization because it "was not accessible about 10% of the time, even for critical uses like 911 calls." *Id.* at 49. Further, the "network was still not sufficiently developed to be commercially viable, even for retail use." *Id.* at 50. DISH thus continued to rely on other wireless carriers to provide network services to DISH's mobile customers.

### C. *Procedural Background*

Plaintiffs filed this action on March 23, 2023, and twice amended their complaint,[7] filing the SAC on February 23, 2024. Plaintiffs purported to bring the

---

[7] The original complaint alleged "that DISH had 'overstated its operational efficiency and maintained a deficient cybersecurity and information technology infrastructure.'" *Lingam*, 2025 WL 872464, at *1 (quoting Compl. at 2, ECF No. 1). Plaintiffs later "abandoned that theory and shifted to asserting that" the complained-of

action "on behalf of themselves and all persons and entities . . . who purchased or otherwise acquired DISH . . . Class A common stock" during the Class Period. *Id.* at 20.

### 1. **The SAC**

The SAC alleged that, during the Class Period, the DISH Executives "made materially false and misleading statements and omissions relating to the capabilities and progress of DISH's 5G network development and deployment, DISH's purported relationships with enterprise customers, the rate at which DISH expected to achieve enterprise revenues, and the purported demand in the enterprise segment." *Id.* at 56. The SAC listed 19 statements as allegedly false and/or misleading.

The SAC alleged two claims. Count I alleged a violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, against all Defendants. Count I further alleged that, throughout the Class Period, the Defendants "carried out a plan, scheme, and course of conduct . . . intended to . . . (i) deceive the investing public . . . ; (ii) artificially inflate and maintain the market price of DISH common stock; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire DISH common stock at artificially inflated prices." *Id.* at 121. Also, Defendants allegedly, "[i]n furtherance of this unlawful scheme," took

---

changes in DISH's stock price "were due to statements about DISH's planning and delayed launch of a cellular network." *Id.*

various actions, including making "untrue statements of material facts and/or

omitt[ing] material facts necessary to make the statements made not misleading." *Id.*

Count II alleged a violation of Section 20(a) of the Exchange Act, 15 U.S.C.

§ 78t, against the DISH Executives, "as controlling persons of DISH." *Id.* at 124.  It

alleged the DISH Executives "controlled the conduct of the Company's business and

its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of

the Exchange Act." *Id.*  Also, the DISH Executives, by allegedly violating

Section 10(b) of the Exchange Act and Rule 10b-5, were "liable pursuant to

Section 20(a) of the Exchange Act." *Id.* at 125.

2. **Motion to Dismiss and Order**

On March 29, 2024, Defendants moved to dismiss the SAC under Federal

Rules of Civil Procedure 9(b) and 12(b)(6).  They argued that the SAC pled no

actionable misstatement, alleged no facts establishing a cogent or compelling

inference of scienter, and pled no loss causation.

Defendants grouped the 19 statements into two categories of alleged

misrepresentations: (1) network integration and (2) enterprise commercialization.

In response, Plaintiffs adopted the same categories.

a. *Section 10(b) claim*

On March 20, 2025, the district court granted the Defendants' motion.

*Lingam*, 2025 WL 872464, at *1.  Starting with the Section 10(b) claim, the court

noted that, although they alleged 19 material misleading statements, "Plaintiffs d[id]

not emphasize any particular statement" and "none of the[] [19 statements] st[ood]

out as particularly important or definitive." *Id.* at *3. The court "focus[ed] its

analysis on one statement representing each category that appear[ed] to have the best

chance of meeting the required [pleading] standards." *Id.*

i. <u>First category statement</u>

On the network integration category, the district court analyzed the following

statement from DISH's Q1 2021 Form 10-Q that was filed on April 29, 2021 ("First

Category Statement"):

> During December 2020, we completed a successful field validation,
> utilizing our fully-virtualized standalone 5G core network and the
> industry's first O-RAN compliant radio. We began construction of our
> first major market, Las Vegas, Nevada, during the second quarter of
> 2021. We anticipate service for this market to begin by the end of the
> third quarter of 2021.

*Id.* at *4.

> The district court said Plaintiffs argued this statement

> was false and misleading when made because DISH had not completed
> a successful field validation utilizing a fully virtualized standalone 5G
> core network but had only sent a single text message which was not
> sufficient by industry standards to validate the 5G network because it
> did not validate data, voice, or any other essential element of network
> functionality and because DISH and its vendors had not yet created the
> software and other critical technologies needed to integrate the network.

*Id.* (quotations omitted).

The court found Plaintiffs' argument was "perplexing because Plaintiffs d[id]

not appear to dispute what the statement actually sa[id]"—"that DISH's network was

a fully-virtualized standalone 5G core network (despite its limited functions at the

time), that the test was performed using a [sic] industry's first O-RAN compliant

14

radio, or that the test was a successful field validation of a network functionality, namely, text messaging." *Id.* (quotations omitted). The court further said "Plaintiffs' arguments that the validation only involved sending a single text message, was not sufficient for industry standards for validating a whole network, and did not validate every essential aspect [we]re perplexing because the [challenged] statement [wa]s not to the contrary." *Id.*

As for the scienter requirement, the district court noted that "Plaintiffs point[ed] to alleged facts suggesting indirectly that Defendants were aware of the limited nature of [the] validation test, such as the frequent meetings" discussing the progress of the network construction (this included bi-weekly 5G Summit, weekly Software Development meetings, and weekly and bi-weekly Vendor Meetings). *Id.* The court concluded, however, that "[n]one of the cited allegations support a conclusion that Defendants knew or were reckless about whether saying they had carried out a 'successful field validation' would deceive investors into believing that they had accomplished what Plaintiffs assert would be the misleading takeaway, i.e., that Defendants had validated DISH's 5G network according to industry standards for all essential elements of network functionality including data and voice." *Id.* "Indeed, it is hard to see how any investor could have taken such an expansive understanding of the validation when the next sentence states that DISH just 'began construction of our first major market,' reflecting the nascent stage of DISH's network operations." *Id.*

As for Plaintiffs' assertion the statement was false "because in April 2021,
DISH could not reasonably expect commercial launch in any cities by 3Q or 4Q 2021
due to the integration issues," the district court concluded "there [wa]s nothing to
suggest that this [wa]s anything more than hindsight." *Id.* at *5 (quotations omitted).
At worst, the district court concluded, "Defendants' launch prediction was an overly
optimistic forward-looking statement." *Id.* The district court also concluded that,
"[d]espite a wealth of allegations about how bad the integration and construction
issues turned out to be, Plaintiffs present nothing showing that Defendants knew by
April 29, 2021, that it would turn out so badly." *Id.*

      ii.  Second category statement

On the enterprise commercialization category, the district court analyzed
Mr. Bye's statement during DISH's Analyst Day on May 10, 2022 ("Second
Category Statement"):

> So the best way to think about it is *we're starting to grow that revenue
> this year. We already got customers, we're growing that revenue this
> year.* Think of it as sort of the private 5G network space. *We see that
> scaling in 2023 and clearly picking up momentum as we go into '24 and
> beyond.* But as I said, there's a long sales cycle when you're dealing
> with enterprise. So it's a ramp that's going to take some time to kind of
> ramp up. The way to look at the sort of revenue as it builds up is really
> going to be about private 5G networks. And then over time, it becomes
> far more transactional as enterprise customers take advantage of the API
> gateway and the transactions that are available through that gateway.
>
> I'm not going to give you a year-by-year forecast of what that looks
> like. But *think of it as early revenue this year, scaling into '23, and
> then picking up momentum into '24 and then '25.* If I look at the size of
> the opportunity, I said it's about $30 billion in 2025 for the private 5G
> as a service. And what I really was pointing out with the 20% is that's
> where we see our long-term sustainable market share over time. So

think of that as beyond 2025 is where we think our sustainable
competitive market share position will be. I actually I think it will be a
little higher than 20%, given the advantages that we have today, but I
think it's going to scale up over time.

So I won't give you specific numbers through those years, *but you'll see
it picking up through '23, '24 and clearly into '25, as we get more
momentum into '25.*

*Id.* (emphases added).[8]

The district court noted that, according to Plaintiffs, "this [Second Category

Statement] was 'materially false and misleading when made because Defendants

were focusing on developing the bare infrastructure to meet the FCC requirements at

the expense of the other elements that were necessary to make the network functional

and relevant to enterprise customers and, therefore, were not seeing growth,

momentum, or revenue from enterprise customers.'" *Id.* (quoting Aplee. App., Vol. 2

at 344). The court concluded Mr. Bye's statements were "entirely consistent with"

the explanation of Plaintiffs' confidential witness 2 ("CW2") that "DISH had

enterprise customers and revenue in 2021 and 2022 from spectrum leases." *Id.* at *6.

Further, the court concluded that "Plaintiffs['] cited allegations do not even suggest

that this optimistic forward-looking statement ha[s] turned out to be false in

hindsight, much less that [Mr.] Bye knew of or was reckless about its falsity." *Id.*

\* \* \* \*

_____

[8] According to Plaintiffs, only the italicized portions of Mr. Bye's statement were
false or misleading.

In sum, the district court concluded as to both the First and Second Category
Statements as well as "the remainder of the alleged misrepresentations" that
"Plaintiffs' allegations simply do not support a conclusion that the statements were
false when made, as required, and Defendants acted with scienter, particularly under
the stringent pleading requirements of the PSLRA." *Id.* Rather, "the allegations in
the Complaint," when considered "as whole in context," "suggest DISH was overly
ambitious about its deadlines for what Plaintiffs acknowledge was an extremely risky
plan reliant on developing unproven technologies." *Id.* "This is insufficient to state
a claim for securities fraud in Count I and to support the derivative claims in
Count II." *Id.*

The district court entered final judgment on March 31, 2025. Plaintiffs timely
appealed.

## II. **DISCUSSION**

Plaintiffs argue the district court erred in dismissing their Section 10(b) claim
because it considered only two of the 19 alleged false or misleading statements and
because its analysis of the First and Second Category Statements was wrong. They
further challenge the dismissal of their Section 20(a) claim because it derives from
their Section 10(b) claim. We conclude the district court did not err. Plaintiffs failed
to meet the heightened pleading standards under Rule 9(b) and the PSLRA.

A. ***Section 10(b) Claim***

1. **District Court's Two-Statement Analysis**

Plaintiffs argue the district court erred by analyzing only two of the SAC's 19 alleged false statements, contending that "[p]roper consideration of an alleged misstatement's context necessarily requires reviewing courts to perform a statement-by-statement falsity analysis." Aplt. Br. at 21.

The district court did not err. In addressing a motion to dismiss a Section 10(b) complaint, a court typically should "perform [its] analysis statement by statement, considering each statement in turn" and "evaluat[ing] the immediate context of each statement." *Zhou v. Desktop Metal, Inc.*, 120 F.4th 278, 293 (1st Cir. 2024). But here the district court's analysis of the Section 10(b) issue was consistent with the manner in which both parties framed their arguments on the motion to dismiss the SAC.

In their motion, Defendants criticized Plaintiffs' "pleading tactic" in the "107-page, 286-paragraph" SAC of "simply declar[ing]" all 19 alleged misstatements as "'materially false and misleading' for the same rote reasons." Aplee. App., Vol. 1 at 22, 23. Defendants grouped the alleged misstatements into two categories: (1) "Network Development and Deployment"; and (2) "Enterprise Demand for Network Functionality." *Id.* at 25, 27.

Rather than challenge this approach, the Plaintiffs followed suit in their opposition to the motion. As the district court noted, rather than discuss why each of the 19 statements was false or misleading, Plaintiffs

(1) "divide[d]" the "nineteen material misleading statements" "into two categories"— "network integration and launch" and "construction of network infrastructure for enterprise customers;"

(2) "d[id] not emphasize any particular statement;" and

(3) "present[ed] each statement in [an attached] chart with all of the allegations they contend[ed] render[ed] it misleading and all of the allegations they contend[ed] show[ed] it was made with the requisite scienter."

*Lingam*, 2025 WL 872464, at *3; *see also* Aplt. Br. at 22 (Plaintiffs acknowledging they "divided the nineteen alleged false statements into two categories by subject matter").

Faced with the parties' two-category approach and finding that "none of [the 19 statements] st[ood] out as particularly important or definitive," *Lingam*, 2025 WL 872464, at *3, the district court reviewed the SAC "taken as a whole" and "focus[ed] its analysis on one statement representing each category that appear[ed] to have the best chance of meeting the required [pleading] standards," *id.* at *3, *6.  In doing so, the court followed "the principle of party presentation," under which the parties "frame the issues for decision" while the court serves as "neutral arbiter of matters the parties present."  *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (quotations omitted); *see also* 16A Wright & Miller's Federal Practice & Procedure § 3950.7 (3d ed. 2025) (under "party presentation" principle, "courts do not ordinarily reach out to decide issues not presented by the parties").  We see no reason to fault the court for taking this course.

Plaintiffs assert the district court "provided no reasoning for its determination that the two selected statements 'appeared' to have the 'best chance' of being actionable, or why those statements' context should be foisted on the remaining seventeen." Aplt. Br. at 22-23. But on appeal, they do not show, let alone argue, that the court picked the wrong statements.[9] They also contend "it was wholly improper for the District Court to conclude all statements in the same category are inactionable for the same reason." *Id.* at 23. But they do not attempt to explain why the First and Second Category statements are not representative of the rest.

The Plaintiffs chose to address the alleged misstatements under the two categories and failed to present a detailed statement-by-statement analysis showing how the SAC could have met the Rule 9(b) and PSLRA heightened pleading

---

[9] In district court, Plaintiffs' briefing in opposition to the motion to dismiss suggested just the opposite. Plaintiffs started their arguments about the "Network Integration and Launch" category with discussion about the First Category Statement chosen by the district court. Aplee. App., Vol. 2 at 302. And in their discussion of the "Enterprise Demand for Network Functionality" category, they focused on Mr. Bye, including the Second Category Statement chosen by the district court. *Id.* at 309-10.

On appeal, rather than contend the district court should have selected a different statement to represent each category, Plaintiffs assert that "Defendants outright admitted falsity for one of the alleged misstatements the District Court did not analyze." Aplt. Br. at 23. For support, they say that "[o]n February 22, 2021, Defendant Rouanne falsely stated that DISH had successfully '**brought radios, compute [and] software together**,'" suggesting DISH had "achieved integration," "yet shortly thereafter, on November 4, 2021, Defendant Mayo revealed that the network launch would be 'delayed' because DISH was having trouble 'just getting the radio software and the core network software to work together and be reliable,'" meaning "DISH had not achieved integration." *Id.* (quoting Aplt. App. at 58, 88-89).

But as Defendants note in response, Mr. Rouanne never stated nor suggested that DISH had "achieved integration" of all the components of its proposed network. Aplee. Br. at 33-34. We agree.

requirements.  As a result, they effectively invited the district court to evaluate the

SAC and decide the motion based on analyzing the First and Second Category

statements.  *See generally Quinn v. Young*, 780 F.3d 998, 1017 (10th Cir. 2015)

(accepting plaintiffs' "framing of th[eir] claim").[10]  Also, given their failure to

conduct a statement-by-statement analysis in their briefing, Plaintiffs could not

reasonably expect the court to parse their densely-composed 24-page chart attached

to their response to the motion and conduct its own statement-by-statement

analysis.[11]  We find no error in the district court's analytical approach under the

circumstances.[12]

---

[10] At oral argument, Plaintiffs' counsel continued to group the statements by category and discussed only a subset of the SAC's 19 statements, effectively conceding that analyzing all 19 statements was not necessary.  Oral Arg. at 12:30-16:37.

[11] In the summary judgment context, a district court has no "obligat[ion] to comb the record in order to make [the plaintiff's] arguments for him."  *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000).  The same principle applies here: the district court was not obligated to parse the Plaintiffs' chart to determine whether each of the 19 misstatements was (a) false and misleading, and (b) made with scienter.  *See also In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339 n.8 (10th Cir. 2012) (disapproving "plaintiff's tendency to excerpt long passages including statements and, to a large degree, leave the Court to the task of teasing out which specific statements [we]re at issue." (alterations and quotations omitted)).

[12] Even assuming the district court erred by failing to address all 19 alleged misstatements, the error likely would be an invited one that is "not reviewable on appeal."  *United States v. Baker*, 155 F.4th 1188, 1200 (10th Cir. 2025); *see United States v. Teerlink*, 141 F.4th 1126, 1131 (10th Cir. 2025) ("Our invited-error doctrine . . . prevents a party who induces an erroneous ruling from being able to have it set aside on appeal." (quotations omitted)); *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 149 F.4th 1142, 1148 (10th Cir. 2025) ("We apply the doctrine only when the record clearly shows that a party previously supported an action and later challenges it on appeal."); *United States v. Edward J.*, 224 F.3d 1216,

2. **First Category Statement**

As noted above, the district court analyzed the following statement contained

in DISH's Q1 2021 Form 10-Q filed on April 29, 2021:

> During December 2020, we completed a successful field validation,
> utilizing our fully-virtualized standalone 5G core network and the
> industry's first O-RAN compliant radio.  We began construction of our
> first major market, Las Vegas, Nevada, during the second quarter of
> 2021.  We anticipate service for this market to begin by the end of the
> third quarter of 2021.

*Lingam*, 2025 WL 872464, at *4.  The parties dispute whether the SAC

plausibly satisfied the (a) false or misleading and (b) scienter elements of a

§ 10(b) claim.

    a.  *False or misleading*

        i.  <u>Plaintiffs' arguments</u>

Plaintiffs argue this statement was false or misleading based on the following.

First, the statement "gave reasonable investors the misimpression that DISH

had conducted a robust validation of the entire 5G network, when it had not," that

"the validation had been achieved" using "DISH's *entire* network," and that "the

'successful field validation' [wa]s a key milestone for DISH's shortly anticipated

commercial launch in a major U.S. metropolis."  Aplt. Br. at 25.

Second, "DISH's purported 'field validation" consisted of a single text

message and did not test any other network functionality such as voice calling or data

---

1222 (10th Cir. 2000) ("The invited error doctrine prevents a party from inducing
action by a court and later seeking reversal on the ground that the requested action
was error." (quotations omitted)).

connections." *Id.* Relying on CW2, Plaintiffs claim a single text was not a "field validation" under "industry standards." Aplee. App., Vol. 2 at 324.

Third, "DISH had not developed the software needed to integrate the network by December 2020 (or anytime in 2021) so its core functionality did not work." Aplt. Br. at 26. Plaintiffs rely on CW3's view that the software to integrate the 5G network had not been developed. *Id.* at 26-27.

Fourth, as of April 2021, DISH could not have reasonably expected to commercially launch its network in any cities by the third quarter of 2021 due to network integration issues. *Id.* at 28.[13]

    ii. <u>Analysis</u>

The SAC fell short of pleading the statement was false or misleading.

<u>First sentence</u> – Plaintiffs do not contest that in December 2020, DISH sent a text message on the fully-virtualized 5G network it had assembled with O-RAN-compliant radio technology. Their reliance on CW2 and CW3 is misplaced.

According to the SAC, CW2 "was employed at DISH in [its] Wireless division prior to January 2021 and continuing at least through October 2022" and "was responsible for planning and developing products to be offered to enterprise

---

[13] Plaintiffs also argue the district court "further erred by inserting its own words into Defendants' misstatements, thereby changing their context and meaning." Aplt. Br. at 29. Whether or not that is so, we review the two challenged statements de novo.

    Plaintiffs attempt in their opening brief to insert their own words into the First Category Statement, asserting that "[w]hat the statement actually says . . . is that DISH completed the field validation 'utilizing' its ***entire*** 'fully-virtualized standalone 5G core network.'" *Id.* (emphasis added).

customers." Aplt. App. at 29. The SAC failed to allege that CW2 was an expert in

"field validation" or was familiar with that phrase in SEC filings. Nor did the SAC

otherwise allege that "field validation" has an accepted meaning in the cellular

industry or among investors.

The SAC identified CW3 as an employee of "one of DISH's primary software

vendors" during part of 2021 and 2022. *Id.* CW3's statement about DISH's software

development is irrelevant to whether the first sentence was false or misleading if

CW2's statement, or any of the other allegations in the SAC, could not show "field

validation" has an established meaning among investors. That is, if an investor could

reasonably understand "field validation" to mean a single text message, DISH's

underdeveloped software did not render the sentence false or misleading. Instead, we

agree with the district court that this sentence accurately states "that DISH had a

successful field validation (of something) using its network (that has certain

characteristics)." *Lingam*, 2025 WL 872464, at *4.

Second sentence – In their brief, Plaintiffs do not challenge the statement that

DISH began construction in Las Vegas during the second quarter of 2021.

Third sentence – This sentence accurately stated DISH's plans for the

remainder of 2021. The district court correctly observed that Plaintiffs' "allegations

showing that DISH was aware [in April 2021] of significant integration issues and

that much additional work would be needed to launch by the end of the year" do not

"indicate that DISH was not planning to accomplish those tasks on that timeline." *Id.*

at *5. The third sentence thus was a "pure statement[] of opinion" or "optimism" that

is "not capable of objective verification." *Hampton v. root9B Tech., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018) (quotations omitted). It cannot be a material misstatement unless it "inaccurately represent[s] the speakers' beliefs concerning then-present factual conditions." *Id.* (quotations omitted).

b. *Scienter*

The SAC also failed to state with particularity facts giving rise to a strong inference that the First Category Statement was made with knowledge of or reckless disregard of falsity. *See* 15 U.S.C. § 78u-4(b)(2).

Plaintiffs argue that "Defendants knew the network's core functionality would not work because . . . DISH's focus in 2021 through at least the first half of 2022 was on 'saving the license' to meet the June 2022 FCC coverage deadline, rather than building a functional network." Aplt. Br. at 27 (quoting Aplt. App. at 38). They also say that

(1) Mr. Mayo "served as executive vice president of Network Development responsible for DISH's wireless buildout strategy and the deployment of its 5G network," *id.* at 33;

(2) the DISH Executives attended bi-weekly 5G Summit meetings from 2020 to 2022 where software development and network integration issues were discussed, *id.*; and

(3) the DISH Executives attended bi-weekly Vendor Meetings and weekly Software Development meetings and were told by CW3 in April 2021 "that DISH was too far behind developing and testing the network's software such that there was no point in even discussing a launch of retail customer service in 2021," *id.* at 34.

Much of our preceding analysis on the false or misleading element shows that Plaintiffs failed to plead scienter on the first sentence. We agree with the district

court that "[n]one of the cited allegations support a conclusion that Defendants knew
or were reckless about whether saying they had carried out a 'successful field
validation' would deceive investors into believing that they had . . . validated . . . all
essential elements of network functionality including data and voice." *Lingam*,
2025 WL 872464, at *4.  As the court explained, "Had Defendants wanted to deceive
investors about their progress, it seems unlikely that they would have" included the
second sentence, which advised that DISH was beginning construction of its network
in Las Vegas.  *Id.*

Apart from our conclusion that the third sentence was a statement of opinion,
Plaintiffs' allegations do not support a strong inference of scienter under the PSLRA.
Although "corporate executives . . . cannot make material representations to
shareholders in disregard or contravention of obvious facts," *SEC v. GenAudio Inc.*,
32 F.4th 902, 924 (10th Cir. 2022), that was not what the SAC alleged.  The DISH
Executives' awareness of the 2020 validation test's limited nature does not impeach
their hope to launch service in Las Vegas by the end of 3Q 2021.  It falls far short of
establishing intent to deceive, manipulate, or defraud investors.  The same goes for
the DISH Executives' alleged awareness of the network development and integration
issues.  The Plaintiffs allege that CW3 told the DISH Executives in April 2021 that it
was doubtful DISH could launch retail customer service in 2021, but they do not
allege that CW3's opinion was widely shared by others, including the DISH
Executives, or even correct.  Finally, the third sentence cannot reasonably be

interpreted as meaning that DISH intended to launch retail customer service, as opposed to enterprise service, in Las Vegas by the end of 2021.

In sum, the district court properly determined that the SAC failed to establish the false/misleading or scienter elements for a § 10(b) claim under the heightened Rule 9(b) and PSLRA pleading standards.

### 3. Second Category Statement

As noted, the district court analyzed Mr. Bye's statement during DISH's Analyst Day on May 10, 2022, on DISH's revenue from enterprise customers:

> So the best way to think about it is *we're starting to grow that revenue this year. We already got customers, we're growing that revenue this year.* Think of it as sort of the private 5G network space. *We see that scaling in 2023 and clearly picking up momentum as we go into '24 and beyond.* But as I said, there's a long sales cycle when you're dealing with enterprise. So it's a ramp that's going to take some time to kind of ramp up. The way to look at the sort of revenue as it builds up is really going to be about private 5G networks. And then over time, it becomes far more transactional as enterprise customers take advantage of the API gateway and the transactions that are available through that gateway.
>
> I'm not going to give you a year-by-year forecast of what that looks like. But *think of it as early revenue this year, scaling into '23, and then picking up momentum into '24 and then '25.* If I look at the size of the opportunity, I said it's about $30 billion in 2025 for the private 5G as a service. And what I really was pointing out with the 20% is that's where we see our long-term sustainable market share over time. So think of that as beyond 2025 is where we think our sustainable competitive market share position will be. I actually I think it will be a little higher than 20%, given the advantages that we have today, but I think it's going to scale up over time.
>
> So I won't give you specific numbers through those years, *but you'll see it picking up through '23, '24 and clearly into '25, as we get more momentum into '25.*

*Lingam*, 2025 WL 872464, at *5 (emphases added).

a. *False or misleading*

i. <u>Plaintiffs' arguments</u>

Plaintiffs argue this statement was "false when made because . . . [Mr.] Bye cut the enterprise product budget in late 2020 or early 2021 to less than $10,000 to focus resources on meeting the FCC deadline," and the remaining budget "was insufficient to fund the development or testing of enterprise products." Aplt. Br.at 37-38. They assert that "as of May 2022, VoNR, a technology critical for enterprises, was not working," a "Q2 2022" analysis "showed DISH's 5G network did not have adequate coverage for enterprise customers," and "as of May 2022, DISH had no 5G network revenue from enterprise customers." *Id.* at 38. Plaintiffs also note that during a February 2023 call, Mr. Ergen "admitted DISH never had enterprise revenue from the 5G network and would not have any until DISH implemented VoNR." *Id.*

In district court, Plaintiffs asserted that the highlighted portions of this statement were "materially false and misleading when made because," at that time, "Defendants were focusing on developing the bare infrastructure to meet the FCC requirements at the expense of the other elements that were necessary to make the network functional and relevant to enterprise customers" and, as a result, they "were not seeing growth, momentum, or revenue from enterprise customers." Aplee. App., Vol. 2 at 344. They pointed to three contemporaneous allegations:

(1) CW1, who was employed at DISH's Retail Wireless Operations segment, said in May 2022 that DISH's network "could only support a few users at that time and . . . was not scalable." *Id.*

(2) CW3, who was employed by one of DISH's primary software vendors,
learned that "SVP Heather Campbell . . . and the [radio frequency] team
had done an analysis around Q2 2022" and "concluded that . . . DISH did
not have network coverage in the right areas and would not be able to
provide . . . potential enterprise customers with the right experience using
the network DISH had built." *Id.*

(3) In May 2022, Defendants "disclosed . . . that DISH's critical software
vendor, Mavenir, was never able to handle the integration of DISH's
physical infrastructure," which "requir[ed] DISH to ultimately hire
Samsung" later in 2022. *Id.*

Plaintiffs point to these same contemporaneous allegations in their opening appellate

brief. Aplt. Br. at 51.

        ii. <u>Analysis</u>

The district court correctly determined that the SAC failed to establish that

Mr. Bye's comments were false or misleading. The three contemporaneous

allegations say nothing about the number or trend of DISH enterprise customers in

May 2022. Indeed, based on CW2's statements, the SAC stated that DISH had been

entering into lease agreements with enterprise customers. Even if the spectrum

leases fell outside DISH's 5G network, CW2 corroborated Mr. Bye's statement that

DISH was acquiring enterprise customers. Mr. Bye did not say the enterprise

customers would use DISH's 5G network.

The remaining highlighted portions of Mr. Bye's statement reported what he

hoped DISH would achieve in enterprise customer growth and were thus statements

of opinion or optimism. Because Plaintiffs did not allege that Mr. Bye did not

believe those statements, they were not material misstatements under § 10(b).

b. *Scienter*

On scienter, Plaintiffs repeat their arguments about falsity. They argue that

(1) Mr. Bye "cut the enterprise budget in late 2020 or early 2021 to less than
    $10,000 to focus resources on meeting the FCC deadline." Aplt. Br. at 37.

(2) Based on CW2's statements, this budget "was insufficient to fund the
    development or testing of enterprise products." *Id.* at 38.

(3) An "analysis in Q2 2022 showed DISH's 5G network did not have
    adequate coverage for enterprise customers." *Id.*

(4) Mr. Ergen admitted during a February 2023 call that "DISH never had
    enterprise revenue from the 5G network and would not have any until
    DISH implemented VoNR." *Id.*

For the reasons stated in our analysis of the false or misleading element, we

conclude that the SAC's allegations are insufficient to give rise to a strong inference

that Mr. Bye, when he made the Second Category Statement, intended to deceive,

manipulate, or defraud investors, or that he acted recklessly. *See* 15 U.S.C.

§ 78u-4(b)(2).

## B. *Section 20(a) Claim*

Plaintiffs limit their argument challenging the dismissal of their § 20(a) claim

to two sentences: "The district court dismissed Plaintiffs' §20(a) claim for lack of a

primary Exchange Act violation. Because the falsity and scienter rulings were

erroneous, it was error to dismiss the §20(a) claim." Aplt. Br. at 59 (citations

omitted). Because we conclude the district court correctly dismissed Plaintiffs'

§ 10(b) claim, we affirm dismissal of the § 20(a) claim.

### III. **CONCLUSION**

We affirm the district court's judgment.

UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157
Clerk@ca10.uscourts.gov

Christopher M. Wolpert                                              Jane K. Castro
Clerk of Court                                               Chief Deputy Clerk

February 17, 2026


Shannon L Hopkins
David Jaynes
Gregory M Potrepka
Levi & Korsinsky
1111 Summer Street, Suite 403
Stamford, CT 06905

Christopher Michael Jackson
Holland & Hart
555 17th Street, Suite 3200
Denver, CO 80202

RE:    **25-1157, Lingam, et al v. Dish Network Corporation, et al**
       Dist/Ag docket: 1:23-CV-00734-GPG-KAS

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has
entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(d)(1), any petition for rehearing must be filed within 14
days after entry of judgment. Please note, however, that if the appeal is a civil case in
which the United States or its officer or agency is a party, any petition for rehearing must
be filed within 45 days after entry of judgment. Parties should consult both the Federal
Rules and local rules of this court with regard to applicable standards and requirements.
In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length,
and no answer is permitted unless the court enters an order requiring a response. *See* Fed.
R. App. P. Rule 40 and 10th Cir. R. 40 for further information governing petitions for
rehearing.

Please contact this office if you have questions.

Sincerely,

Christopher M. Wolpert
Clerk of Court

cc:     Kelley Bergelt Duke
        Brian T. Frawley
        Matthew J. Seelig
        James K. Vincenti

CMW/jjh